ADVOCATES FOR FAITH & FREEDOM
Robert H. Tyler (SBN 179572)
btyler@faith-freedom.com
Julianne Fleischer (SBN 337006)
jfleischer@faith-freedom.com
25026 Las Brisas Road
Murrieta, California 92562
Telephone: (951) 304-7583

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MADISON MCPHERSON, an individual; A.M., a minor by and through her mother and natural guardian, MARIBEL MUNOZ, individually; H.H., a minor by and through her mother and natural guardian, HANAN HAZAMEH, individually;<br><br>Plaintiff(s)<br><br>v.<br><br>JURUPA UNIFIED SCHOOL DISTRICT; CALIFORNIA INTERSCHOLASTIC FEDERATION; and CALIFORNIA DEPARTMENT OF EDUCATION;<br><br>Defendant(s) | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES:**<br><br>1) **VIOLATION OF TITLE IX - SEX DISCRIMINATION**<br>2) **EQUAL PROTECTION VIOLATION – SEX DISCRIMINATION**<br>3) **VIOLATION OF FREE SPEECH CLAUSE**<br>4) **VIOLATION OF FREE EXERCISE CLAUSE**<br><br>**ACTION SEEKING STATEWIDE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

### INTRODUCTION

1.      This lawsuit seeks to protect the rights of female student-athletes who have been deprived of equal educational opportunities and athletic participation by the California Department of Education ("CDE"), the California Interscholastic Federation ("CIF"), and Jurupa Unified School District ("District" or "JUSD").

2.      Plaintiffs are three current and former female athletes at Jurupa Valley High School ("JVHS"). Defendants have knowingly permitted a male[1] student to compete on the JVHS varsity girls' track and field and volleyball teams, access female locker rooms and bathrooms, and engage in harassing conduct toward female athletes.

3.      As a result of Defendants' actions, Plaintiffs have suffered sex discrimination, including sexual harassment, unsafe and unfair athletic environments, viewpoint discrimination, and infringements on their religious liberty and safety. These actions have deprived them of equal opportunities and their civil rights guaranteed by Title IX, the Equal Protection Clause of the Fourteenth Amendment, and the First Amendment.

4.      When Plaintiffs A.M. and H.H. most recently informed their coach that they were uncomfortable sharing the volleyball court and locker room with a male student, the coach retaliated by removing them from team group chats and communications, and telling one of the girls, "If you want to be a captain and a member of our team, then be one."

5.      Plaintiffs have been intimidated by an intentionally hostile environment created by Defendants wherein they were bullied by school officials to censor their objections to competing with, and against, a male and to sharing intimate and private spaces with a male.

6.      As recognized by California Governor Gavin Newsom in 2025, it is "deeply unfair" unfair for girls to compete against boys.[2]

---

[1] "Male," "Female, "Boy," and "Girl" used in this Complaint refer solely to binary, biological sex and not a person's "gender identity." *See Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (Title IX defines "sex" "based on biology and reproductive function."); Black's Law Dictionary (5th ed. 1979) ("**Sex**. The sum of the peculiarities of structure and function that distinguish a male from a female organism[.]"); *see also Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 655 (2020) ("Sex" in the Civil Rights Act of 1964 "refer[s] only to biological distinctions between male and female"); *see also* Executive Order No. 14168, "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (2025) ("'Sex' shall refer to an individual's immutable biological classification as either male or female. 'Sex' is not a synonym for and does not include the concept of 'gender identity.'").

[2] *Gavin Newsom calls trans sports participation 'deeply unfair,' breaking with Democrats*, NBC News, https://www.nbcnews.com/nbc-out/out-politics-and-policy/california-gov-gavin-newsom-breaks-democrats-trans-sports-participatio-rcna195165.

7.    Plaintiffs seek relief because Defendants' decision to allow a male student to compete on the 2025–2026 girls' varsity volleyball team has not only led other schools to forfeit matches against Jurupa Valley High School, further depriving Plaintiffs of fair athletic opportunities, but has also forced Plaintiffs themselves to abstain from participating in games and practices due to the male athlete's unlawful participation on their girls' varsity team.

8.    Plaintiffs file this action to stop Defendants' illegal sex discrimination against female student athletes.

## PARTIES - PLAINTIFFS

9.    Plaintiff Madison McPherson, a female, is a former student athlete at Jurupa Valley High School and, at all times relevant to this Complaint, a resident of Riverside County, California.

10.    Plaintiff A.M., a minor female, is a twelfth-grade female student athlete at Jurupa Valley High School and, at all times relevant to this Complaint, a resident of Riverside County, California.

11.    Plaintiff H.H., a minor female, is a twelfth-grade female student athlete at Jurupa Valley High School and, at all times relevant to this Complaint, a resident of Riverside County, California.

12.    Plaintiff Maribel Munoz is A.M.'s mother and natural guardian. At all times relevant to this Complaint, Munoz is a resident of Riverside County, California.

13.    Plaintiff Hanan Hazameh is H.H.'s mother and natural guardian. At all times relevant to this Complaint, Hazameh is a resident of Riverside County, California.

## PARTIES - DEFENDANTS

14.    Defendant Jurupa Unified School District ("JUSD" or "District") is a school district in Riverside County, California. JUSD is a current and past recipient of federal funding. Defendant District is responsible for the adoption and implementation of District policies and ensuring its agents enforce District policies, state law, and federal law.

15.    Defendant California Interscholastic Federation ("CIF") is a statewide, voluntary non-profit association, made up of 1,615 public, public charter, and private high schools that are aligned into 10 geographical sections for the purpose of governing education-based athletics in

Grades 9 through 12. CIF oversees Defendant JUSD's athletic program. Defendant CIF's member schools, including JUSD, are current and past recipients of federal funding.

16.     Defendant California Department of Education ("CDE") is a current and past recipient of federal funding. CDE distributes federal funding to public and private local schools, including to schools participating in interscholastic athletics within the Central District of California.

17.     Defendant CDE, under the California Education Code, has authority over the interscholastic athletic policies of Defendant CIF and local school districts, including JUSD. Cal. Educ. Code § 33354(a)(1).

18.     All Defendants are responsible for the implementation and application of federal law, state law, and District policies.

## JURISDICTION AND VENUE

19.     This civil rights action raises federal questions under the United States Constitution, specifically the First and Fourteenth Amendment, brought pursuant to 42 U.S.C. § 1983, and under federal law, specifically Title IX.

20.     This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

21.     This Court has authority to grant the requested declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, implemented through Rule 57 of the Federal Rules of Civil Procedure. This Court is also authorized to grant injunctive relief and damages under 28 U.S.C. § 1343, pursuant to Rule 65 of the Federal Rules of Civil Procedure, and reasonable attorney's fees and costs under 42 U.S.C. § 1988.

22.     This Court has authority to award costs, attorneys' fees and expert witness fees under 42 U.S.C. § 1988(b) and (c).

23.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

**STATEMENT OF FACTS**

**A.  PLAINTIFFS' BACKGROUND**

    **i.**    **Plaintiffs' Athletic and Academic Background**

24.    Plaintiffs McPherson, A.M., and H.H. are avid athletes and have dedicated their lives to high level athletic competition.

25.    McPherson is a former Jurupa Valley High School ("JVHS") multi-sport athlete who participated in varsity track and field, soccer, and volleyball. She currently competes as a collegiate volleyball player.

26.    As a high school freshman, McPherson played both club and varsity high school soccer, while also joining a club volleyball program.

27.    During her high school sophomore year, McPherson played varsity volleyball, varsity soccer, and varsity track and field. She served as captain of her volleyball team and distinguished herself by earning several awards, including Volleyball Offensive MVP All-League, Soccer League Champion, and multiple All-Academic Awards.

28.    As a high school junior, McPherson served as captain of the girls' varsity volleyball team. Under her leadership, the team won a League Championship and the CIF Southern Section Division 8 Title. McPherson was named League MVP and Athlete of the Month and received an All-Academic Award. She also continued to compete in varsity soccer and varsity track and field, where she earned additional awards and recognition.

29.    As a high school senior, McPherson maintained her leadership role in volleyball as varsity captain and continued to play on the varsity soccer team. She continued to receive various awards, including volleyball All League MVP, Athlete of the Month (8/2023), and multiple All-Academic Awards across volleyball and soccer.

30.    In addition to her athletic skill, McPherson excelled academically, maintaining a cumulative GPA of 4.0.

31.    McPherson's younger sister, Plaintiff A.M., is also a multi-sport athlete at JVHS, competing in varsity volleyball, varsity soccer, and track and field. She is currently a senior at JVHS.

32.     As a freshman, A.M. played on the junior varsity volleyball team, where she earned the Best Defensive Player Award and an All-Academic Award. She also competed on the varsity soccer team, helping them secure a League Championship and receiving Honorable Mention along with an All-Academic Award. In addition, she played club volleyball and club soccer.

33.     During her sophomore year, A.M. advanced to varsity volleyball, where she contributed to a League Championship, was named to the First Team, and earned another All-Academic Award. In varsity soccer, she again helped capture a League Championship, was recognized with a Second Team award, and earned an All-Academic Award. She also competed in track and field in the 100m and 200m events, starting on junior varsity before earning opportunities to compete at the varsity level.

34.     During her junior year, A.M. continued to excel in volleyball, helping lead the varsity team to another League Championship.

35.     As a senior, A.M. serves as captain of the varsity volleyball team and a starter, continuing her leadership role on and off the court. On September 2, 2025, she was awarded Athlete of the Month by Principal Todd Moerer.

36.     In addition to her athletic skill, A.M. has excelled academically, maintaining a cumulative GPA of 4.3.

37.     Plaintiff H.H. is also a multi-sport athlete at JVHS, competing in varsity volleyball and varsity track and field. She is currently a senior at JVHS.

38.     During her freshman year, H.H. competed in varsity track and field, participating in the triple jump, long jump, 200-meter, and 400-meter events. She earned recognition as an All-Academic athlete and contributed to her team winning the Girls Mountain Valley League Championship.

39.     In her sophomore year, H.H. joined varsity volleyball, where she contributed to the team winning the League Championship and earned All-Academic honors. The team advanced to CIF Round 3. H.H. continued competing in varsity track and field, maintaining her All-Academic status and demonstrating high-level performance across multiple events.

40.     During her junior year, H.H. continued to excel in volleyball and track and field. She helped the varsity volleyball team win the League Championship and earned All-Academic recognition. In track and field, H.H. competed at the varsity level, again earning All-Academic honors and consistently placing in competitions.

41.     In her senior year, H.H. remains an active member of the varsity volleyball team as a starter and will again be competing in track and field in the upcoming track and field season.

42.     In addition to her athletic skill, H.H. has excelled academically, maintaining a cumulative GPA of 4.3.

### ii.    Plaintiffs' Religious Background

43.     Plaintiffs Munoz, McPherson, and A.M. are practicing Catholics who believe that God created human beings as male and female and that gender is a fixed characteristic that cannot be changed. Their faith informs their understanding of human identity and shapes their views regarding the importance of recognizing and honoring the distinctives of male and female as created by God.

44.     Plaintiffs Hazameh and H.H. are practicing Muslims whose religious obligations prevent H.H. from exposing her hair or body to males, including by wearing a hijab. Guided by Islamic teachings, they believe that men and women have distinct biological differences, roles, and responsibilities, which should be respected and upheld. Their faith emphasizes modesty, dignity, and the honoring of gender distinctions which must conform with one' biological sex in both practice and identity.

45.     Based on these sincerely held religious beliefs, Plaintiffs McPherson, A.M., and H.H. object to sharing locker rooms with members of the opposite sex and to participating on athletic teams that include members of the opposite sex. Plaintiffs also object to any inappropriate and unwelcomed physical contact with males.

46.     Based on their sincerely held religious beliefs, Plaintiffs Hazameh and Munoz also object to their daughters being required to share locker rooms or teams with males and inappropriate physical contact with males.

47.     Due to fear and intimidation caused by school administrators, Plaintiffs have felt intimidated, silenced. and unable to state their religious objections.

**B. SCOPE OF TITLE IX**

48.     Congress enacted Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, to prohibit sex-based discrimination in federally funded education programs. Section 901(a) provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

49.     Title IX was designed to eliminate significant "discrimination against women in education" and to ensure that biological women received "equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities." *See Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 766 (9th Cir. 1999); *United States v. Virginia*, 518 U.S. 515, 532 (1996).

50.     Title IX was adopted in response to widespread educational discrimination against women, particularly in admissions and faculty employment. *See* H.R. Rep. No. 92-554, at 51–52; 116 Cong. Rec. 6398–6400.

51.     In the hearings on equal rights, Dr. Bernice Sandler called for protections for women in education because, "Sex prejudice is so ingrained in our society that many who practice it are simply unaware that they are hurting women. Let me reiterate, –it is the last socially acceptable prejudice." Hearings, Ninety-first Congress, second session, on S.J. Res. 61, May 5, 6, and 7, 1970, p. 415.

52.     Senator Birch Bayh, Title IX's chief sponsor, stated the bill was designed to "guarantee that women, too, enjoy the educational opportunity every American deserves." 117 Cong. Rec. 32,476–79; 118 Cong. Rec. 5808 (1972).

53.     Senator Bayh further stressed that Title IX "provide[d] equal access to women and men" but did not "desegregate" spaces and activities that have long been sex-separated. 117 Cong. Rec. 30407 (1971). Senator Bayh recognized that regulations would be necessary to "allow

enforcing agencies to permit differential treatment by sex only, . . . such as . . . in sports facilities or other instances where personal privacy must be preserved." 118 Cong. Rec. 5807.

54.    Title IX does have exemptions that allow for traditionally male-only and female-only activities, so long as similar opportunities are permitted for the opposite sex. *See* 20 U.S.C. § 1686; 34 C.F.R. §§ 106.33, 106.41(b).1.

55.    Under Title IX, "sex, like race and national origin, is an immutable characteristic determined solely by" biology. *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality opinion).

56.    As a whole, biological males have physiological advantages over biological females. *See Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) ("The record makes clear that due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team. Thus, athletic opportunities for women would be diminished."); *Cape v. Tennesee Secondary School Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) (overturned on other grounds) ("It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement.").

57.    Scientific research demonstrates that biological males, on average, possess significant physiological advantages over biological females, including greater height and body mass, larger and stronger muscles and bones, increased lung capacity, and higher cardiac output. While these advantages are greatest after puberty, they begin at birth. *See, e.g.*, Frank Falkner, J.M. Tanner, Human Growth: Postnatal Growth, p. 286 (1976) ("Boys demonstrate, on the average, greater strength than girls at all ages.").

58.    As Justice Stevens put it, "[w]ithout a gender–based classification in competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events." *O'Connor v. Bd. of Ed. of Sch. Dist. 23*, 449 U.S. 1301, 1307 (1980) (Stevens, J., in chambers).

59.     At the time of Title IX's enactment, the dictionary definitions of "sex" demonstrate that Congress meant *biological* sex when it prohibited discrimination on the basis of "sex" in education. *See Adams v. Schl. Bd. of St. Johns Cty.*, 58 F.4th 791 (2022) (citing Sex, American Heritage Dictionary of the English Language *(*1976) ("The property or quality by which organisms are classified according to their reproductive functions."); Sex, American Heritage Dictionary of the English Language (1979) (same); Sex, Female, Male, Oxford English Dictionary (re-issue ed. 1978) (defining "sex" as "[e]ither of the two divisions of organic beings distinguished as male and female respectively," "female" as "[b]elonging to the sex which bears offspring," and "male" as "[o]f or belonging to the sex which begets offspring, or performs the fecundating function of generation"); Sex, Webster's New World Dictionary (1972) ("[E]ither of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions."); Sex, Female, Male, Webster's Seventh New Collegiate Dictionary (1969) (defining "sex" as "either of two divisions of organisms distinguished respectively as male or female," "female" as "an individual that bears young or produces eggs as distinguished from one that begets young," and "male" as "of, relating to, or being the sex that begets young by performing the fertilizing function"); Sex, Random House College Dictionary (rev. ed. 1980) ("[E]ither the male or female division of a species, esp. as differentiated with reference to the reproductive functions.").

60.     The Department of Health, Education and Welfare (the predecessor to the Department of Education) issued regulations for Title IX that took effect in 1975. *See* 34 C.F.R. § § 106.1-106.82.

61.     These regulations required that, if an entity subject to Title IX provides athletic programs or opportunities separated by sex, then it must do so in a manner that "provide[s] equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).

62.     Equal athletic opportunity can be determined by whether such athletic opportunities "effectively accommodate the interests and abilities of both sexes." 34 C.F.R. § 106.41(c).

63.     Here, the "governing principle" is that "the athletic interests and abilities of male and female students must be equally effectively accommodated." Policy Interpretation, 44 Fed. Reg. 71,413, 71,414 (1979).

64.     More specifically, the District must accommodate the physical abilities of girls "to the extent necessary to provide equal opportunity in . . . levels of competition," and competitive opportunities "which equally reflect their abilities." Policy Interpretation, 44 Fed. Reg. at 71,417-418.

65.     As another aspect of equal athletic opportunity, implementing regulations and guidance state that male and female athletes "should receive equivalent treatment, benefits and opportunities." Policy Interpretation, 44 Fed. Reg. at 71,415.

66.     The "equal treatment" to which girls are entitled includes equal "opportunities to engage in . . . post-season competition," *id.* at 71,416, equal opportunities for public recognition, 34 C.F.R. § 106.41(c), and the right to be free of any policies which are "discriminatory in . . . effect" or that have the effect of denying "equality of athletic opportunity." 44 Fed. Reg. at 71,417.

67.     An institution is only in compliance "if the compared program components are equivalent, that is, equal or equal in effect." *Id.* at 71,415.

68.     Accordingly, Title IX is understood to require the allocation of equal opportunities based on biological sex alone without regard to or consideration of gender identity. When an institution creates a team for one sex, "it must do so for members of the other sex" given certain conditions are met. *Id.*

69.     In 2024, the Biden administration issued provisions aimed at expanding Title IX. The new regulations stated that Title IX forbids discrimination based on sexual orientation or gender identity.

70.     On January 9, 2025, a federal judge invalidated the Biden administration's regulations citing several legal flaws, including that the United States Education Department exceeded its authority by expanding the scope of Title IX. *Tennessee v. Cardona*, No. CV 2:24-072-DCR, 2025 WL 63795 (E.D. Ky. Jan. 9, 2025), as amended (Jan. 10, 2025).

71.     On January 20, 2025, President Donald Trump issued an Executive Order "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." *See* Executive Order 14168 (2025) ("EO").

72.     The EO recognized that "ideologues who deny the biological reality of sex have

VERIFIED COMPLAINT

increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women." *Id.*

73.    The EO states that it "is the policy of the United Staes to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality."  Under the EO, the "executive Branch will enforce all sex-protective laws to promote this reality."

74.    Pursuant to EO, the provided definitions for "sex," "women," "men," "female," and "male" "shall govern all Executive interpretation of and application of Federal law and administration of policy." *Id.*

75.    Specifically, "sex" "shall refer to an individual's immutable biological classification as either male or female. 'Sex' is not a synonym for and does not include the concept of 'gender identity.'" *Id.*

76.    The EO further recognizes that "gender identity" "reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." *Id.*

77.    Pursuant to EO, "[e]ach agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes." *Id.*

78.    Further, the EO states that "[f]ederal funds shall not be used to promote gender ideology." *Id.*

79.    The EO reinstates the federal protections for women under Title IX that the Biden and Obama administrations attempted tom remove through executive aciton.

80.    Title IX may be enforced by a private right of action. *Cannon v. University of Chicago*, 441 U.S. 677 (1979). "[A] damages remedy is available for an action brought to enforce Title IX." *Franklin v. Gwinnet County Public Schools*, 503 U.S. 60, 76 (1992).

81.    All public schools in California, including JVHS, receive federal funds covered by Title IX, and thus are subject to the requirements of Title IX.

VERIFIED COMPLAINT

## C. DEFENDANTS' AUTHORITY OVER ATHLETICS

82. Defendant CDE oversees Defendant CIF, which governs high school athletics in California.

83. Under the California Education Code, CDE has authority over interscholastic athletic policies of Defendant CIF and local school districts, including JUSD. Cal. Educ. Code § 33354(a)(1).

84. CDE is currently, and has been for many years, a recipient of federal financial assistance from various federal agencies, including the United States Department of Education ("USDOE").

85. CIF's member schools are recipients of federal funding.

86. Under the Implementing Regulations, CDE is required to comply with Title IX, the Implementing Regulations, and ensure equal athletic opportunities regardless of "any State or local law . . . rule or regulation of any organization, club, athletic or other league, or association." 34 C.F.R. § 106.6(b)-(c).

87. JUSD, CDE, and CIF currently have policies that violate Title IX. These policies discriminate against girls in interscholastic athletics by mandating that schools allow boys to compete in girls' sports, which denies girls equal educational opportunities. These policies also force girls to share intimate spaces, such as locker rooms, with boys, causing a hostile and unsafe educational environment that denies girls educational opportunities.

88. JUSD Administrative Regulation 6145.2 ("AR 6145.2") provides, "[e]ach student shall be allowed to participate in any single-sex athletic program or activity consistent with the student's gender identity, of the gender listed on the student's records, for which the student is otherwise eligible to participate."

89. In 1976, the California legislature enacted California Education Code section 221.5, which prohibits elementary and secondary schools from discriminating against students based on their *sex* in both academic and non-academic courses.

90. Section 221.5 was amended a couple times before Tom Ammiano (D), a member of the California State Assembly from 2008-2014, introduced AB 1266 in 2013. After the bill passed

VERIFIED COMPLAINT

both the Assembly and the Senate in summer 2013, Governor Brown signed it into law in August 2013 and AB 1266 became effective on January 1, 2014.

91.    Upon amendment, California Education Code section 221.5(f) (or AB 1266) provides, "a pupil shall be permitted to participate in sex-segregated school programs and activities, including athletic teams and competitions, and use facilities consistent with his or her *gender identity*, irrespective of the gender listed on the pupil's records." (emphasis added).

92.    The primary goal of AB 1266 was to "take away [] discretion from local school districts and create a uniform policy for participation in sports." Assembly Comm. on Educ. AB 1266, p. 2 (2013).

93.    The further purpose, according to the primary author of the bill, was to provide school districts with a method for dealing with transgender students playing sports in schools. Ammiano reasoned:

> [M]any school districts do not understand and are not presently in compliance with their obligations to treat transgender students the same as all other students in the specific areas addressed by this bill. As a result, some school districts are excluding transgender students from sex-segregated programs, activities and facilities. Other school districts struggle to deal with these issues on an ad hoc basis. Current law is deficient in that it does not provide specific guidance about how to apply the mandate of non-discrimination in sex-segregated programs, activities and facilities.

Senate Comm. on Educ., AB 1266, p. 4 (2013).

94.    Ammiano reasoned that AB 1266 was necessary because:

> When transgender students are denied the opportunity to participate in physical education classes in a manner consistent with their gender identity, they miss out on these important benefits and suffer from stigmatization and isolation. In addition, in many cases, students who are transgender are unable to get the credits they need to graduate on time when, for example, they do not have a place to get ready for gym class.

Assembly Comm. on Educ. AB 1266, p. 3 (2013).

95.    CDE currently has posted on its website guidance entitled "Gender Equity/Title IX," which states in part: "The laws found in the California Education Code 221.5-231.5 are collectively known as the Sex Equity in Education Act. These laws expand upon gender equity and Title IX laws

---

14

which provide guidance to California's education system. Each Local Educational Agency (LEA) will be responsible for following the laws in addition to Title IX requirements."[3]

96.    Article 30, Section 300(B)(3) of the CIF Constitution and Bylaws ("Girls Team") provides: "[w]henever the school provides only a team or teams for girls in a particular sport, boys shall not be permitted to qualify for the girls team in that sport unless opportunities in the total sports program for boys in the school have been limited in comparison to the total sports program for the girls in that school. Permission for boys to qualify for a girls' team must be secured through petition by the school principal to the Federated Council." CIF Constitution and Bylaws 2025-26 (Girls Team), https://www.cifstate.org/governance/constitution/Constitution_and_Bylaws.pdf.

97.    Article 30, Section 300(D) ("CIF Bylaw 300.D") specifically requires that California public high schools participating in interscholastic athletic activities must allow males to participate in girls' interscholastic athletics: "All students should have the opportunity to participate in CIF activities in a manner that is consistent with their gender identity, irrespective of the gender listed on a student's records." CIF Constitution and Bylaws 2025-26 (Gender Identity Participation), https://www.cifstate.org/governance/constitution/Constitution_and_Bylaws.pdf.

98.    On February 12, 2025, the USDOE notified CIF that it was commencing a Title IX investigation into its provision of student athletics that allows boys to compete in girls' athletic programs and to access girls' spaces, including bathrooms and locker rooms.

99.    On April 4, 2025, the USDOE notified CDE that it was commencing a Title IX investigation into its provision of student athletics that allows boys to compete in girls' athletic programs and to access girls' spaces, including bathrooms and locker rooms.

100.    On June 2, 2025, Assistant Attorney General Harmeet Dhillon of the Department of Justice, Civil Rights Division, sent a letter to California public schools informing them that CIF Bylaw 300.D was facially unconstitutional.

---

[3] CDE, Gender Equity/Title IX, https://www.cde.ca.gov/re/di/eo /genequitytitleix.asp.

VERIFIED COMPLAINT

101.    On July 7, 2025, CDE and CIF confirmed they would not voluntarily comply with Title IX, and the USDOE referred its findings of Defendants' Title IX violations to the United States Department of Justice for enforcement.

102.    On July 9, 2025, the United States filed a Title IX action against CDE and CIF. *United States of America v. California Interscholastic Federation et al*, No. 8:25-cv-01485-CV-JDE (C.D. Cal. July 9, 2025).

### D. DEFENDANTS' DISCRIMINATION AGAINST FEMALE STUDENTS IN ATHLETICS

103.    JVHS provides athletic programs separated by sex, including sex-specific track and field and volleyball teams, with separate boys' varsity and junior varsity teams and girls' varsity and junior varsity teams.

104.    By enforcing AB 1266, CIF Bylaw 300.D, and AR 6145.2, Defendants CDE, CIF, and JUSD, have allowed a male student, A.H., to compete on girls' sports teams and access girls' facilities, including bathrooms and locker rooms.

105.    As a result of A.H.'s participation in the JVHS girls' athletic program, Plaintiffs have suffered unfair athletic competition, safety risks, sexual harassment, and deprivation of equal educational opportunities resulting in harm to Plaintiffs and many other female athletes.

#### i.    Deprivation Of Fair Athletic Competition

106.    A.H. is a twelfth-grade male student athlete at JVHS who is and has been competing with and against female athletes in numerous sports from 2022 to the present with JUSD.

107.    A.H. has competed on the JVHS's girls' varsity track and field team since 2022.

108.    Plaintiffs McPherson and H.H., as members of the girls' varsity track and field team, were forced to compete with A.H. and lost higher rankings as a result.

109.    During the 2022-2023 track season, Plaintiff McPherson placed behind A.H. in multiple track and field events, including:[4]

---

[4] Jurupa Valley High School, *Track and field (Outdoor) 2023 Season*, ATHLETIC.NET, https://www.athletic.net/team/1707/track-and-field-outdoor/2023 (last visited Aug. 31, 2025).

VERIFIED COMPLAINT

| Date | Meet | Event | A.H. Place | A.H. Mark | McPherson Place | McPherson Mark |
|---|---|---|---|---|---|---|
| March 4, 2023 | Roosevelt Track and Field Invitational | Long Jump | 1st | 16'2" | 5th | 14'5" |
| March 4, 2023 | Roosevelt Track and Field Invitational | Triple Jump | 1st | 32'11.75" | 2nd | 31'10.75" |
| March 9, 2023 | JVHS v. A.B. Miller | Long Jump | 1st | 16'6" | 2nd | 14'6.5" |
| April 6, 2023 | JVHS v. Indian Springs | Long Jump | 1st | 16'11" | 3rd | 14'2" |
| April 6, 2023 | JVHS v. Indian Springs | Triple Jump | 1st | 35'0" | 2nd | 29'6" |

110.    McPherson grew frustrated and angry that, despite her high athletic ability, she was losing many placements—often first place—to A.H.

111.    In or around March 2023, A.H. posted a TikTok stating, "It must suck to come in second, while I'm over here getting all the medals," seemingly taunting McPherson who consistently came in second place behind A.H.

112.    Plaintiff Munoz, McPherson's mother, reported the video to Principal Shelley Morris and Assistant Principal Peter Zamora. Principal Morris and Assistant Principal Zamora stated they would investigate the situation. Neither McPherson nor her mother received any follow up communications regarding the "investigation."

113.    During the 2023-2024 track season, Plaintiff McPherson again placed behind A.H. in multiple track and field events, losing higher rankings as a result of his participation, including:[5]

---

[5] Jurupa Valley High School, *Track and field (Outdoor) 2024 Season*, ATHLETIC.NET, https://www.athletic.net/team/1707/track-and-field-outdoor/2024 (last visited Aug. 31, 2025).

VERIFIED COMPLAINT

| Date | Meet | Event | A.H. Place | A.H. Mark | McPherson Place | McPherson Mark |
|---|---|---|---|---|---|---|
| March 6, 2024 | JVHS v. A.B. Miller | High Jump | 1st | 4'5" | 2nd | 4'4" |
| March 6, 2024 | JVHS v. A.B. Miller | Long Jump | 1st | 16'9" | 3rd | 14'7" |
| March 6, 2024 | JVHS v. A.B. Miller | Triple Jump | 1st | 37'11" | 2nd | 28'5" |
| March 13, 2024 | JVHS v. San Bernardino | High Jump | 2nd | 4'6" | 1st | 4'8" (PR) |
| March 13, 2024 | JVHS v. San Bernardino | Long Jump | 1st | 17'9" | 2nd | 13'7" |
| March 13, 2024 | JVHS v. San Bernardino | Triple Jump | 1st | 35'5" | 2nd | 30'2" |
| March 27, 2024 | JVHS v. Patriot | High Jump | 3rd | 4'6" | 1st | 4'8" |
| March 27, 2024 | JVHS v. Patriot | Long Jump | Did Not Compete | – | 1st | 13'10.5" |
| March 27, 2024 | JVHS v. Patriot | Triple Jump | Did Not Compete | – | 1st | 30'2" |
| April 10, 2024 | JVHS v. Pacific | High Jump | 1st | 4'10" | 3rd | 4'2" |
| April 10, 2024 | JVHS v. Pacific | Long Jump | 1st | 18'7.5" | 3rd | 14'3.5" |
| April 10, 2024 | JVHS v. Pacific | Triple Jump | 1st | 39'11" | 2nd | 32'1" |
| April 17, 2024 | JVHS v. Rubidoux | High Jump | 1st | 4'10" | 2nd | 4'6" |
| April 17, 2024 | JVHS v. Rubidoux | Long Jump | 1st | 17'4" | 2nd | 14'5" |
| April 17, 2024 | JVHS v. Rubidoux | Triple Jump | 1st | 37'6" | 3rd | 29'2" |
| April 24, 2024 | League Meet | High Jump | 1st | 4'8" | 2nd | 4'6" |
| April 24, 2024 | League Meet | Long Jump | 1st | 16'9" | 2nd | 14'5" |
| April 24, 2024 | League Meet | Triple Jump | 1st | 35'0" | 2nd | 31'6" |
| April 24, 2024 | CIF-SS D3 Prelims | Triple Jump | 2nd | 37'3" | 25th | 32'6" |

114.    McPherson again grew frustrated and angry that, despite her high athletic ability, she was losing many placements—often first place—to A.H.

18

115.    Following her experience during the 2023-2024 season and as a result of consistently losing her 1st place position and other higher rankings across multiple events to a male student, McPherson refused to participate in the 2024-2025 track season during her senior year.

116.    At the completion of the 2024-2025 track season, A.H. won the CIF State Championship for the girls' high jump and triple jump.[6]

117.    During the 2024–2025 track season, Plaintiff H.H. continued to compete against A.H., consistently losing higher placements because of A.H.:[7]

| Date | Meet | Event | A.H. Place | A.H. Mark | H.H. Place | H.H. Mark |
|------|------|-------|-----------|-----------|-----------|-----------|
| March 1, 2025 | Roosevelt Invitational | Long Jump | 1st | 19' | 21st | 12'.5" |
| March 12, 2025 | JVHS v. Rubidoux | Long Jump | 1st | 18'7.5" | 3rd | 12'8" |
| March 12, 2025 | JVHS v. Rubidoux | Triple Jump | 1st | 40'2" | 3rd | 27'8" |
| March 22, 2025 | Yorba Linda Invitational | Long Jump | 1st | 19'6" | 35th | 10'3.25" |
| April 30, 2025 | River Valley League Championships | Long Jump | 1st | 19'5" | 11th | 12'8" |

118.    Of the approximately 16 CIF meets in which A.H. competed against girls during the 2024-2025 outdoor track and field season, he took home at least 36 first-place victories or gold medals.

119.    A.H.'s track performance demonstrates his biological advantage within the girls' track and field team. For example, on or about March 2025, at the Rancho Cucamonga Kickoff

---

[6] California Interscholastic Federation, *2025 CIF State Track and Field Championships Results*, CIFSTATE, https://www.cifstate.org/sports/track_and_field/past_results_records/2025_Results.pdf (last visited Sept. 4, 2025).

[7] Jurupa Valley High School, *Track and field (Outdoor) 2025 Season*, ATHLETIC.NET, https://www.athletic.net/team/1707/track-and-field-outdoor/2025 (last visited Aug. 31, 2025).

VERIFIED COMPLAINT

Classic, A.H. won girls' varsity long jump with a distance of approximately 18 feet – a result that would have placed only 20th among male competitors.[8]

120.    In addition to his inclusion on the girls' track and field team, A.H. has been and is also a current member on JVHS's girls' varsity volleyball team.

121.    Having competed with A.H. on volleyball, Plaintiffs have observed A.H.'s rapid athletic development, which they attribute to inherent biological advantages stemming from male physiology, including height, muscle mass, and vertical jumping ability.

122.    Plaintiffs also observed noticeable changes in A.H.'s physicality. Throughout 2023-2024, A.H. appeared to have undergone significant physical development and growth consistent with male puberty, including increased musculature, strength, and facial features becoming more defined.

123.    Plaintiffs observed that A.H. has progressed athletically far more quickly in volleyball than every other female athlete on the girls' varsity volleyball team, including Plaintiffs.

124.    Despite Plaintiffs' own year-round training, gym work, club volleyball participation, and nutritional supplements, they could not overcome the apparent biological advantages of A.H.

125.    Plaintiffs reasonably feared that their season's accomplishments would be devalued and invalidated because they were compelled to compete with a male athlete in girls' volleyball.

126.    Since the commencement of the 2025-2026 volleyball season, at least six schools have forfeited or canceled their matches against the JVHS girls' varsity volleyball team.

127.    Specifically, girls' varsity volleyball teams from Riverside Poly High School (August 15, 2025), Rim of the World High School (August 25, 2025), Aquinas High School (August 19, 2025), San Jacinto High School (August 21, 2025), Orange Vista High School (August 29,

---

[8] *Rancho Cucamonga Kickoff Classic Track and field Meet Results*, ATHLETIC.NET, https://www.athletic.net/TrackAndField/meet/586649/results/all (last visited Sept. 4, 2025).

VERIFIED COMPLAINT

2025), and A.B. Miller High School (September 10, 2025) all canceled or forfeited their matches against JVHS girls' varsity volleyball team.[9]

128.    It was widely reported that each of these six schools forfeited or canceled their matches against the JVHS girls' varsity volleyball team because they refused to compete against the male athlete, A.H.

129.    On August 20, 2025, Volleyball Coach Liana Manu gathered the girls' varsity team and informed the players, including Plaintiffs A.M. and H.H., that the game cancellations and further cancellations were likely because of A.H.'s participation, and that the continuation of the season depended on whether A.H. chose to step down.

130.    Plaintiffs A.M. and H.H. expressed that while they respected A.H. as a person, they wanted to preserve their right to compete and complete their senior season. Nonetheless, the school administration gave the decision to A.H. on whether to step down, instead of taking action to protect the female athletes.

131.    On August 22, 2025, A.H. informed teammates S.F. and C.O. that Principal Nancy Reyna had instructed him not to step down from the girls' volleyball team. That same day, C.O. told A.M. the same information during 4th-period.

132.    In a response given to a media outlet regarding the game forfeitures and cancellations, JVHS stated:

> We understand and acknowledge the disappointment of our Jurupa Valley High School athletes who are ready and prepared to play. Decisions to cancel matches were made by teams in other districts.

> As a public school district in California, JUSD is compelled to follow the law, which protects students from discrimination based on gender identity and requires that students be permitted to participate on athletic teams that are consistent with their gender identity (California Education Code 221.5 (f)). This is consistent with the guidance provided by California Attorney General Rob Bonta and California State Superintendent of Public Instruction Tony Thurmond.

---

[9] MaxPreps, *Jurupa Valley Jaguars Volleyball – Schedule*, 2025–26 Season, https://www.maxpreps.com/ca/jurupa-valley/jurupa-valley-jaguars/volleyball/schedule/ (last visited Sept. 2, 2025).

VERIFIED COMPLAINT

> We are proud of our JVHS Jaguars and their willingness to play any team and represent their school and our district with pride. We are currently working to find additional matches to give them that opportunity.

Jackson Thompson, More California Girls' High School Volleyball Teams Forfeit to Squad with Trans Athlete, Fox News (Aug. 24, 2025), https://www.foxnews.com/sports/more-california-girls-volleyball-teams-forfeit-squad-trans-athlete.

133.    In further response to these forfeitures, JVHS, without advance notice to the athletes or their families, arranged internal scrimmages among its own volleyball teams, including requiring the girls' varsity volleyball team to compete against the boys' varsity volleyball team.

134.    The inclusion of a male athlete on the girls' volleyball team and the subsequent game cancellations in response to his inclusion, deprive Plaintiffs and their teammates of meaningful athletic opportunities.

### ii.    Invasion of Intimate Spaces

135.    Additionally, Defendants have allowed A.H. to access intimate female spaces, including locker rooms and bathrooms.

136.    All Plaintiffs have at various times while students at JVHS, shared a locker room with A.H., which made them feel unsafe and uncomfortable.

137.    Plaintiffs experienced repeated discomfort when A.H. entered and lingered in the girls' locker room, often remaining inside after changing and making eye contact with female athletes and Plaintiffs while they were changing, which Plaintiffs found invasive and intimidating.

138.    During H.H.'s freshman year, H.H. and A.H. both enrolled in a 5th-period volleyball class to prepare for team tryouts. On occasion, A.H. entered the girls' locker room to change clothes while H.H. was present in the locker room.

139.    Because of her religious obligations and her own discomfort with sharing an intimate space with a male, H.H. attempted to avoid changing in A.H.'s presence by waiting until A.H. left the locker room, using the nurse's bathroom, or changing in the volleyball storage room.

140.    H.H. eventually had to expressly ask A.H. not to enter the area when she was changing.

141.    Similarly, McPherson and A.M. have experienced discomfort sharing the locker room with A.H. McPherson and A.M. have on multiple occasions chosen to use the nurse's bathroom or the individual stalls within the locker room rather than share space with A.H., because they felt uncomfortable with A.H.'s presence while changing.

142.    Using the individual stalls in the locker room was not a workable solution, as the gaps between stalls allowed visibility from the outside.

143.    Similarly, using the nurse's bathroom was not feasible because it separated Plaintiffs from their team, depriving them of the comradery, instruction, and discussion that often takes place in the locker room. Further, the nurse's bathroom was located a considerable distance from the girls' locker room. This arrangement also created difficulties during away games as the girls did not always have access to the nurse's bathroom.

144.    These measures taken by Plaintiffs to preserve their privacy and comply with their religious beliefs have created a stressful and uncomfortable environment. The need to avoid A.H. while changing has interfered with their ability to fully and comfortably participate in athletic activities.

145.    The circumstances in the locker room demonstrate the impact of the shared space on Plaintiffs, creating hostile conditions that require them to take extraordinary measures to protect their religious practices, personal dignity, and sense of safety while participating in school athletics.

### iii.    Sexual Harassment

146.    Beyond the locker room, A.H. engaged in unwelcomed and offensive contact, including slapping and/or placing his hands on female players' buttocks, including Plaintiffs, during practices, games, and huddles.

147.    On or about August 16, 2024, during a match against Hillcrest High School, Plaintiff Munoz, who routinely filmed games, observed and recorded that A.H. regularly placed his hands on Plaintiffs and their teammates' buttocks during play and team huddles. Attached is a true and correct image of A.H. (No. 4) with his hands on A.M.'s and H.H.'s buttocks:



148.    Plaintiffs felt violated and objectified by A.H.'s repeated inappropriate touching.

149.    In addition to experiencing physical discomfort in the locker room and during team activities, Plaintiffs have been subjected to repeated and unwelcome sexual comments and remarks in the athletic environment, creating an offensive atmosphere.

150.    In August 2023, during a summer practice, A.M. dove for a ball and landed on her chest. When she remarked about the pain, A.H. interjected, "Right, it hurts my boobs too when I land on them." This comment, made by a male, mocked A.M.'s anatomy and left her embarrassed and uncomfortable.

151.    In October 2023, before a home volleyball game, A.H. complained to Plaintiff A.M. that he was having "cramps" and "on his period." This statement caused shock and discomfort to A.M. because A.H.'s statement is a mere fantasy and marginalizes the pain shared by most women.

152.    On or about July 15, 2024, Plaintiffs McPherson and A.M. hosted a team bonding event for the girls' varsity volleyball team at their home.

153.    During the gathering, several girls engaged in casual conversation regarding their menstrual cycles.

154.    At that time, A.H. interjected and stated, "I don't have to worry about that, I have a custom coochie."

155.    This remark was sexual in nature and made Plaintiff McPherson and Plaintiff A.M., who were both present, uncomfortable.

156.    A.H.'s comment contributed to McPherson's growing sense that it would be difficult for her to enjoy her senior year under the circumstances created by A.H.'s continued presence on the girls' teams.

### iv.    Physical Harm

157.    A.H.'s inclusion in JVHS's girls' athletic program creates a dangerous environment that has resulted in physical harm to Plaintiffs and other female athletes.

158.    In addition to competitive inequity, A.H.'s presence creates ongoing safety concerns. A.H. has the strength to hit balls at a force greater than most female athletes yet lacks the skill to consistently control his strikes. On multiple occasions, A.H. struck opposing players' heads with the ball.

159.    Rather than expressing remorse when the players were injured, A.H. laughed, tapped his own head, and celebrated the point, even when it resulted in humiliating or injuring another player.

160.    In or around September 2024, during fifth period, A.H. boasted to A.M. and another student that he had recently caused three female volleyball players to suffer possible concussions.

161.    These incidents were unsafe, inappropriate, and damaging to the integrity of competition.

162.    In response, Coach Fernando Centeno restricted A.H. to hitting only from the back row. However, A.H. often ignored these instructions and attacked from the front row with force far exceeding female standards of play, endangering Plaintiffs and their teammates.

163.    In September 2024, while warming up before a home game, A.M. was paired with A.H. for drills. A.H., lacking control but wielding male strength, spiked a ball directly into A.M.'s face, striking her right side and leaving visible redness and causing her pain.

164.    Crying and holding her face, A.M. immediately went to her mother, Plaintiff Munoz, who was working in the snack bar, and reported that A.H. had spiked a ball directly into her face. Assistant Principal Zamora, who was standing next to Plaintiff Munoz, did not initiate concussion protocol, arrange for medical evaluation, or prepare an incident report. Instead, he merely asked if A.M. needed ice. A.M. held a cold soda can to her face, continued playing in the game, and later developed a headache.

165.    Assistant Principal Zamora's failure – along with that of other school administrators—to respond appropriately left A.M. feeling disregarded, unsafe, and unsupported in her athletic environment.

v.    **Failure of Administrators To Address Plaintiffs' Concerns**

166.    Plaintiffs have raised concerns with various school administrators about safety, fairness, discomfort, and fear resulting from A.H.'s inclusion on the girls' team, yet the school has taken no remedial action.

167.    From 2022-2024, on a nearly weekly basis during the volleyball pre-season and season, McPherson engaged in conversations with Coach Manu about her discomfort with A.H.'s presence on the volleyball team and in the locker room and the unfair nature of having a male on the girls' team.

168.    In response, Coach Manu repeatedly told McPherson to "focus on herself" and "control what she could control."

169.    However, McPherson could not control the fact that A.H. was permitted on the girls' sports teams or permitted in the girls' locker room.

170.    McPherson's concerns and complaints regarding A.H.'s participation on the girls' sports teams and permission to be in the girls' locker room were ignored and left unaddressed.

171.   In or around September 2022, Plaintiff McPherson, and her mother, Plaintiff Munoz, met with a school counselor to address the unfairness of allowing a male student, A.H., to participate on the girls' volleyball team.

172.   Plaintiffs McPherson and Munoz also raised concerns about privacy within the locker room due to A.H. lingering in the locker room and watching the girls. Plaintiffs McPherson and Munoz explained to the school counselor that McPherson and A.M. were uncomfortable changing in the presence of a male student.

173.   Plaintiff McPherson described the experience as feeling "like changing in the street" and "exposing herself for all to see."

174.   Plaintiff McPherson also reported to the school counselor that A.H. touched her and Plaintiff A.M.'s buttocks during volleyball activities. Plaintiff McPherson emphasized that this contact was inappropriate and made her feel uncomfortable.

175.   McPherson raised additional concerns regarding A.H.'s participation, including athletic advantages due to male physiology and puberty.

176.   In response, the school counselor advised McPherson and A.M. that they could use the nurse's restroom to change. She further stated that the school was "following state law." She indicated that McPherson's and Munoz's other concerns would be addressed at a "later time."

177.   The school counselor's suggestion that the girls use the nurse's bathroom appeared to favor A.H. at the expense of the other girls, requiring them to adjust their schedules to avoid the girls' locker room.

178.   Using the nurse's bathroom was not feasible because it separated Plaintiffs from their team, depriving them of the comradery, instruction, and discussion that often takes place in the locker room. Further, the nurse's bathroom was located a considerable distance from the girls' locker room. This arrangement also created difficulties during away games as the girls did not always have access to the nurse's bathroom.

179.   Days later, McPherson and her mother, Plaintiff Munoz, met with Assistant Principal Zamora to raise the same concerns brought before the school counselor. Plaintiff Munoz asked about how the school was protecting her daughters' privacy, safety, and space. Assistant Principal Zamora

stated that the school was "following state law" and again reiterated that the girls could use the nurse's bathroom. He further stated that the "butt touching" was a "difficult situation" but that he would discuss boundaries with the coach.

180.    After these meetings, McPherson felt that she was forced to sacrifice her privacy and safety in order to continue participating in a sport she loved and to continue accessing female spaces.

181.    Given the school's lack of support, she told her mother she feared retaliation from teammates for speaking up. A.M. similarly feared backlash and questioned why the school would not protect the rights of the female athletes.

182.    As a result of these events and ongoing concerns regarding the male athlete's participation in the girls' volleyball program, McPherson and A.M.'s parents advised the girls to step away from participation in the volleyball team. The girls expressed frustration, stating, "Why should we have to step down? It should be A.H."

183.    On or about August 2023, Coach Manu came to Plaintiffs McPherson and A.M.'s home to pick up tie-dye shirts made for a fundraiser. During this visit, Plaintiffs' parents, including Plaintiff Munoz, expressed concerns about A.H. participating on the girls' volleyball team and using the locker rooms, again raising issues of safety, fairness, privacy, and the "butt tapping."

184.    Plaintiffs' parents, including Plaintiff Munoz, noted that A.H. appeared to be going through puberty, with increased strength and male physical characteristics, and raised safety concerns about the female athletes sharing both the court and locker room with A.H.

185.    In response, Coach Manu stated that she would tell them the same thing she told McPherson when she raised similar concerns about A.H.: "Focus on yourself and let the administration deal with that."

186.    Plaintiffs' parents, including Plaintiff Munoz, were confused and angered by this response, as they understood Coach Manu to be part of the school staff and directly involved with the team.

187.    After Coach Manu left, McPherson and A.M. told their parents, "We told you, they don't care."

188.    In or around September 2023, McPherson, continuing to feel uneasy about having to compete with A.H. and share the locker room with him, met with Assistant Principal Zamora, along with Plaintiff Munoz, to express her ongoing concerns regarding A.H.'s participation on the girls' volleyball team. McPherson and Munoz specifically raised issues of athletes being required to share a locker room with a male, the repeated "butt tapping" by A.H. after every point, and the unfairness of the situation.

189.    Assistant Principal Zamora responded that the school was following state law but stated that the concerns would be brought to Principal Morris and Coach Manu.

190.    When McPherson returned home, she told her mother and A.M. that the school continued to repeat the same response about following state law. McPherson expressed disappointment, asking, "How could they allow a biological male to touch my behind and I have to pretend it's okay?"

191.    A.M. responded that raising concerns was a waste of time because "they don't care."

192.    On October 25, 2023, McPherson and her mother, Plaintiff Munoz, were summoned to a meeting with Principal Morris and Assistant Principal Zamora.

193.    During the meeting, McPherson was confronted with accusations allegedly raised by A.H. and his mother. A.H.'s mother had complained that McPherson told teammates what to do and that A.H. did not like being directed by her. A.H. further complained that McPherson was "slandering the transgender community" and expressed personal dislike toward her.

194.    McPherson explained that, as captain, she regularly directed teammates during games and practices but always did so respectfully and with the intent of improving team performance.

195.    McPherson further explained that the only statement she had ever made regarding transgender participation in athletics occurred the prior year, when she expressed her belief to a friend that it was unfair for biological males to compete in girls' sports. McPherson emphasized that she had never referred to A.H. by name.

196.    McPherson also told school administrators that, rather than A.H. being held accountable, she felt she was the one being punished, forced to sacrifice her own safety and comfort on the court and in the locker room.

197.    School administrators did not provide any support or response to McPherson's concerns.

198.    In or around April 2024, McPherson, A.M. and their mother, Plaintiff Munoz, attended a boys' volleyball game. After the game, Coach Makini Manu ("Coach Mak"), Coach Manu's husband, approached Plaintiff Munoz and stated, "My wife and I told [A.H.], you should try out for the boys' program. [A.H.] would have the strongest hit out of all the boys."

199.    Coach Mak further explained to Plaintiff Munoz that A.H. sometimes attended boys' practices.

200.    These statements reinforced Plaintiffs' belief that school administrators prioritized accommodating A.H.'s interests and celebrating his skills over protecting the rights and interests of the female athletes, including Plaintiffs.

201.    Throughout July and August 2024, McPherson repeatedly complained to Coach Manu – on a weekly basis – about the significant increase in A.H.'s strength and male physical characteristics.

202.    McPherson expressed concern that A.H.'s presence would tarnish the athletic records of female athletes, as A.H.'s male strength and lack of ball control created a risk of physical injury to herself and other players and disadvantaged the other female teams. McPherson further noted that A.H.'s jumping ability and power gave him an unfair advantage.

203.    McPherson reported that the situation with A.H. was dangerous, but Coach Manu repeatedly told her that it was "out of her control" and advised her to "focus on yourself."

204.    McPherson felt increasingly dismissed by these responses, and A.M. began to feel hopeless as well, questioning how she could raise concerns if her older sister, McPherson, as team captain, could not.

205.    Plaintiff H.H. was likewise compelled to refrain from raising objections or expressing safety and fairness concerns regarding A.H.'s inclusion on her volleyball team, having

VERIFIED COMPLAINT

observed that McPherson's prior complaints were disregarded by school administrators and reasonably fearing retaliation from teammates and/or school officials.

206. During the 2024-2025 season, A.M., who played libero, was regularly required to receive A.H.'s hits. She complained on multiple occasions to Coach Manu and Coach Mak that A.H.'s hits were stronger than those of all the players in the boys' volleyball program.

207. Neither coach provided any remedial measures to Plaintiffs' concerns.

208. In or around September 2024, McPherson met with Assistant Principal Denise Lopez to report that the issues with A.H. were ongoing. McPherson explained that she felt uncomfortable because A.H. lingered in the locker room after changing and stared at other female athletes. She told Dr. Lopez this was unfair and uncomfortable.

209. McPherson further reported that, as captain of the varsity team, several freshmen and other teammates, including Plaintiff H.H., had confided in her that they also felt uncomfortable changing in the locker room with A.H. These players stated they did not feel safe raising concerns with Coach Manu, whom they perceived as unapproachable, and feared retaliation.

210. McPherson again raised the issue of A.H. "butt tapping," stating it was inappropriate and made her uncomfortable. She also reported A.H.'s July 2024 sexually explicit comment and other inappropriate comments made by A.H mocking female anatomy.

211. McPherson emphasized that even her Muslim teammate, Plaintiff H.H., along with the other female athletes, should not be forced to sacrifice privacy and comfort in order to participate.

212. Assistant Principal Lopez told McPherson that the school was required to follow state law. Assistant Principal Lopez advised that if other teammates did not feel safe, they should come speak to her directly. She further acknowledged that "butt tapping" was not acceptable and stated she would address it with the coach.

213. McPherson, having heard similar "promises" with no resolution, felt that no meaningful changes would be made. She encouraged younger teammates to report concerns to Assistant Principal, and once again the administration responded only that they would "investigate" the issue of butt touching.

214. School administrators continued to not address, respond, or resolve, Plaintiffs concerns regarding A.H.'s inclusion on the girls' volleyball team.

215. On or about October 2024, McPherson and her mother, Plaintiff Munoz were called into a meeting with Principal Reyna, during which McPherson was again accused of "slandering the transgender community."

216. Plaintiff Munoz explained to Principal Reyna that there had been multiple ongoing issues with A.H., including privacy concerns in the locker room, A.H. lingering in the locker room after changing in a stall, and inappropriate comments mocking female anatomy. McPherson also reiterated how uncomfortable A.H.'s comments and actions made her and also how unfair it was for a male to compete on the girls' team.

217. Rather than addressing these concerns, Principal Reyna immediately warned Plaintiff McPherson that if she made any comments to her peers about transgender students or about A.H., it would result in suspension.

218. Plaintiff McPherson explained that she was merely describing her own experiences and further clarified that the only comment she had made publicly was when she stated to a friend that playing with a transgender student was unfair because "biology is a proven fact that males don't belong in women's sports." She never mentioned A.H. by name in those comments.

219. Despite this, Principal Reyna warned Plaintiff McPherson again that any remarks about transgender students or A.H. would be deemed bullying and grounds for suspension.

220. Plaintiff McPherson cried during the meeting, questioning why she was being punished for expressing her discomfort, asking: "How is this possible? I have to change in the locker room with a male, and I have to compete with a male that doesn't belong on the girls' team. How is this legal?" No response was given to this question.

221. Principal Reyna also stated, "I don't know what happened in the past. This is my first year here, and I can only go from here," before again warning that any such remarks would lead to suspension.

222.    Plaintiff Munoz asked how this could be fair to her daughters when staff members – including Assistant Principal Zamora, teachers, counselors, and other coaches – were already aware of the issues Plaintiffs had endured.

223.    Principal Reyna responded by telling Plaintiff McPherson that she knew she had the opportunity to play in college and should remain quiet because she had "too much to lose."

224.    McPherson left the meeting in tears, feeling that the school had again taken A.H.'s side and dismissed her valid concerns. She and Plaintiff Munoz cried afterward, feeling that they had been treated as though they were the problem.

225.    At home, the family discussed the meeting. Plaintiff A.M. responded: "It's like the school is pushing us to allow being seen nearly naked by a male, being touched inappropriately, and we're the problem! I'm done! This school is awful and won't protect us."

226.    On July 28, 2025, during a team practice, A.M. raised safety and fairness concerns with Coach Manu about A.H.'s continued participation on the team. Coach Manu told A.M. that, as team captain, she needed to "be friends with A.H. and the group that supported A.H.," both on and off the court.

227.    Coach Manu's comments placed coercive pressure on A.M. to adopt a certain viewpoint regarding male participation on girls' sports team, to associate socially with A.H. as a condition of leadership, and to keep her views and concerns to herself.

228.    On August 22, 2025, Plaintiff Munoz called Assistant Principal Todd Moerer to object to the unfairness A.M. was experiencing as a result of A.H.'s inclusion on the girls' volleyball team and to raise Title IX concerns. Assistant Principal Todd Moerer responded that the school was "following state law" and dismissed concerns about Title IX and federal protections as "over my pay grade."

229.    On August 25, 2025, Plaintiff Munoz and her daughter, A.M., met with the District's Title IX Coordinator, Olga Alferez, and raised concerns about locker room privacy, safety, game cancellations cause by A.H., retaliation, and unfair practice and game conditions. She also reiterated her objection to A.H. touching her daughter's buttocks. A.M.'s mother was told that an investigation would be "initiated."

VERIFIED COMPLAINT

230.    Plaintiffs Munoz and A.M. again reported A.H.'s sexualized comments to school administrators, including Principal Reyna and Title IX Coordinator Olga, but their concerns were ignored, and no remedial action was taken.

231.    Since at least 2022, JVHS has not provided any remedies for Plaintiffs, and JUSD has continued to allow A.H. to compete in JVHS's girls' athletic program.

232.    On September 4, 2025, despite the ongoing lack of support from school administrators, Plaintiff Munoz and A.M. met with Principal Reyna to raise their ongoing concerns regarding A.H.'s involvement in the girls' athletic program.

233.    Plaintiffs Munoz and A.M. again reiterated to Principal Reyna their safety, privacy, and fairness concerns regarding A.H.'s presence in the locker room, his participation on the girls' volleyball team, his inappropriate sexual comments, and his offensive touching of Plaintiffs' A.M. and H.H.'s buttocks.

234.    Principal Reyna represented that she would "investigate" but emphasized that "the school was following state law."

235.    On September 4, 2025, Plaintiffs A.M. and H.H. separately informed Coach Manu that they were uncomfortable sharing the court or locker room with a male athlete and stated that they could no longer participate in games or practices that included a male athlete. Coach Manu did not address their concerns and simply responded, "Ok thank you for letting me know."

236.    On September 5, 2025, Plaintiffs A.M. and H.H. discovered they had been removed from the varsity volleyball group chats. This was shocking and hurtful to them as Coach Manu had neither informed them of this action nor followed up with them regarding their September 4 messages.

237.    On September 5, 2025, Plaintiff A.M. and Coach Manu engaged in the following text thread:

> **Plaintiff A.M.:** hey coach i just noticed i have been kicked off the varsity group chat, does this mean you're kicking me off the team?
>
> **Coach Manu: Hey,** no, no one kicked you off the team. But my question to you is – if you're stepping back and not participating with our team, do you even want to be in the group chat? I'm not sure what you're looking for moving forward as far as me and the team goes.

**Plaintiff A.**M.: but why take me off without asking me?

I'm waiting to hear from principal reyna.

**Coach Manu:** Well, I don't have to ask you; I don't have to run my decisions by you or any player. Any time someone has chosen not to participate any longer, I remove them from the group chats they're in or even Band as a whole. That's not abnormal because theres no point in them being in the chats if they're not participating.

You're wait [sic] to hear from principal Reyna about . . .? Participating?

**Plaintiff A.M.:** as a captain and a member of the team, i should not be removed from the team chats. i'm still a part of the team, never did i ever state that i quit.

**Coach Manu:** If you want to be a captain and a member of our team, then be one.
Show up, be a team member. Lead, be a captain to your team. Also, I did not remove you from the group chat.

**This** is an extremely confusing situation, which is why I said I'm not sure what you're looking for as far as continuing the season goes.. you are not quitting, but you're quitting practicing and playing? So with the team being how it is, what would you like to do moving forward? What are you looking to participate in?

238.    After Plaintiff H.H. asked why she had been removed from the varsity team chats, Coach Manu responded by posing similar questions to her as those directed at A.M.

239.    Plaintiff A.M. was injured last volleyball season and did not "participate" in games or practices. At that time, she was never removed from the team chats.

240.    These statements and actions were hurtful and confusing to A.M. and H.H. and confirmed their fears that speaking up about their concerns regarding sharing a court and locker room with a male athlete would result in retaliation and negative treatment.

241.    Coach Manu retaliated against A.M. and H.H. for expressing their views by removing them from the team chats, and further reprimanded A.M. regarding how she should conduct herself as team captain.

242.    The cumulative effect of A.H.'s sexual comments, combined with the offensive physical contact and sexual harassment, dangerous athletic incidents, and failure of school administrators to provide any remedial action, has further exacerbated the sex-discrimination faced by Plaintiffs.

243.    From now until the end of the season, Plaintiffs' A.M. and H.H. will be forced to sit out of their volleyball season or be required to compete and practice alongside A.H. and share intimate spaces with A.H. Additionally, H.H. plans to participate in the upcoming track and field season, and Plaintiffs anticipate that A.H. will also compete in that season under the same conditions that Defendants have required for volleyball.

## FIRST CAUSE OF ACTION

### (Violation of Title IX – Sex Discrimination)

### 20 U.S.C. § 1681 et seq.

244.    Plaintiffs re-allege and incorporate herein, as though fully set forth, Paragraphs 1 through 243 of this Complaint.

245.    Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

246.    At all relevant times, Defendants CDE and JUSD have been recipients of federal financial assistance within the meaning of Title IX and are therefore subject to its provisions. Under the California Education Code, Defendant CDE has authority over interscholastic athletic policies of Defendant CIF and local school districts, including JUSD. Cal. Educ. Code § 33354(a)(1).

247.    AB 1266, CIF Bylaw 300.D, and AR 6145.2, on their face and as applied, have subjected Plaintiffs to discrimination and unequal opportunity on the basis of sex, in violation of Title IX.

### A.    Sex Discrimination - Sexual Harassment

248.    Plaintiffs were subjected to sexual harassment that was severe, pervasive, and objectively offensive, including repeated incidents in which A.H., a male student, slapped their buttocks after scoring points during volleyball matches and inappropriately touched their buttocks during team huddles. *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 652 (1999).

249.    Plaintiffs were also subjected to sexual harassment that was severe, pervasive, and objectively offensive, including repeated sexualized remarks by A.H., a male student, in which he mocked and demeaned female anatomy.

250.    Plaintiffs, as young women, experienced repeated discomfort and stress, each time A.H., a male, accessed and lingered in their shared locker rooms.

251.    Plaintiffs were forced to take extraordinary measures to protect their privacy and comply with their religious practices, including using the nurse's restroom, waiting until A.H. left the locker room, and modifying participation in athletic activities.

252.    Defendants fostered an environment that permitted A.H. to engage in such harassing conduct through enforcement of AB 1266, CIF Bylaw 300.D, and AR 6145.2.

253.    Despite complaints made by Plaintiffs Munoz, McPherson, and A.M. to Coach Manu, Principal Reya, Principal Morris, Assistant Principal Lopez, and Title IX Coordinator Olga regarding A.H.'s offensive touching and comments, Defendants acted with deliberate indifference by failing to take prompt and appropriate corrective action.

254.    As a result, the harassment so undermined and detracted from Plaintiffs' educational experience that they were effectively denied equal access to Defendants' resources and opportunities.

255.    Plaintiffs reasonably felt unsafe, disrespected, and humiliated because of A.H.'s conduct, which created an offensive educational and athletic environment.

**B.    Sex Discrimination – Failing to Provide Effective Accommodation**

256.    Defendants provide athletic opportunities in volleyball and track and field that are separated by sex.

257.    Under Title IX, Defendants are obligated to provide competitive opportunities for female athletes that accommodate their physical abilities, ensuring that female athletes have access to competition based on biological differences between males and females that reflects their abilities and provides equal opportunity in levels of competition comparable to those available to male athletes.

258.    Due to inherent biological differences between the sexes, the athletic performance of female athletes is not equivalent to that of comparably trained and fit male athletes.

259.    By permitting a male student with the physiological advantages conferred by male biology to participate in female athletic programs, Defendants have failed to provide competitive opportunities for female athletes that accommodate their abilities, in violation of their Title IX obligations.

260.    As a direct result of Defendants' actions, Plaintiffs McPherson and H.H. consistently lost higher placements in track and field due to A.H.'s participation in JVHS's girls' athletic program.

261.    Plaintiffs H.H. and A.M. have also been denied competitive opportunities because this season, opposing teams have refused to compete against Plaintiffs' volleyball team due to the substantial risks posed by A.H.'s presence on the girls' volleyball team. This has deprived Plaintiffs of the opportunity to compete against other female teams, whereas male teams face no comparable restrictions.

262.    Additionally, Plaintiffs A.M. and H.H. have refused to participate in games and practices due to concerns for their safety, privacy, and fairness, resulting in lost athletic opportunities and diminished participation in the girls' athletic program because of A.H.'s inclusion on the team.

263.    The participation of a male athlete in female athletic programs also exposes Plaintiffs to unsafe athletic conditions, as evidenced by A.H.'s powerful strikes against A.M. and other female athletes, which have resulted in injury.

**C.    Sex Discrimination – Failing to Provide Equal Treatment**

264.    Defendants have an obligation under Title IX to ensure that female athletes receive treatment, benefits, and opportunities in athletic competition that are equivalent to those provided to male athletes.

265.    Equivalent treatment and opportunities include not only equal access to sex-segregated competition, but also protection from policies or practices that are discriminatory in language or effect, or that have the effect of denying female athletes' equality in athletic opportunity.

266.  Defendants' policies and practices deprive female athletes, including Plaintiffs, of equal opportunities to participate in competition, are discriminatory in effect, and deny female athletes equality in athletic opportunities, including the opportunity to achieve and be recognized for competitive success.

267.  Plaintiffs McPherson and H.H. consistently lost higher placements in track and field due to A.H.'s participation in JVHS's girls' athletic program.

268.  Plaintiffs H.H. and A.M. have lost competitive opportunities because understandably, competitors have refused to compete against Plaintiffs' volleyball team because of the substantial risks posed by A.H. playing on Plaintiffs' team. This has resulted in Plaintiffs losing the right to compete against female teams from other schools while male teams have no such challenge.

269.  Additionally, Plaintiffs A.M. and H.H. have refused to participate in games and practices due to concerns for their safety, privacy, and fairness, resulting in lost athletic opportunities and diminished participation in the girls' athletic program because of A.H.'s inclusion on the team.

270.  Defendants have ignored Plaintiffs repeated complaints and concerns, instead subjecting Plaintiffs to ongoing sexual harassment and sexual discrimination.

271.  Defendants have threatened suspension, reprimanded Plaintiffs, and have removed them from team activities for voicing concerns with A.H.'s behavior and continued participation on the girls' team.

272.  As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered harm, including emotional distress, humiliation, loss of personal dignity, and interference with their ability to fully participate in athletics and educational programs.

273.  Plaintiffs are therefore entitled to declaratory and injunctive relief, compensatory and punitive damages to the extent permitted by law, attorneys' fees, costs, and any other relief the Court deems just and proper.

**SECOND CAUSE OF ACTION**

**(Violation of the Equal Protection Clause of the Fourteenth Amendment – Sex Discrimination)**

**42 U.S.C. § 1983.**

274.    Plaintiffs re-allege and incorporate herein, as though fully set forth, Paragraphs 1 through 273 of this Complaint.

275.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

276.    AB 1266, CIF Bylaw 300.D, and AR 6145.2, on their face and as applied, have subjected Plaintiffs to discrimination and unequal opportunity based on sex, in violation of the Equal Protection Clause of the Fourteenth Amendment.

277.    Defendant, through its policies, practices, or actions, intentionally discriminated against Plaintiffs based on sex.

278.    Specifically, female athletes, including Plaintiffs, were subjected to harassment, unsafe conditions, and unfair competition due to the inclusion of a male, A.H., on girls' athletic teams.

279.    A.H. engaged in repeated inappropriate and offensive contact with female athletes, including touching Plaintiffs' buttocks during practices, games, and team activities, conduct that male athletes were not subjected to in comparable circumstances.

280.    A.H. also made repeated sexualized comments, including references to female anatomy and menstruation, during team activities, creating embarrassment, discomfort, and intimidation for Plaintiffs that male athletes were not subjected to in comparable circumstances.

281.    Plaintiffs reasonably experienced fear, humiliation, and distress because of these actions, which interfered with their ability to participate safely and fully in school athletics and deprived them of educational and athletic opportunities available to their male peers.

282.    Defendants, acting under color of state law, had actual knowledge of the discriminatory treatment and harassment, including through complaints from Plaintiffs, but

1    responded with deliberate indifference, failing to take prompt, effective, or equitable remedial

2    measures.

3        283.    Due to inherent biological differences between boys and girls which give boys and

4    overwhelming sport performance advantage over girls, by implementing AB 1266, CIF Bylaw

5    300.D, and AR 6145.2 Defendants are discriminating against girls by knowingly allowing boys to

6    deprive girls of equal competitive sport opportunities.

7        284.    Defendants knew that they had purposeful policies, namely AB 1266, CIF Bylaw

8    300.D and AR 6145.2, that discriminated against girls by allowing boys to access girls' competitive

9    athletic opportunities to the detriment of girls.

10        285.    Plaintiffs have further been forced to alter their routines to preserve their safety,

11    privacy, and religious practices, including Plaintiffs' need to use the nurse's bathroom or isolated

12    stalls to change, and H.H.'s need to shield herself while removing her hijab.

13        286.    Administrators and staff have failed to provide aid, intervene, or take corrective

14    measures, even when notified of incidents such as A.M. being struck in the face with a ball or A.H.

15    making inappropriate sexual remarks during practice and games.

16        287.    The Defendants' failure to act, coupled with their tolerance of this conduct, has

17    deprived Plaintiffs of equal access to the educational opportunities and benefits of participation in

18    athletics on the same terms as their peers.

19        288.    Defendants have threatened suspension, reprimanded Plaintiffs, and have removed

20    them from team activities for voicing concerns with A.H.'s behavior and continued participation in

21    the girls' team.

22        289.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered

23    harm, including emotional distress, humiliation, loss of personal dignity, and interference with their

24    ability to fully participate in athletics and educational programs.

25        290.    Defendants' acts and omissions constitute intentional discrimination and a violation

26    of Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the United

27    States Constitution, actionable under 42 U.S.C. § 1983.

28

VERIFIED COMPLAINT

291.    Plaintiffs are therefore entitled to declaratory and injunctive relief, nominal damages, compensatory and punitive damages to the extent permitted by law, attorneys' fees, costs, and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION

### (Violation of the Free Exercise Clause of the First Amendment)

### 42 U.S.C. § 1983

### (Against Defendant JUSD)

292.    Plaintiffs re-allege and incorporate herein, as though fully set forth, Paragraphs 1 through 291 of this Complaint.

293.    The First Amendment to the United States Constitution, applicable to state and local governments through the Fourteenth Amendment, guarantees that "Congress shall make no law . . . prohibiting the free exercise" of religion.

294.    Plaintiffs Munoz, McPherson, and A.M. are practicing Catholics who's sincerely held religious beliefs teach that God created human beings as male and female, that gender is a fixed characteristic, and that distinctions between male and female are to be honored as part of God's created order.

295.    Plaintiffs Hazameh and H.H. are practicing Muslims who's sincerely held religious beliefs teach that men and women have distinct biological differences, roles, and responsibilities, and that modesty—including the obligation for H.H. to cover her hair and body in the presence of biological males—is a core tenet of their faith.

296.    Based on their sincerely held religious beliefs, Plaintiffs object to being compelled to share locker rooms with members of the opposite sex, to being compelled to participate on athletic teams with members of the opposite sex, and to being subjected to inappropriate physical contact from males.

297.    Plaintiffs' religious objections are substantial, central to their practice of their faith, and sincerely held.

298.    Defendants, acting under color of state law, have implemented and enforced policies and practices that compel Plaintiffs and similarly situated students to:

a. share locker rooms and changing facilities with males;

b. compete on athletic teams with males;

c. endure inappropriate physical contact and sexualized comments by male athletes; and

d. forego their religious practices of modesty, privacy, and gender distinction.

299.    On September 4, 2025, Plaintiffs A.M. and H.H. separately informed Coach Manu that they were uncomfortable sharing the court or locker room with a male athlete and stated that they could no longer participate in games or practices while A.H. remained on the court.

300.    On September 5, 2025, Plaintiffs A.M. and H.H. discovered they had been removed from the varsity volleyball group chats. Coach Manu had neither informed them of this action nor followed up with them regarding their September 4 messages.

301.    Plaintiff A.M. and Coach Manu exchanged messages in which Coach Manu told A.M. that the decision to remove Plaintiffs from the group chats was hers alone, stating, "I don't have to ask you; I don't have to run my decisions by you or any player."

302.    After A.M. and H.H. shared their concerns about A.H., Coach Manu separately messaged each of them, stating: "I'm not sure what you're looking for moving forward as far as me and the team goes."

303.    Coach Manu retaliated against A.M. and H.H. for expressing their views regarding their discomfort with sharing a court and a locker room with a male athlete by removing them from the team chats, and further reprimanded A.M. regarding how she should conduct herself as team captain.

304.    School administrators also told Plaintiff McPherson that she had "too much to lose" and threatened her with suspension for speaking up about her concerns regarding A.H.'s participation on the girls' volleyball and track and field teams.

305.    By conditioning continued participation in athletics on abandoning their religious convictions, Defendants forced Plaintiffs to choose between practicing their faith and accessing equal educational and extracurricular opportunities.

306.     Such statements and actions demonstrate hostility toward Plaintiffs' religious beliefs and confirm that Defendants did not seek to accommodate Plaintiffs' faith but instead penalized them for adhering to it.

307.     Defendants have further exacerbated the burden on Plaintiffs' religious exercise by refusing to require the male student to use an alternative facility such as the nurse's restroom. Instead, Defendants singled out Plaintiffs for disfavored treatment by forcing them to use the nurse's restroom or storage closet if they wished to preserve their modesty and adhere to their faith.

308.     Defendants' policies stigmatized Plaintiffs, imposed practical hardships such as the inability to change during away games, and failed to address the underlying violation of their religious and privacy rights. Rather than accommodating Plaintiffs' religious beliefs, Defendants imposed the entire burden of accommodation on them while privileging the preferences of the male student.

309.     Defendants' policies and actions are not neutral or generally applicable. By allowing the male student to access the girls' locker room while relegating Plaintiffs to the nurse's restroom, Defendants have made a value judgment that elevates one set of beliefs and preferences over Plaintiffs' religious convictions.

310.     A policy that requires only religious objectors to alter their conduct, while exempting others who create the conflict, is neither neutral nor generally applicable. Defendants' enforcement scheme intentionally burdens religious exercise while accommodating nonreligious conduct.

311.     Defendants have threatened suspension, reprimanded Plaintiffs, and have removed them from team activities for voicing concerns with A.H.'s behavior and continued participation on the girls' team.

312.     As a direct and proximate result of Defendants' unconstitutional policies and actions, Plaintiffs have suffered and continue to suffer irreparable harm, including violation of their constitutional rights, emotional distress and stigmatization.

313.     As a result of the actions of the Defendants, Plaintiffs were deprived of their constitutional right to free exercise of religion and suffered severe emotional distress and injuries

VERIFIED COMPLAINT

for which Plaintiffs are entitled to declaratory and injunctive relief, compensation, nominal damages, punitive damages and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

**FOURTH CAUSE OF ACTION**

**(Violation of the Free Speech Clause of the First Amendment)**

**42 U.S.C. § 1983**

**(Against Defendant JUSD)**

314.    Plaintiffs re-allege and incorporate herein, as though fully set forth, Paragraphs 1 through 313 of this Complaint.

315.    The First Amendment to the United States Constitution, applicable to state and local governments through the Fourteenth Amendment, protects the right of students to speak freely on matters of public concern without fear of retaliation or censorship by school officials.

316.    Plaintiffs' objections to being compelled to compete with and against a male athlete in girls' sports, and to share locker rooms with a male, constitute speech on matters of profound public concern, including fairness in athletics, safety, privacy, and the integrity of girls' sports.

317.    Defendants, acting under color of state law, created and maintained an intentionally hostile environment designed to suppress Plaintiffs' views. Plaintiffs were intimidated, threatened, and pressured to self-censor their objections to competing with and against a male athlete.

318.    School administrators warned Plaintiff McPherson that if she made any comments regarding A.H. or transgender athletes, she would face immediate suspension.

319.    McPherson explained that she had only once expressed her views the prior year – that she believed it was unfair for biological males to compete in girls' sports – and that she had never referred to A.H. by name. Despite this clarification, Defendants reiterated that any remarks on the subject would be treated as bullying and grounds for discipline.

320.    During this meeting, Principal Reyna told McPherson to "keep quiet" because she "had too much to lose" given her opportunities to play collegiate volleyball. These comments were intended to and did intimidate McPherson into silence, coercing her to abandon her speech rights in order to avoid suspension and protect her future.

321.    McPherson left the meeting in tears, feeling silenced, unsupported, and retaliated against for expressing her views. The threats from administrators caused her to refrain from speaking further about their objections.

322.    Plaintiff Munoz felt helpless and felt compelled to self-censor given the lack of support given to her family when they did raise concerns regarding A.H.'s participation in female sports to numerous school administrators.

323.    A.M. and H.H. were also informed by what was said to McPherson and felt compelled to self-censor out of fear of retaliation or lack of support from school administrators.

324.    On July 28, 2025, Volleyball Coach Manu told Plaintiff A.M. that, as team captain, she needed to "be friends with A.H. and the group that supported A.H.," both on and off the court. This directive coerced A.M. to conform her associations and speech to Defendants' preferred viewpoint as a condition of team leadership.

325.    On September 4, 2025, Plaintiffs A.M. and H.H. separately informed Coach Manu that they were uncomfortable sharing the court or locker room with a male athlete and stated that they could no longer participate in games or practices while A.H. remained on the court.  Coach Manu responded, "Ok thank you for letting me know."

326.    On September 5, 2025, Plaintiffs A.M. and H.H. discovered they had been removed from the varsity volleyball group chats. Coach Manu had neither informed them of this action nor followed up with them regarding their September 4 messages.

327.    Plaintiff A.M. and Coach Manu exchanged messages in which Coach Manu told A.M. that the decision to remove Plaintiffs from the group chats was hers alone, stating, "I don't have to ask you; I don't have to run my decisions by you or any player."

328.    Coach Manu retaliated against A.M. and H.H. for expressing their views regarding their discomfort with sharing a court and a locker room with a male athlete by removing them from the team chats, and further reprimanded A.M. regarding how she should conduct herself as team captain.

VERIFIED COMPLAINT

329.    Defendants' actions – including threats of suspension, removal from team chats, warnings to remain silent, and coercive pressure to associate – constitute viewpoint discrimination, retaliation, and prior restraint on Plaintiffs' protected speech.

330.    The restrictions Defendants imposed were not reasonably related to legitimate pedagogical concerns or the maintenance of school order. Instead, Defendants targeted Plaintiffs' speech because of its viewpoint, silencing disfavored perspectives on a matter of public concern while permitting opposing views to be expressed.

331.    As a result of the actions of the Defendants, Plaintiffs were deprived of their constitutional right to free speech and suffered severe emotional distress and injuries for which Plaintiffs are entitled to declaratory and injunctive relief, compensation, nominal damages, punitive damages and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief against defendants as follows:

1.    **Declaratory Relief:**

- A declaration that Defendants' actions and omissions violated Plaintiffs' rights under Title IX of the Education Amendments of 1972, the First Amendment (Free Exercise and Free Speech Clauses), and the Equal Protection Clause of the Fourteenth Amendment;

- A declaration that AB 1266, as applied and on its face, violates Title IX and the Equal Protection Clause of the Fourteenth Amendment;

- A declaration that CIF Bylaw 300.D, as applied and on its face, violates Title IX and the Equal Protection Clause of the Fourteenth Amendment;

- A declaration that AR 6145.2, as applied and on its face, violates Title IX and the Equal Protection Clause of the Fourteenth Amendment;

2.    **Injunctive Relief:**

- Permanently enjoin JUSD from allowing any male student to participate or compete in any female sports at JUSD or access or use JUSD female bathrooms and locker rooms;

VERIFIED COMPLAINT

- Permanently enjoin Defendant JUSD from retaliating against, censoring, or otherwise punishing Plaintiffs for expressing their sincerely held religious beliefs or views on matters of public concern, including fairness in athletics, safety, privacy, and gender distinctions;

- Permanently enjoin Defendants from enforcing AB 1266, CIF Bylaw 300.D, and AR 6145.2;

3.    An award of nominal, compensatory damages, punitive damages, and other monetary relief as permitted by law;

4.    For costs, attorneys' fees and interest, as allowed by law; and

5.    For such other relief the Court determines is proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury.


DATED:  September 9, 2025                    ADVOCATES FOR FAITH & FREEDOM


                                        By: /s/ Julianne Fleischer
                                            Julianne Fleischer, Esq.
                                            Attorneys for Plaintiffs

**VERIFICATION**

I have read the foregoing **VERIFIED COMPLAINT FOR INJUNTIVE AND DECLARATORY RELIEF AND DAMAGES** and know its contents.

I am a party to this action.  The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed September 9, 2025, at Jurupa Valley, California.



_____
MADISON MCPHERSON

**VERIFICATION**

I have read the foregoing **VERIFIED COMPLAINT FOR INJUNTIVE AND DECLARATORY RELIEF AND DAMAGES** and know its contents.

I am a party to this action.  The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 9, 2025, at Jurupa Valley, California.


*Maribel Munoz*
MARIBEL MUNOZ

**VERIFICATION**

I have read the foregoing **VERIFIED COMPLAINT FOR INJUNTIVE AND DECLARATORY RELIEF AND DAMAGES** and know its contents.

I am a party to this action.  The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 9, 2025, at Jurupa Valley, California.


HANAN HAZAMEH