UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—
GENERAL

| Case No. | 5:25-cv-02362-SSS-SPx | Date | May 7, 2026 |
|---|---|---|---|
| Title | *Madison McPherson et al. v. Jurupa Unified School District et al.* | | |

| Present: The Honorable | SUNSHINE S. SYKES, UNITED STATES DISTRICT JUDGE |
|---|---|

| Irene Vazquez | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:   (IN CHAMBERS) ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS [DKT. NOS. 35, 36]**

Before the Court are Motions to Dismiss Plaintiffs' First Amended Complaint filed by Defendants California Department of Education ("CDE") and California Interscholastic Federation ("CIF") and Defendant Jurupa Unified School District ("JUSD").  [Dkt. No. 35, "State MTD"; Dkt. No. 36-1, "School MTD"]. The Motion is fully briefed and ripe for review.  [Dkt. No. 41, "Opp. to State"; Dkt. No. 42, "Opp. to School"; Dkt. No. 43, "State Reply"; Dkt. No. 44, "School Reply"].

## I.   FACTUAL BACKGROUND

The Court recounts the facts as alleged in the First Amended Complaint. [Dkt. No. 29, First Amended Complaint, or "FAC"].

The Court uses the same terms the Ninth Circuit used in its recent decision in *Hecox v. Little*. *Hecox v. Little*, 104 F.4th 1061 (9th Cir. 2024), *as amended* (June 14, 2024), *cert. granted*, No. 24-38, 2025 WL 1829165 (U.S. July 3, 2025). As the Court explained:

"Gender identity" is "the term used to describe a person's sense of being male, female, neither, or some combination of both." A person's "sex"

is typically assigned at birth based on an infant's external genitalia, though "external genitalia" do not always align with other sex-related characteristics, which include "internal reproductive organs, gender identity, chromosomes, and secondary sex characteristics." A "transgender" individual's gender identity does not correspond to their sex assigned at birth, while a "cisgender" individual's gender identity corresponds with the sex assigned to them at birth.

*Id.* at 1068–69 (citations omitted). Throughout its decision, the Court will use the terms "cisgender girl" and "transgender girl" to refer to the relevant parties.

In California, state law requires the inclusion of transgender students in athletic programs. Under AB 1266, students must be "permitted to participate in sex-segregated school programs and activities, including athletic teams and competitions, and use facilities consistent with his or her gender identity, irrespective of the gender listed on the pupil's records." *See* Cal. Educ. Code § 221.5(f).

### A.    Parties to the Suit

This suit arises from incidents involving student-athletes at Jurupa Valley High School ("JVHS"). JVHS is part of JUSD in Riverside County, California; the school offers sex-segregated athletic programs, including separate boys' and girls' teams in sports such as volleyball and track and field. [FAC ¶ 105].

Plaintiffs include three current and former cisgender female student-athletes: Madison McPherson, A.M., and HH. McPherson is a former JVHS student-athlete who competed in varsity volleyball, soccer, and track and field. [FAC ¶¶ 9, 25–29]. A.M. is a twelfth-grade student-athlete who competes in varsity volleyball, soccer, and track and field and serves as captain of the varsity volleyball team. [*Id.* ¶¶ 10, 33–35]. H.H. is a twelfth-grade student-athlete who competes in varsity, volleyball and track and field. [*Id.* ¶¶ 11, 37]. Also joining the suit are Plaintiffs Maribel Munoz and Hanan Hazameh, who are the parents of A.M. and H.H., respectively. [*Id.* ¶¶ 12, 13].

Plaintiffs have named three Defendants: JUSD, CIF, and CDE. [FAC ¶¶ 14–16]. JUSD, or "School Defendant", is a school district in Riverside County responsible for ensuring its agents enforce state and federal law. [*Id.* ¶ 14]. CIF and CDE, collectively "State Defendants," are entities of the State of California. Cal. Educ. Code § 33350 (establishing CDE and outlining its functions); Cal. Educ. Code § 33353 (defining CIF and its functions). CDE is a past and current recipient of federal funding and oversees educational policy. [FAC ¶¶ 16, 17; *see*

*id.* ¶¶ 82, 84, 96].  CDE exercises authority over CIF, which governs interscholastic athletics in California.  [*Id.* ¶¶ 15–16].

Plaintiffs allege Defendants' policies, which permitted a transgender student to participate in girls' athletics, negatively impacted them in violation of their rights under the First Amendment, Fourteenth Amendment, and Title IX.  [*See generally* FAC].

## B.      Incidents at JVHS

The Court recites the events at JVHS, accepting the facts in the FAC as true.

A.H. is a twelfth-grade transgender girl at JVHS who began participating in the girls' track and field team back in 2022; she has also competed on the girls' varsity volleyball team.  [FAC ¶¶ 108, 122].  Plaintiffs McPherson, A.M., and H.H. competed on the girls' track and field team during this period, often against A.H.  [*Id.* ¶¶ 31, 110, 111].  Plaintiff A.M. and H.H. competed on the girls' varsity volleyball team alongside A.H.  [*Id.* ¶¶ 35, 37, 119, 131 ].

According to the FAC, Defendants' policies and actions that allowed A.H. to compete on JVHS's girls' sports teams caused Plaintiffs to suffer grievances and injuries underlying their various claims.  [FAC ¶¶ 108, 109].  In other words, permitting A.H. to compete on JVHS's girls' sports teams deprived Plaintiffs of meaningful athletic opportunities, exposed them to uncomfortable circumstances, and infringed on their constitutionally protected rights.  [*See generally id.*].

### 1.      Loss of Fair Athletic Competition

Some of Plaintiffs' claims relate to their loss of ability to compete in girls' sports due to A.H.'s comparative athletic advantage as a transgender girl.  [*See* FAC ¶¶ 105–136].

Plaintiffs point to the results from the 2022-2023, 2023-2024, and 2024-2025 track and field seasons.  [*See* FAC at ¶¶ 111, 115, 119].[1]  In multiple track and field events during the 2022-2023 and 2023-2024 track seasons, A.H. placed ahead of McPherson.  [*Id.* ¶¶ 111, 115].  In fact, A.H. often placed first during these meets.  [*Id.* ¶¶ 116].  Plaintiffs attribute A.H.'s successful performance at

---

[1] School Defendant observes that some of the factual allegations in the FAC include events that precede September 9, 2023, which it argues is the earliest period that the Court can consider Plaintiffs' claims given the applicable statute of limitations.  [School MTD at 31].  The Court merely recites the facts here, and discusses in Section III.B. whether the factual allegations preceding that date can be considered.

these events to her "biological advantage" that "stem[s] from male physiology, including height, muscle mass, and vertical jumping ability." [*Id.* ¶¶ 120, 123]. Having observed "noticeable changes in A.H.'s physicality," Plaintiffs attribute A.H.'s competitive advantage over biological girls as a deprivation of fair athletic competition. [*Id.* ¶¶ 121, 124]

Out of frustration and anger from losing many placements to A.H., some of the Plaintiffs, like McPherson, ultimately refused to participate in track and field during her twelfth-grade season in 2024-2025. [FAC ¶¶ 116, 117]. A.H., however, continued to compete. During the 2024-2025 track season, A.H. placed ahead of H.H. in various events. [*Id.* 119].

Plaintiffs raised their concerns regarding the unfair competition that resulted from A.H.'s participation in girls' sports with school officials on multiple occasions. [FAC ¶¶ 167, 168]. Starting in 2022, Plaintiff McPherson regularly expressed her discomfort with A.H. being on the volleyball team with Coach Manu. [*Id.* ¶ 168]. Although some of these discussions touched on issues extending past unfair competition, McPherson did articulate her feelings regarding "the unfair nature of having a male on the girls' team. [*Id.*].

In September 2022, Plaintiff McPherson and her mother, Plaintiff Munoz, met with a school counselor to address A.H.'s participation on the volleyball team. [FAC ¶ 172]. Plaintiffs raised, among other things, their concerns regarding competitive fairness. [*Id.* ¶¶ 172, 173]. In particular, McPherson expressed her beliefs that A.H. possessed some "athletic advantages" due to her "male physiology and puberty." [*Id.* ¶ 176]. The school counselor responded that the school was "following state law," and would address other concerns at a later time. [*Id.* ¶ 177].

Plaintiffs later escalated their concerns with additional school officials, including JVHS's Assistant Principals, Principal, and JUSD's Title IX Coordinator. [FAC ¶¶ 189, 209, 216, 217, 229, 230]. In spite of numerous discussions with school administrators, Plaintiffs contend they ultimately did not receive any redress because School Defendant "continued to allow A.H. to compete in JVHS's girls' athletic program." [FAC ¶ 232].

Beyond outcompeting the individual Plaintiffs, the FAC also alleges adverse consequences from A.H.'s place on JVHS's girls' sports teams. A.H. also participated in the girls' varsity volleyball team, on which Plaintiffs A.M. and H.H. were members. [FAC ¶¶ 122, 131]. During the 2025–2026 season, multiple opposing schools forfeited or cancelled matches against JVHS, attributing their refusal to compete to a transgender girl being on JVHS's team. [*Id.* ¶¶ 128–130].

On August 20, 2025, JVHS's girls' volleyball coach Liana Manu informed the team that many more games were likely to be cancelled unless A.H. chose to step down from the team. [FAC ¶ 131]. A.H. was given a choice whether to step down from the team; however, the principal of JVHS, Nancy Reyna, instructed A.H. not to step down. [*Id.* ¶¶ 132, 133]. In response to the cancellations, JVHS arranged alternative scrimmages, including matches between the girls' and boys' varsity volleyball teams. [*Id.* ¶ 135].

Plaintiffs consider these alternative scrimmages insufficient, as they maintain that the game cancellations in response to A.H.'s place on the volleyball team "deprive[d] Plaintiffs and their teammates of meaningful athletic opportunities." [FAC ¶ 135].

## 2. Hostile Conditions

Plaintiffs also raise concerns resulting from Defendants' conduct such as having shared spaces with A.H. Because A.H. participates on the JVHS's girls' teams, Plaintiffs allege this exposes them to hostile conditions that require extraordinary measures to protect their religious practices, personal dignity, and sense of safety while participating in school athletics. [FAC ¶ 146].

For example, Plaintiffs report "repeated discomfort" from times that A.H. "entered and lingered in the girls' locker room" after changing, including during periods when other students were undressed." [FAC ¶ 139]. McPherson claims A.H. would linger in the locker room and watch the girls change, describing it as feeling like 'changing in the street. [*Id.* ¶¶ 173, 174]. Because of their discomfort with the situation, Plaintiffs altered their routines to avoid changing in A.H.'s presence. Plaintiffs report waiting until A.H. left the locker room, using the nurse's bathroom, or changing in alternative locations such as the volleyball storage room. [*Id.* ¶¶ 141, 142]. Plaintiffs posit that these alternatives are impractical. These locations are far from team facilities, limit Plaintiffs' ability to participate in team discussions, and are not always available during away games. [*Id.* ¶¶ 143, 144].

Plaintiffs also mention instances in which A.H. engaged in inappropriate conduct during practices and games. [FAC ¶ 147]. In particular, Plaintiffs "felt violated and objectified" because A.H. touched other team players' buttocks during huddles and after plays. [*Id.* ¶¶ 147–149]. Beyond physically touching other team players, A.H. also allegedly made verbal remarks of a sexual nature during practices and team events. [*Id.* ¶¶ 151–156]. A.H.'s comments caused McPherson to find it difficult to enjoy her twelfth-grade year as a part of the volleyball team alongside A.H. [*Id.* ¶ 157].

Given these events, Plaintiffs had conversations with the volleyball coach Manu.  Plaintiff McPherson expressed her feelings of "discomfort, and fear resulting from A.H.'s inclusion" on the team and A.H.'s presence in the girls' locker room.  [FAC ¶¶ 167, 168].  McPherson also shared in this conversation that A.H. had touched her and A.M. inappropriately during volleyball activities and it made her feel uncomfortable.  [*Id.* ¶ 175].  Coach Manu "repeatedly told McPherson to focus on herself," and to "control what she could control."  [*Id.* ¶ 169].  Given Coach Manu's responses, McPherson felt ignored and that her concerns were left unaddressed. [*Id.* ¶ 171].

In the September 2022 meeting with the school counselor, Plaintiffs McPherson and Munoz articulated their concerns about privacy within the locker room.  [FAC ¶¶ 172, 173].  The school counselor suggested that McPherson and A.M. use the nurse's bathroom to change instead.  [*Id.* ¶ 178].  Plaintiffs believe this suggestion deprives them of camaraderie that often takes place in the locker room, and may not be an option for away games.  [*Id.* ¶¶ 178, 179].

Days later, Plaintiffs McPherson and Munoz met with Assistant Principal Zamora to discuss these same concerns.  [FAC ¶ 180].  When Munoz prompted Zamora to explain "how the school was protecting her daughters' privacy, safety, and space," Zamora attributed the situation to the school's compliance with state law and offered Plaintiffs access to the nurse's bathroom should they feel uncomfortable around A.H.  [*Id.*].  Moreover, Zamora reiterated that the inappropriate touching was a "difficult situation," and that he would discuss boundaries with Coach Manu.  [*Id.* ¶ 180].  Plaintiffs felt this meeting was unproductive, and that she was forced to sacrifice her privacy and safety to continue to participate in the team.  [*Id.* ¶¶ 180, 181].

Around September 2024, Plaintiff McPherson met with Assistant Principal Denise Lopez to report new issues with A.H.  [FAC ¶ 209].  In this meeting McPherson shared that other teammates felt uncomfortable with A.H. in the locker room, but did not feel safe raising concerns to Coach Manu for fear of retaliation. [*Id.* ¶ 210].  She also voiced her issues with A.H.'s inappropriate touching and comments that mocked female anatomy.  [*Id.* ¶ 211].  McPherson further emphasized that H.H., who is Muslim, should not be forced to sacrifice privacy and comfort to participate in JVHS's athletic program.  [*Id.* ¶ 212].  Assistant Principal Lopez shared that the school was required to follow state law and if others did not feel safe, McPherson or the others should speak with her directly. [*Id.* ¶ 213].  Though Lopez acknowledged the inappropriate touching as unacceptable and assured she would address it with Coach Manu, McPherson felt no meaningful change would occur.  [*Id.* ¶¶ 214, 215].

Subsequent interactions with school officials were similarly discouraging to Plaintiffs. [*See* FAC ¶¶ 184–188 (recounting an instance in which Coach Manu told Plaintiffs to allow the school administration to deal with it); *id.* ¶¶ 189–192 (describing another instance in which Assistant Principal Zamora told Plaintiffs that the school was following state law and would raise concerns to the Principal and Coach Manu)]. Notably, on August 22, 2025, Plaintiff Munoz contacted Assistant Principal Todd Moerer to raise Title IX concerns regarding A.H. being on the volleyball team. [*Id.* ¶ 229]. Moerer informed Munoz that the school was "following state law," and that Munoz's Title IX concerns were "over [his] pay grade. [*Id.*]. Munoz and A.M. later met with JUSD's Title IX Coordinator, Olga Alferez. [*Id.* ¶ 230]. Alferez indicated that she would initiate an investigation into A.H.'s inappropriate touching; however, Plaintiffs maintain that no remedial action was taken. [*Id.* ¶¶ 230–233].

Finally, Plaintiffs A.M. and H.H. were subject to uncomfortable, unsportsmanlike conduct by other players on the team, which they attribute for speaking out against A.H.'s inclusion on the team. [FAC ¶¶ 247–252]. A.M. and H.H. sat on the bench for a volleyball game at which "[a]ll but one of the JVHS varsity players refused to high-five [Plaintiffs], instead giving [them] side glances and expressions of disapproval." [*Id.* ¶¶ 248–249 (contrasting this experience with the customary practice of players to high-five members of the bench)]. Plaintiffs reported this to Principal Reyna, who responded that the issue would be addressed on Monday. [*Id.* ¶ 252]. Plaintiffs state that these issues were never addressed. [*Id.*]. Instead, days later, A.M. and H.H. were once again subject to the same reactions by JVHS teammates. [*Id.* ¶¶ 253–255].

### 3. Physical Harm

Aside from the competitive opportunities lost from having to compete with A.H., Plaintiffs also posit that A.H. "creates a dangerous environment" that resulted in "physical harm to Plaintiffs and other female athletes." [FAC ¶¶ 158, 159]. Once again, Plaintiffs attribute these circumstances to A.H.'s participation in JVHS girls' athletic program.

According to Plaintiffs, because A.H. possesses greater strength than other players, they observed that A.H. tends to strike volleyballs "at a force greater than most female athletes," which has "struck opposing players' heads with the ball." [FAC ¶ 159]. Plaintiffs report that Coach Manu's husband made a similar observation. In April 2024, Plaintiffs attended a boys' volleyball game where Coach Manu's husband, Coach Mak, approached Munoz and shared that he believed A.H. should try out for the boys team. [*Id.* ¶ 199]. Coack Mak said this because he believed A.H. would have "the strongest hit out of all the boys." [*Id.*].

Plaintiffs received these statements as a celebration of A.H. skills, rather than as an expression of concern to protect Plaintiffs' rights and interests. [*Id.* ¶ 201].

Throughout July and August of 2024, McPherson continued to complain to Coach Manu weekly about A.H.'s strength and physical characteristics, but Coach Manu again told her it was "out of her control." [FAC ¶¶ 202, 204]. Plaintiff H.H. refrained from raising concerns, as she believed McPherson's complaints were being disregarded and feared retaliation from teammates and school officials. [*Id.* ¶ 206].

During the 2024-2025 volleyball season, A.M. played libero, a back-row player responsible for receiving serves. [FAC ¶ 207]. Given the nature of her position, A.M. was regularly required to receive A.H.'s hits. [*Id.*] A.M. complained to Coach Manu and Coach Mak on multiple occasions about A.H.'s hits being stronger than all of the boys' volleyball program; however, neither coach took any remedial actions to address her concerns. [*Id.* ¶¶ 207, 208].

In September 2024, A.H. struck A.M. in the face with a ball during a warmup drill, causing pain and visible injury. [*Id.* ¶¶ 164, 165]. Although Assistant Principal Zamora saw A.M. get hit in the face by A.H.'s strike, he "merely asked if A.H. needed ice" instead of "initiat[ing] concussion protocol, arrang[ing] for medical evaluation, or prepar[ing] an incident report." [*Id.* ¶ 165]. A.M. felt disregarded by the administration after this incident, which she viewed as an inappropriate response. [*Id.* ¶ 166].

Over a year later, A.M. approached Coach Manu in her capacity as team captain of the volleyball team to raise safety and fairness concerns about A.H.. [FAC ¶¶ 35, 227]. Coach Manu responded that A.M. "needed to be friends with A.H. as the team caption. [*Id.* ¶ 227]. A.M. found these comments to be coercive pressure to adopt a certain viewpoint and keep her views to herself. [*Id.* ¶ 228].

### 4.    Adverse Interactions with School Officials

***Disciplinary Meetings.*** On October 25, 2023, Principal Morris and Assistant Principal Zamora asked Plaintiffs McPherson and Munoz to meet. [FAC ¶ 193]. At this meeting, the school officials described how A.H. and his mother accused McPherson of "slandering the transgender community" and "expressing personal dislike toward [A.H.]." [*Id.* ¶ 194]. A.H.'s mother had made complaints to the school regarding McPherson's role in directing teammates' conduct, and how A.H. disliked that behavior. [*Id.*].

McPherson attempted to clarify that "she regularly directed teammates" in her role as team caption. [FAC ¶ 195 ]. Moreover, although McPherson admitted

to making one statement about the unfairness of biological males competing in girls' sports, she denied ever referring to A.H. by name [*Id.* ¶ 196]. At this meeting, McPherson shared with administrators that she felt punished. [*Id.* ¶ 197]. However, the school officials did not respond to any of her concerns about A.H. in this meeting. [*Id.* ¶¶ 197, 198].

A year later, Principal Reyna once again summoned Plaintiffs McPherson and Munoz to JVHS for a meeting. [FAC ¶ 216]. To Plaintiffs' surprise, Reyna had called McPherson in once more for "slandering the transgender community." [*Id.*]. When McPherson reiterated her concerns about having A.H. on the team, Principal Reyna warned McPherson that if she made any comments about transgender students to her peers or about A.H., she would be suspended. [FAC ¶¶ 217–220]. In an attempt to defend her daughter, Plaintiff Munoz voiced her concerns about what Plaintiff McPherson had endured. [*Id.* ¶¶ 223–225]. Nevertheless, Principal Reyna responded that McPherson "knew she had the opportunity to play in college and should remain quiet" because McPherson had "too much to lose." [*Id.* ¶ 224]. McPherson left the meeting in tears and with the impression that "the school had again taken A.H.'s side and dismissed her valid concerns." [*Id.* ¶ 225].

### 5.    Exclusion from Athletic Team Activities

***Exclusion from the Volleyball Team.*** On September 4, 2025, A.M. and Munoz again met with Principal Reyna to talk about their persisting concerns with A.H.'s continued involvement in girls' athletics programs. [FAC ¶¶ 233, 234]. Much like before, Principal Reyna said the school was following state law, and they would investigate the ongoing concerns. [*Id.* ¶ 235]. That, Plaintiffs A.M. and H.H. separately shared with Coach Manu that they were uncomfortable with A.H. being on the same team and they could no longer participate in games or practices that included a male athlete. [FAC ¶ 236].

The next day, Plaintiffs learned they were removed from the varsity volleyball group chats. [FAC ¶ 237]. This surprised Plaintiffs, as Coach Manu did not follow up with them regarding their conversation the day prior. [*Id.* ¶ 237]. Coach Manu explained to A.M. that he removed her from the group chats because A.M. had chosen not to participate any longer. [*Id.*]. Plaintiffs interpreted Coach Manu's actions as confirmation of retaliation for speaking out against A.H.'s participation on the team. [*Id.* ¶ 241].

Two weeks later, Plaintiffs noticed their names were excluded from a poster that listed the names of other varsity players. [FAC ¶¶ 244, 245]. H.H. requested that the Associated Student Body ("ASB") who had created the poster add her

name.  [*Id.*].  Upon receiving H.H.'s request, ASB replied that they had no control over the situation, and that the coaches had provided the players' information.  [*Id.* ¶ 245].  Plaintiff Munoz reported these events to Principal Reyna.  [*Id.* ¶ 246].

***Exclusion from Senior Night.***  On October 8, 2025, during Senior Night, Coach Manu instructed Plaintiffs A.M. and H.H. that the two would need permission to sit on the bench with their teammates during any future games.  [FAC ¶ 256].  This surprised Plaintiffs, as they were "members of the girls' volleyball team and no other players were required to seek such permission.  [*Id.* ¶ 257].

Nevertheless, Plaintiffs both sought Coach Manu's permission to sit on the team bench.  [FAC ¶ 258]  Coach Manu did not respond to A.M.'s request, and denied H.H.'s request.  [*Id.* ¶¶ 259, 260].  When asked to explain why Plaintiffs could not sit on the team bench, Coach Manu offered to discuss the matter later.  [*Id.* ¶ 262].  This situation embarrassed and discouraged both Plaintiffs, leading them to contact Principals Reyna and Moerer about the incident.  [FAC ¶¶ 264–266].

Plaintiffs Munoz and Hazameh also emailed the two principals once more on behalf of their daughters.  [FAC ¶ 266].  The school administrators never addressed these reports.  [*Id.* ¶ 266].

***Exclusion from the October 22, 2025 Match.***  On October 22, 2025, there was a volleyball match that Plaintiffs wanted to attend.  [FAC ¶ 267].  Munoz attended the game with A.M. and H.H.  [*Id.* ¶ 267].  Upon arriving at the match, Munoz explained to school staff that A.M. and H.H. were rostered varsity players and "should be permitted entry without payment."  [*Id.*].

To their confusion and frustration, Plaintiffs learned that the school administrators would not allow them entry without payment because Plaintiffs were not "physically listed on a roster".  [FAC ¶¶ 267–269].  Munoz ultimately paid entrance fees for A.M. and H.H.  [*Id.* ¶ 269].

During the game, Plaintiffs were harassed by another varsity athlete's parent, Celia Adams.  [FAC ¶ 271].  Adams allegedly yelled at Plaintiffs in the presence of school administrators and even "press[ed] against H.H.'s head in a threatening and intimidating manner."  [*Id.* ¶¶ 271, 272].  After the game, when students were taking photographs together, two other women yelled at Plaintiffs and made obscene gestures at them.  [*Id.* ¶¶ 273, 274].  These events, which occurred in front of school administrators, left Plaintiffs feeling "intimidated, threatened, uncomfortable, and harassed" due to the lack of remedial action taken to protect or support them.  [*Id.* ¶ 275].

After these events, Plaintiff Munoz emailed Principals Reyna and Moerer of the events that had transpired at the game. [FAC ¶ 276]. Plaintiff Hazameh separately emailed Principals Reyna and Moerer of the registration and roster incident. [*Id.* ¶ 277].

## C.     The Instant Lawsuit

On September 9, 2025, Plaintiffs filed this lawsuit alleging violations of their constitutional and statutory rights. [Dkt. No. 1, "Complaint"]. On November 12, 2025, pursuant to a stipulation, Plaintiffs amended their complaint to add two Title IX challenges. [*See* Complaint; *see also* FAC].

***Claims against State Defendants:*** The FAC brings two claims against State Defendants: Claims 2 and 3. [FAC at ¶¶ 327–366]. Plaintiffs' claims argue that State Defendants' policies and practices violate Title IX of the Education Amendments of 1972, and seek declaratory relief and damages. [*Id.* at ¶¶ 338, 348, 361, 366].

***Claims against School Defendant:*** Plaintiffs bring five claims against School Defendant: Claims 1, 2, 4, 5, and 6. [FAC ¶¶ 280–348, 367–437]. Claims 1 and 2 allege violations of Title IX by School Defendant, while Claims 4, 5, and 6 allege § 1983 claims for violations of the First Amendment's Free Speech and Free Exercise Clauses as well as the Fourteenth Amendment's Equal Protection Clause. [*Id.*]. Plaintiffs Munoz and Hazameh join Claim 5 only. [*Id.* ¶¶ 387–418].

***Motions to Dismiss.*** On January 9, 2026, Defendants filed their Motions to Dismiss. [*See* State MTD; *see* School MTD].

State Defendants seek to dismiss all claims brought against them by primarily arguing Plaintiffs lack Article III standing, or that sovereign immunity bars suit. [State MTD at 14–23].

School Defendant also seeks dismissal of Claims 1, 2, 3, 5, and 6. The Motion argues that Plaintiffs fail to state a claim, but also invokes immunity as a public entity. [School MTD at 15–21]. School Defendant further challenges Article III standing of individual Plaintiffs Munoz and Hazameh, and also requests that the Court strike Plaintiffs' request for punitive damages.

For the reasons discussed below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motions.

## II.     LEGAL STANDARD

### A.     Motion to Dismiss Under Rule 12(b)(1)

"[L]ack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). To have Article III standing, Plaintiffs must show: (1) an "injury in fact," (2) "causation," and (3) "a likelihood that a favorable decision will redress the plaintiff's alleged injury." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). To meet the first element of Article III standing, a Plaintiff must allege an "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Id. (citing *Lujan*, 504 U.S. at 560–61). "Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021).

### B.     Motion to Dismiss under Rule 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims in a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal of a claim is proper under Rule 12(b)(6) when a plaintiff "fails to state a cognizable legal theory or fails to allege sufficient factual support for its legal theories*." Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016). To survive a Rule 12(b)(6) motion, a plaintiff must allege sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

In analyzing a motion to dismiss, a court must accept as true all material factual allegations and draw all reasonable inferences in the non-moving party's favor. *Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005). A court need not accept, however, "a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). When reviewing a Rule 12(b)(6) motion, a court must consider the complaint in its entirety and any attached documents, documents incorporated by reference, or matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). If a complaint fails to state a plausible claim, a court should freely grant leave to amend under Federal Rule of Civil Procedure 15(a)(2) even if such a request was not made, unless amendment would be futile. *Watison v. Carter*, 668 F.3d 1108, 1117 (9th Cir. 2012).

### C.     Motion to Strike under Rule 12(f)

---

Under Rule 12(f), "[t]he Court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). A Rule 12(f) motion is not a motion to dismiss for failure to state a claim upon which relief may be granted. A motion to strike eliminates from consideration that which "can have no possible bearing on the subject matter of the litigation." *Naton v. Bank of California*, 72 F.R.D. 550, 552 n. 4 (N.D. Cal. 1976).

The essential function of a Rule 12(f) motion is to "avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial," and grounds for a motion to strike must be readily apparent from the face of the pleadings or from materials that may be judicially noticed. *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527, 1528 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994).

Similar to a motion for judgment on the pleadings, the court, in considering a motion to strike, views the challenged pleadings in the light most favorable to the plaintiffs. *See Hoeft v. Tucson Unified School Dist.*, 967 F.2d 1298, 1301 (9th Cir. 1992). "[B]ecause of the limited importance of pleadings in federal practice and because [a motion to strike] is usually used as a delaying tactic," *In re New Century*, 588 F. Supp. 2d 1206, 1220 (C.D. Cal. 2008) (citation omitted) (edits in original), federal courts generally disfavor motions to strike unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation, *see Shabaz v. Polo Ralph Lauren Corp.*, 586 F. Supp. 2d 1205, 1209 (C.D. Cal. 2008). "Ultimately, whether to grant a motion to strike lies within the sound discretion of the district court." *Cruz v. Bank of N.Y. Mellon*, No. 12-846, 2012 WL 2838957, at *2 (N.D. Cal. July 10, 2012) (citing *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010)).

## III.    DISCUSSION

Because Defendants' Motions each raise challenges to Article III standing, the Court addresses these threshold issues before discussing the merits-based arguments.

### A.    Justiciability of Plaintiffs' Claims

Although both Motions identify issues with Article III standing, the nature of these arguments differ slightly. The Court first considers State Defendants' Motion, which challenges the entirety of the FAC.

#### 1.    Article III Standing for Claims 2 and 3

State Defendants challenge each element of Article III standing. [State MTD at 14–20 (raising concerns with injury-in-fact, causation, and

---

redressability)].[2]  The Court first considers whether it has subject matter jurisdiction to consider Plaintiffs' claims for declaratory relief, and then discusses each element of Article III standing as to Plaintiffs' claims for damages.

### i.        Mootness

*First*, State Defendants observe that "Plaintiff McPherson has already graduated, and Plaintiffs A.M. and H.H. are in the process of graduating." [State MTD at 15; State Reply at 8].  Because these Plaintiffs have graduated or will soon graduate, State Defendants argue that "there is no longer a live case or controversy" to justify declaratory relief.  [*Id.*].  Based on the Court's review of Plaintiffs' Opposition to the State Defendants' Motion, there does not seem to be a substantive response to this argument.

The Court also notes that the FAC alleges that A.M., H.H., and A.H. are all seniors at JVHS.  [FAC ¶¶ 35, 37, 108].  Although it is unclear based on the FAC and the parties' briefings, it is possible that A.H. may also be in the process of graduating, which would affect whether Plaintiffs have Article III standing.

"A federal court's Article III power to hear disputes extends only to live cases or controversies."  *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1502 (D.C.Cir.1995) (citing *Renne v. Geary,* 501 U.S. 312, 320–21 (1991) ("Past exposure to illegal conduct does not in itself show a present case or controversy. . . if unaccompanied by any continuing, present adverse effects.")).  "Once the movant is no longer in harm's way, a motion for an injunction becomes moot."  *Id.*

"The starting point for analysis is the familiar proposition that 'federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them.'"  *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)).  In other words, a federal court has no authority to give opinions upon moot questions.  *See id.*  This principle applies even if the case becomes moot at a later stage in the litigation: "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997).

---

[2] Although School Defendant's Motion does not challenge Plaintiffs' Article III standing to bring Claims 2 and 3, the Court has an independent obligation to ensure it has subject matter jurisdiction over all claims even in the absence of a party's failure to raise such argument.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501 (2006).

Because mootness implicates a jurisdictional limitation, it must be addressed prior to reaching the merits of the claims. *DeFunis*, 416 U.S. at 316 (quoting *Rice*, 404 U.S. at 246); *see also Warth v. Seldin*, 422 U.S. 490, 498 (1975) (Whether a party has standing, and thus whether the case is justiciable, "is the threshold question in every federal case, determining the power of the court to entertain the suit.").

Claims 2 and 3 seek declaratory relief as well as "compensatory and punitive damages . . . , attorneys' fees, costs, and any other relief the Court deems just and proper." [FAC ¶¶ 348, 366].

Where Plaintiffs McPherson, A.M., and H.H. are no longer positioned to compete in athletics at JVHS against A.H. due to their graduation or upcoming graduation, Plaintiffs are unable to maintain a claim for declaratory relief. *See Craig v. Boren*, 429 U.S. 190, 192 (1976); *see also Ringgold v. United States*, 553 F.2d 309, 310 (2d Cir.1977). No Plaintiffs to the suit can plausibly show they will foreseeably face the injury that might have previously been posed by A.H. As such, the Court **GRANTS IN PART** School Defendants' Rule 12(b)(1) Motion for Claims 2 and 3 and **DISMISSES WITHOUT PREJUDICE** Plaintiffs' request for declaratory relief for Claims 2 and 3. However, the Court **DENIES** School Defendants' Motion as to Plaintiffs' request for monetary damages for these claims.

### ii.    Injury-In-Fact, Causation, and Redressability

Although the Court finds the above requests for relief as moot, that determination only applies to Plaintiffs' claims for prospective relief. *See Buckhannon Board & Care Home v. W. Va. Department of Health & Human Res.*, 532 U.S. 598, 608–09 (2001) ("[S]o long as the plaintiff has a cause of action for damages, a defendant's change in conduct will not moot the case"). The Court now evaluates whether Plaintiffs have Article III standing for their request for damages for Claims 2 and 3.

***Injury-In-Fact***. State Defendants suggest Plaintiffs' injuries are only generalized allegations about unfair competition, which cannot confer Article III standing. [State MTD at 15–16]. In response, Plaintiffs suggest that State Defendants' concretely injured Plaintiff in depriving them of "equal athletic opportunity, competitive displacement, loss of advancement opportunities," among other things. [Opp. to State at 10].

Consistent with this Court's observations in *T. S. v. Riverside Unified School District*, one can be injured when directly competing for some meaningful placement in athletics such that the loss of an opportunity to compete in fair and

non-discriminatory high school athletics as guaranteed by Title IX is a cognizable injury. *T. S. v. Riverside Unified Sch. Dist.*, No. 5:24-CV-02480-SSS-SPX, 2025 WL 2884416 at *7 (C.D. Cal. Sept. 24, 2025). For purposes of Article III standing, the Court finds the FAC adequately contains facts to support injury-in-fact for Claims 2 and 3.

*Causation.* State Defendants next argue that Plaintiffs' injuries cannot be fairly traced to any conduct by CDE or CIF. [State MTD at 16–17]. The SAC alleges that other schools refused to compete against A.H. such that it should be considered "'independent action' of third parties," and that Plaintiffs' "own refusal to participate along A.H." is self-inflicted injury that severs a casual chain. [*Id.*]. Underlying this argument is State Defendants' contention that "neither AB 1266 nor Bylaw 300.D require the forfeiture of participation because of a transgender student's participation." [State MTD at 16–17].

Plaintiffs dispute this characterization, arguing that State Defendants mandate compliance with AB 126, which in turn cause Plaintiffs to lose competitive opportunities or the ability to participate meaningfully in female athletic programs. [Opp. to State at 12–13].

Consider the types of injuries suffered by Plaintiffs as recited in the FAC for Claims 2 and 3. Plaintiffs insist they were injured by "losing competitive spots and opportunities due to unfair physiological advantages." [FAC ¶¶ 339, 355, 359]. Plaintiffs allege that their displacement from participation and loss of opportunity to compete in female athletic programs at JVHS is the result of State Defendants' choice to enforce AB 1266 and Bylaw 300.D. [*Id.* ¶¶ 331, 332, 352–354]. Those injuries serve as the basis for Plaintiffs' discrimination claims. As such, the Court concludes that the FAC adequately alleges that Plaintiffs' injuries are fairly traceable to State Defendants' conduct.

*Redressability.* Finally, State Defendants' Motion further argues that Plaintiffs' injuries are not redressable by damages because they "have not alleged that they lost any future opportunities because of A.H.'s participation, let alone lost opportunities quantifiable as damages." [State MTD at 18]. However, this is contrary to this Court's reasoning. *See T. S. v. Riverside*, 2025 WL 2884416 at *7 (recognizing that "[t]his type of injury can be remedied by money damages"). As such, the Court finds Plaintiffs' injuries are redressable.

The Court **DENIES** State Defendants' Motion for lack of Article III standing for Plaintiffs' request for monetary damages for Claims 2 and 3.

### 2.    Sovereign Immunity for Claims against State Defendants

Because the only remaining claims against State Defendants are Claims 2 and 3 for damages, the Court evaluates whether Congress abrogated immunity such that Plaintiffs can proceed with these claims.

State Defendants argue that Claims 2 and 3 are barred by Eleventh Amendment sovereign immunity. [State MTD at 19–23]. Under the Eleventh Amendment, a non-consenting state defendant enjoys sovereign immunity from private suits brought in federal court except where its immunity has been abrogated by Congress. *See Papasan v. Allain*, 478 U.S. 265, 276 (1986); *In re Jackson*, 184 F.3d 1048, 1049 (9th Cir. 1999). In particular, State Defendants assert that Plaintiffs "have not pleaded actual Title IX claims against [them]" but have instead brought "preemption claims under the Supremacy Clause of the Constitution." [*Id.* at 21–23]. State Defendants observe that "any purported abrogation of sovereign immunity under Title IX . . . would not extend to Plaintiffs' preemption claims." [*Id.* at 20–21].

Plaintiffs respond that they do not bring claims under the Supremacy Clause, but under Title IX. [Opp. to State MTD at 19]. The Opposition to the State Defendants' Motion reiterates that Title IX abrogates sovereign immunity for Claims 2 and 3, and that California waived immunity by accepting federal funding. [*Id.* at 15–19]. Plaintiffs correctly point out that a state waives its Eleventh Amendment immunity when it receives federal funds under Title IX. [*See* Opp. to State MTD at 15]; *see also Douglas v. California Dep't of Youth Auth.*, 271 F.3d 812, 819 (9th Cir. 2001). Moreover, Plaintiffs may seek damages for Title IX violations. *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 71 (1992).

The Court, therefore, must determine whether Plaintiffs have properly brought a Title IX claim.

Congress enacted Title IX with the twin objectives of avoiding the use of federal resources to support discriminatory practices and providing individual citizens effective protection against those practices. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998).

The FAC expressly characterizes Claims 2 and 3 as violations of Title IX. Plaintiffs maintain that AB 1266 "requires California schools to allow biological males who identify as female to participate in female-only athletic programs" such that it "mandate[s] discrimination against biological females on the basis of sex." [FAC ¶¶ 331, 334, 359, 360]. In other words, Plaintiffs bring Title IX discrimination claims against State Defendants. Without bearing on the merits of Claims 2 and 3, the Court concludes that Plaintiffs have brought Title IX discrimination claims against State Defendants. Because Congress has abrogated

the Eleventh Amendment immunity for Title IX claims, Claims 2 and 3 cannot be dismissed on this ground. *See Stanley v. Trs. of the Cal. State Univ.*, 433 F.3d 1129, 1133 (9th Cir. 2006).

To the extent Plaintiffs' factual allegations within Claim 2 appears to plead some type of preemption-based challenge to AB 1266, Plaintiffs cannot bring a preemption-based challenge under the guise of bringing a Title IX discrimination claim. The Court provides Plaintiffs with **LEAVE TO AMEND** should they seek to include these claims.

The Court **DENIES** State Defendants' Rule 12(b)(1) Motion on Eleventh Amendment immunity.

### 3.    Article III Standing for Claims against School Defendant

Plaintiffs Munoz and Hazameh only join in Claim 5, which alleges violations of the Free Exercise Clause of the First Amendment by School Defendant. [FAC ¶¶ 387–418]. Specifically, Munoz and Hazameh are practicing Catholics and Muslims who hold sincere religious convictions over certain beliefs concerning "modesty, sexual privacy, and gender distinction." [*Id.* ¶ 394]. It is undisputed that individual Plaintiffs Munoz and Hazameh are not students.

Nevertheless, School Defendant argues that individual Plaintiffs Munoz and Hazameh lack standing by maintaining that only students are affected by the school district's regulation of students pursuant to AR 6145.2 and § 221.5(f). [School MTD at 27–28]. Not so.

Consistent with the Supreme Court's decision in *Mahmoud v. Taylor*, the Free Exercise Clause of the First Amendment protects "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of " religious acts. *Mahmoud v. Taylor*, 606 U.S. 522, 546 (2025). This encompasses some "limits on the government's ability to interfere with a student's religious upbringing in a public school setting." *Id.* at 547.

For purposes of Article III standing, the Court finds that the FAC plausibly supports injury-in-fact for individual Plaintiffs Munoz and Hazameh to bring Claim 5. As such, the Court **DENIES** School Defendant's Rule 12(b)(1) Motion to Dismiss.

### B.    Motion to Strike

School Defendant seeks to strike all portions of the FAC that seek punitive damages as well as the factual allegations that are beyond the applicable statute of

limitations.  [School MTD at 31–32].  Plaintiffs' Opposition to School Defendant's Motion does not include any specific argument against this request.

As to any factual allegations that School Defendant characterizes as time-barred, Plaintiffs respond that the continuing violations doctrine prevents their exclusion from consideration.  [Opp. to School at 23].  The Ninth Circuit has observed that this doctrine "extends the accrual of a claim if a continuing system of discrimination violates an individual's rights 'up to a point in time that falls within the applicable limitations period.'"  *Douglas v. California Dep't of Youth Auth.*, 271 F.3d 812, 822 (9th Cir. 2001) (citing *Williams v. Owens–Illinois, Inc.,* 665 F.2d 918, 924 (9th Cir.1982)).

Indeed, here, it appears the FAC alleges that School Defendant engaged in sex discrimination against Plaintiffs through a series of events that began in 2022 and extended into 2025.  Where Plaintiff seeks to "point[] to a series of related acts" of which at least one falls within the relevant period of limitations, the Court finds the pre-September 2023 allegations to be included through the continuing violations doctrine.  *See Douglas*, 271 F.3d at 822.  The Court now considers School Defendant's request to strike punitive damages.

A "majority of courts" interpret the Supreme Court's opinion in *Barnes v. Gorman* to support the proposition that "punitive damages are not available under Title IX."  *See Videckis v. Pepperdine Univ.*, No. CV1500298DDPJCX, 2017 WL 11633265 at *1 (C.D. Cal. July 18, 2017) (citing *Barnes v. Gorman*, 536 U.S. 181, 186–89 (2002)).  Because punitive damages are unavailable for Claims 1, 2, and 3, the Court **GRANTS IN PART** School Defendant's Motion to Strike.  Plaintiffs' prayer for punitive damages as to Claims 1, 2, and 3 are stricken.

However, the FAC also includes § 1983 claims.  Punitive damages are available under a § 1983 claim "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).

At this stage of the pleadings, striking punitive damages for Plaintiffs' § 1983 claims is premature.  Thus, the Court **DENIES IN PART** School Defendant's Motion to Strike Plaintiffs' request for punitive damages in its entirety. Plaintiffs' prayer for punitive damages for Claims 4, 5, and 6 are not stricken.

### C.    Merits of Plaintiffs' Claims Against State Defendants

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "The existence of a private right of action to enforce Title IX is well-established." *Mansourian v. Regents of Univ. of California*, 602 F.3d 957, 964 n.6 (9th Cir. 2010).

The parties do not appear to dispute that State Defendants receive federal funding. However, State Defendants argue that Plaintiffs cannot pursue Claims 2 and 3 because (1) the Spending Clause bars Plaintiffs' Claims, (2) disparate impact is not a cognizable theory under Title IX; and (3) Plaintiffs fail to allege facts to support State Defendants' failure to provide effective accommodations or unequal treatment of Plaintiffs. [State MTD at 27–31].

The Court finds persuasive State Defendants' argument regarding disparate impact. As State Defendants observe in their Motion, Title IX is modeled after Title VI, and is interpreted consistently with the latter. [State MTD at 27 (citing *Barnes v. Gorman*, 536 U.S. 181, 185 (2002)]. Thus, where the Supreme Court has held that Title IX prohibits "intentional sex discrimination," one cannot rely on theories of disparate impact. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173–78 (2005) (referencing *Alexander v. Sandoval*, 532 U.S. 275 (2001), which held private parties may not invoke Title VI regulations to obtain redress for disparate impact).

Based upon the Court's review of the FAC, there are no factual allegations that suggest intentionality by State Defendants. Although it may be true that AB 1266 and CIF Bylaw 300.D resulted in allowing A.H. to participate in girls' athletics, Plaintiffs do not plausibly allege that State Defendants themselves excluded Plaintiffs from participation, denied them benefits, or otherwise subjected them to discrimination within the meaning of Title IX. Nor are there any facts to suggest that this was done so intentionally.

Instead, it may be that Plaintiffs seek to challenge the legality of state policies and their downstream effects at the school level. As discussed above, Plaintiffs may not bring a preemption-based challenge as a Title IX claim. Because Plaintiffs fail to allege intentional sex discrimination against State Defendants, the Court **GRANTS** State Defendants' Rule 12(b)(6) Motion.

Given the discussion above, however, the Court grants Plaintiffs **LEAVE TO AMEND** to cure any deficiencies associated with Claims 2 and 3 against State Defendants.

### D.    Merits of Plaintiffs' Claims against School Defendant

Remaining for discussion are Plaintiffs' claims against School Defendant. Plaintiffs bring two Title IX claims (Claims 1 and 2) and three § 1983 claims (Claims 4, 5, and 6) and seek damages as well as attorneys' fees. School Defendant's Motion seeks dismissal of all claims for failure to state a claim. [*See generally* School MTD]. The Court considers each type of claim in turn.

### 1.      Claim 1: Sexual Discrimination

To state a Title IX claim, Plaintiffs must plausibly allege that School Defendant excluded them from participation, denied them benefits, or subjected them to discrimination on the basis of sex. *See Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138 n.5 (9th Cir. 2019). "Title IX 'encompass[es] diverse forms of intentional sex discrimination.'" *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 946 (9th Cir. 2020) (quoting *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005)).

School Defendant challenges whether Plaintiffs' grievances amount to "sexual harassment . . . that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. [*See* School MTD at 18–19]. School Defendant's Motion relies heavily on *Parents for Privacy v. Barr* to suggest that the presence of transgender individuals does not create a hostile environment under Title IX. [*Id.* at 15–17 (citing *Barr*, 949 F.3d 1210 (9th Cir. 2020)]. However, in doing so, School Defendant fails to appreciate that plaintiffs in *Barr* did not allege inappropriate comments or physical touching as Plaintiffs in this case do. *Barr*, 949 F.3d at 1228. *Barr* specifically said that "[t]he use of facilities for their intended purpose, without more, does not constitute an act of harassment simply because a person is transgender." *Id.* at 1229. Here, Plaintiffs allege more than merely the presence of a transgender student. Therefore, the Court focuses on whether School Defendant was deliberately indifferent to A.H.'s conduct directed at Plaintiffs.

Claim 1 alleges three separate theories through which School Defendant violated Title IX in permitting A.H. to participate in girls' athletics: (1) sexual harassment; (2) failure to provide effective accommodation; and (3) failure to provide equal treatment. [FAC ¶¶ 284–326].

### i.      Sexual Harassment

"Discrimination on the basis of sex can be defined as treating someone differently simply because that person's sex is different from a similarly situated person of the opposite sex." *Videckis v. Pepperdine Univ.*, 150 F. Supp. 3d 1151, 1161 (C.D. Cal. 2015); *City of Los Angeles, Dep't of Water & Power v. Manhart*,

435 U.S. 702, 711 (1978) (applying the "simple test of whether the evidence shows treatment of a person in a manner which but for that person's sex would be different" (citation modified)). "[D]iscrimination on the basis of transgender status is a form of sex-based discrimination." *Hecox*, 104 F.4th at 1079.

The FAC maintains that Plaintiffs McPherson, A.M., and H.H. were "subjected to sexual harassment" by A.H. in repeated incidents. [FAC ¶ 284]. Because Plaintiffs' claim is predicated on a third-party's actions, Plaintiffs must plead facts supporting the conclusion that School Defendant acted with deliberate indifference. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 641–43 (1999). An educational institution acts with deliberate indifference "only where the recipient's response to the harassment or lack thereof is *clearly unreasonable* in light of the known circumstances." *Davis*, 526 U.S. at 648 (emphasis added).

"Under this standard, if an institution takes timely and reasonable measures to end the harassment, it is not liable under Title IX for prior harassment." *Lilah R. v. Smith*, 2011 U.S. Dist. LEXIS 81023, at *14, 2011 WL 2976805 (N.D. Cal. Jul. 22, 2011). "If, on the other hand, an institution either fails to act, or acts in a way which could not have reasonably been expected to remedy the violation, then the institution is liable for what amounts to an official decision not to end discrimination." *Id.*, citing *Gebster v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) ("The administrative enforcement scheme presupposes that an official who is advised of a Title IX violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation.").

Here, Plaintiffs complain that School Defendant "acted with deliberate indifference by failing to take prompt and appropriate corrective action" despite the numerous complaints that Plaintiffs made to school administrators. [FAC ¶ 289]. Plaintiffs specifically identify repeated incidents in which A.H. "slapped [Plaintiffs'] buttocks" during volleyball matches and team huddles, made "sexualized remarks" about female anatomy, and "accessed and lingered in their shared locker rooms." [*Id.* ¶¶ 284–286].

### a.    *Inappropriate Touching and Sexual Remarks.*

Deliberate indifference is generally "a fact-intensive inquiry" that must be resolved by the trier of fact. *Lilah R. ex rel. Elena A. v. Smith*, No. 11-cv-01860-MEJ, 2011 WL 2976805, at *5 (N.D. Cal. July 22, 2011). Nevertheless, "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, [can]not identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649. Therefore, we

begin with Plaintiffs' allegations regarding School Defendant's response and must determine whether that response was clearly unreasonable in light of the known circumstances.

Plaintiffs contend School Defendant were deliberately indifferent in two interrelated ways: (1) inadequate or delayed response to Plaintiffs' complaints, and (2) failure to open an investigation into A.H.'s misconduct. [Opp. to School at 11].

Plaintiffs, on many occasions, reported to school officials of A.H.'s inappropriate touching. [FAC ¶¶ 175, 180, 214, 230, 234]. In response, school administrators stated that would "investigate" the issue. [*Id.* ¶ 214 (recounting that the administration responded that it would investigate instances of A.H.'s inappropriate touching); *id.* ¶ 230 (indicating that School Defendant's Title IX coordinator told A.M.'s mother that an investigation would be initiated into their concerns); *id.* ¶ 235 (same)]. Plaintiffs further observe that they never received any follow-up communications regarding any investigation. [*Id.* ¶¶ 114, 215].

School Defendant instead argues that the FAC does not allege any inappropriate touching by A.H. after the September 2024 meeting with Assistant Principal Lopez. [School MTD at 18–19; *see* FAC ¶¶ 209–214]. School Defendant posits that the lack of subsequent inappropriate touching indicates that school officials did address and rectify Plaintiffs concerns. [*Id.*]. Although the FAC does not expressly detail each instance in which A.H. inappropriately touched Plaintiffs, the Court must draw all reasonable inferences in favor of Plaintiffs. Because the FAC mentions a meeting in August of 2025 at which Plaintiff Munoz reiterated her concerns with A.H.'s inappropriate touching, the Court finds it plausible that A.H.'s inappropriate touching continued into August of 2025. As such, School Defendant's temporal argument is unavailing.

Based on the FAC, it is unclear whether School Defendant actually initiated investigations into A.H.'s touching. Plaintiffs merely report that they never heard back from various school administrators about the inappropriate touching. At this stage in the pleadings, the Court must draw all inferences in favor of Plaintiffs. Accepting the facts in the FAC as true, there are sufficient facts to support an inference that School Defendant did not launch an investigation into A.H.'s inappropriate touching.

As such, the Court **DENIES IN PART** School Defendant's Motion as to Plaintiffs' sexual harassment theory for Claim 1.

### b.    *Locker Room Privacy.*

In contrast, School Defendant did provide some remedial action in response to Plaintiffs' grievances regarding locker room privacy.  [School MTD at 18].  Pertinent to Plaintiffs' claims of sex discrimination, School Defendant responded to Plaintiffs' various complaints by offering them "access to alternative changing areas," such as the nurse's bathroom.  [FAC ¶¶ 141, 177].  Moreover, school officials advised Plaintiffs that their concerns would be addressed at a later time, or would be escalated with the proper authorities.  [*Id.* ¶¶ 177, 186, 190].

School Defendant contends that Plaintiffs cannot show deliberate indifference because officials provided Plaintiffs with "acceptable alternatives" to their complaints about A.H.'s presence in the locker room.  [School MTD at 18 (citing *Parents for Priv. v. Dallas Sch. Dist. No. 2,* 326 F.Supp.3d 1075, 1099 (D. Or. 2018))].  Plaintiffs characterize School Defendant's remedial measures as inadequate for away games, rendering it "a further demonstration . . . of the lack of care Defendant exhibited for Plaintiffs' safety."  [Opp. to School at 12].

Courts must scrutinize the reasonableness of a school's response, even though Title IX does not provide a "right to make particular remedial demands."  *Davis*, 526 U.S. at 648.  Considering the known circumstances and environments over which School Defendant had authority, the facts in the FAC do not support an inference that the proposed alternative measures were deliberately indifferent as a matter of law.

The Court thus **GRANTS IN PART** School Defendant's Motion as to Plaintiffs' locker room privacy theory for Claim 1.  Plaintiffs are provided with **LEAVE TO AMEND**.

### ii.     Effective Accommodation and Equal Treatment

Although an intentional discrimination claim can arise in any educational context, Title IX and its regulations as applied to athletics require that funding recipients "provide equal athletic opportunity for members of both sexes."  34 C.F.R. § 106.41(c).

There are two types of claims relevant to athletic opportunity cases, effective accommodation and equal treatment.  "Effective accommodation claims . . . concern the opportunity to participate in athletics, while equal treatment claims allege sex-based differences in the schedules, equipment, coaching, and other factors affecting participants in athletics."  *Mansourian v. Regents of Univ. of California*, 602 F.3d 957 (9th Cir. 2010).

The Ninth Circuit has adopted a three-part test from Title IX's regulations to determine if an institution is complying with Title IX's effective accommodation requirement:

(1) Whether . . . participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among . . . athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among . . . athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed. Reg. 71,413, 71,418 (Dec. 11, 1979); *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 854 (9th Cir. 2014). So long as an institution complies with "any one of the above conditions," it has complied with Title IX. *Ollier*, 768 F.3d at 854.

School Defendant does not present any substantive argument as to effective accommodation. The Court, nonetheless, will evaluate whether School Defendant meets the first condition: substantial proportionality.

At the first step of the substantial proportionality analysis, the Court "begins with a determination of the number of participation opportunities afforded to male and female athletes," counting only "actual athletes, not unfilled spots." *Ollier*, 768 F.3d at 855–56 (citation modified). Then the Court "considers whether the number of participation opportunities—*i.e.*, athletes—is substantially proportionate to each sex's enrollment." *Id.* at 856. At this stage, "[e]xact proportionality is not required." *Id.*; *Id.* at 857 n.10 (paraphrasing a Department of Education statement that "a 62–woman gap would likely preclude a finding of substantial proportionality, but that a six-woman gap would likely not").

Based on the facts in the FAC, there are insufficient facts to suggest that the participation of a single transgender athlete—A.H— or anything else about the operation of AB 1266 has affected the substantial proportionality of participation opportunities available for female athletes at JVHS or within JUSD. As such,

Plaintiffs have failed to state an equal accommodation claim. *See e.g., T. S. v. Riverside Unified Sch. Dist.*, No. 5:24-CV-02480-SSS-SPX, 2025 WL 2884416 at *10 (C.D. Cal. Sept. 24, 2025)

Plaintiffs also raise an unequal treatment claim, claiming loss of athletic opportunities. [FAC ¶¶ 312–326]. Equal treatment claims require "equivalence in the availability, quality and kinds of other athletic benefits and opportunities provided male and female athletes." 44 Fed.Reg. 71,413, 71,417–418. "Compliance in the area of equal treatment and benefits is assessed based on an overall comparison of the male and female athletic programs, including an analysis of recruitment benefits, provision of equipment and supplies, scheduling of games and practices, availability of training facilities, opportunity to receive coaching, provision of locker rooms and other facilities and services, and publicity." *Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d 1093, 1110 (S.D. Cal. 2012).

Neither party engages substantively with Plaintiffs' unequal treatment claim. The Court notes that an equal treatment claim analyzes benefits available to sex-segregated teams, and the appropriate comparison is between male and female. But Plaintiffs' only comparison between the teams is that JVHS has "no 'women's' team" because of A.H.'s participation in girls' athletics. [FAC ¶ 319]. The Court interprets Plaintiffs' claim to be an argument that cisgender girls are entitled to rules of competition against only other cisgender girls. However, Plaintiffs do not allege any facts that show that School Defendant has created a sex-based difference in team policies that would affect participants in athletics. Unless Plaintiffs adequately allege that School Defendant treats, or would treat, its boys' and girls' teams differently in complying with AB 1266, CIF Bylaw 300.D, and AR 6145.2, Plaintiffs cannot demonstrate how a Title IX equal treatment claim is appropriate in this case.

The Court **GRANTS** School Defendant's Motion as to Plaintiffs' effective accommodation and equal treatment claims. Plaintiffs are granted **LEAVE TO AMEND**.

Consistent with the discussion above, the Court **GRANTS IN PART** and **DENIES IN PART** School Defendant's Motion as to Title IX sex discrimination.

### 2.     Claim 2: Facial Challenge

Claim 2 posits that School Defendant, along with State Defendants, engage in policies and practices that "result in unequal treatment of female athletes in violation of Title IX." [FAC ¶ 338]. For the same reasons discussed above in Part IIII.C, Claim 2 attempts to bring a Title IX claim under a disparate impact theory. Plaintiffs cannot do so.

Because Claim 2 lacks the factual support to show intentional discrimination, the Court **GRANTS** School Defendant's Motion to Dismiss as to Claim 2. Plaintiffs are granted **LEAVE TO AMEND** any pleading deficiencies associated with this claim.

### 3.     Section 1983 Claims (Claims 4, 5, and 6)

Plaintiffs bring § 1983 claims against School Defendant for depriving them of their right to equal protection under the law in violation of the Fourteenth Amendment and their right to free exercise and free speech under the First Amendment. [*See* FAC ¶¶ 367–437]. To state a claim under § 1983, Plaintiffs must plausibly "allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

As a preliminary matter, School Defendant argues that it is immune from suit. [School MTD at 21].

The Eleventh Amendment bars § 1983 claims against the State of California and its school districts. *Belanger v. Madera Unified School District,* 963 F.2d 248, 254–55 (9th Cir.1992); *Corales v. Bennett*, 567 F.3d 554, 573 (9th Cir. 2009) ("The district court correctly determined that school districts in California are immune from § 1983 claims by virtue of Eleventh Amendment immunity."). Moreover, the Ninth Circuit has continued to rely on *Belanger* for the proposition that "a school district cannot be sued for damages under § 1983." *C.W. v. Capistrano Unified Sch. Dist.,* 784 F.3d 1237, 1247 (9th Cir.2015); *see also Pierce v. Santa Maria Joint Union High Sch. Dist.,* No. 12–57296, 2015 WL 2345154, at *1 (9th Cir. May 18, 2015).

School Defendant is a school district in Riverside County, California. [FAC ¶ 14]. Moreover, the Court has already determined that the FAC's prayer for relief now only seeks monetary relief in relation to Plaintiffs' claims. Therefore, Plaintiff's § 1983 claims are barred by the Eleventh Amendment.

The Court **GRANTS** School Defendant's Motion to Dismiss as to Claims 4, 5, and 6. These claims are **DISMISSED WITH PREJUDICE**.

## IV.     CONCLUSION

The Court **GRANTS IN PART** and **DENIES IN PART** the Motions as follows:

---

- State Defendants' Rule 12(b)(1) Motion is **GRANTED** as to Plaintiffs' request for declaratory relief for Claims 2 and 3 as to all Defendants;

- State Defendants' Rule 12(b)(1) Motion is **DENIED** as to Plaintiffs' request for damages for Claims 2 and 3;

- State Defendants' Rule 12(b)(6) Motion is **GRANTED** as to Claims 2 and 3. The Court grants Plaintiffs **LEAVE TO AMEND** any deficiencies with these claims.

- School Defendant's Rule 12(b)(1) Motion is **DENIED** as to Plaintiffs Munoz and Hazameh;

- School Defendant's Rule 12(b)(6) Motion is **GRANTED IN PART** as to Claim 1's sexual harassment claim under the locker room theory and Claim 1's effective accommodation and equal treatment claims. Plaintiffs are granted **LEAVE TO AMEND** those claims. The Motion is **DENIED IN PART** as to Claim 1's sexual harassment claim under the inappropriate touching theory.

- School Defendant's Rule 12(b)(6) Motion is **GRANTED** as to Claim 2. The Court grants Plaintiffs **LEAVE TO AMEND** any deficiencies with this claim.

- School Defendant's Rule 12(b)(6) Motion is **GRANTED** as to Claims 4, 5, and 6. Claims 4, 5, and 6 are **DISMISSED WITH PREJUDICE**.

- School Defendant's Rule 12(f) Motion is **GRANTED IN PART** as to Claims 1, 2, and 3 and **DENIED IN PART** as to Claims 4, 5, and 6.

Plaintiffs are **ORDERED** to file an amended complaint by **May 29, 2026**, as to the surviving claims. Plaintiff is also **ORDERED** to email a red lined version of the amended complaint to SSS_chambers@cacd.uscourts.gov on the date it is filed. If an amended complaint is filed, Defendants must either file a motion to dismiss or responsive pleading within 14 days after being served with the amended complaint.

**IT IS SO ORDERED.**