ADVOCATES FOR FAITH & FREEDOM
Robert H. Tyler (SBN 179572)
btyler@faith-freedom.com
Erin Mersino (*Pro Hac Vice*)
emersino@faith-freedom.com
25026 Las Brisas Road
Murrieta, California 92562
Telephone: (951) 600.2733

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

MADISON MCPHERSON, an individual; A.M., a minor by and through her mother and natural guardian MARIBEL MUNOZ, individually; H.H., a minor by and through her mother and natural guardian, HANAN HAZAMEH, individually;

Plaintiff(s)

v.

JURUPA UNIFIED SCHOOL DISTRICT; CALIFORNIA INTERSCHOLASTIC FEDERATION; and CALIFORNIA DEPARTMENT OF EDUCATION;

Defendant(s)

Case No.: 5:25-cv-02362-SSS (SPx)

**PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY**

**Judge: Hon. Sunshine S. Sykes**

Plaintiffs MADISON MCPHERSON, an individual; A.M., a minor by and through her mother and natural guardian MARIBEL MUNOZ, individually; H.H., a minor by and through her mother and natural guardian, HANAN HAZAMEH, individually (collectively, "Plaintiffs"), by and through their counsel of record, respectfully request this Court take notice of the decision in *West Virginia v. B.P.J.*, 609 U.S. ___ (2026) (herein after "B.P.J."), decided by the U.S. Supreme Court on June 30, 2026, notably after this Court issued its February 5, 2026 and May 5, 2026

Orders which dismissed several of Plaintiffs' Title IX claims. The holding in *B.P.J.* creates inconsistency with this Court's prior orders and serves as a basis for revising those orders.

In *B.P.J.*, the Supreme Court clarified the scope of Title IX's guarantee of "equal opportunity for female student-athletes" and held that allowing a biological boy violates Title IX for two reasons relevant to the instant case. *B.P.J.*, No. 24-43, slip op. at 1.

First, due to inherent physical differences pertinent to athletic competition, a male's mere inclusion in girls' sports threatens girls' physical safety poses a harm. *Id*. at 16-17. In volleyball, for instance, males' physical advantages in terms of jumping ability, weight, and strength mean "spiked balls can cause serious injury" to female players. *Id*. at 16. A threat female athletes would otherwise not face. The Court noted that the inclusion of biological males in girls' sports carries "second-order effects," such as preventing girls, who would otherwise play girls sports, from even trying out for a team due to the appearance of competitive disadvantage and fear of sustaining a physical injury. *Id*. at 16-17.

Second, the inclusion of biological boys in girls' sports necessarily undermines competitive fairness for the female athletes because sports are a "zero sum" game. *Id*. at 27. The Supreme Court explains that, "[e]ven if only one or a few males were to play on a women's or girl's team, that would still place specific individual athletes at a significant competitive disadvantage." *Id*. at 16-17. The Supreme Court recognized the realtity that "[e]very biological male who wins a race takes a gold medal away from a female athlete." *Id*. at 16. And this is true of every spot of a team, every starting line-up, every athletic scholarship, every player of the game, every award, and every other opportunity—if the opportunity goes to the biological male, *ipso facto*, it is taken from the biological girl or woman, including the Plaintiffs. *Id*. at 16-17, 27. The mere inclusion of one biological male athlete means the exclusion or loss for a biological girl. *Id*. at 16-17, 27.

This Court's prior orders rely on now-overruled standards. Namely, that a single transgender male did not render athletic opportunities unequal or unsafe for Plaintiffs. The Supreme Court has now clarified that even one male's participation in girls' sports violates Title IX because it unduly threatens female athletes' physical safety and undermines equal athletic opportunity.

And while the Supreme Court explained that its decision in *B.P.J.* "do[es] not present the distinct question of whether, under Title IX and the Equal Protection Clause, schools may allow biological males who identify as female to participate on girls' and women's sports teams[,]" and that "[n]othing in [*B.P.J.*] is intended to decide that question[,]" Plaintiffs do not argue that the holding in *B.P.J.* decided that question. *Id.* at 3 n.1. The Plaintiffs, to the contrary, argue that the Supreme Court's reasoning and holdings in *B.P.J.*, specifically regarding the proper interpretation and parameters of Title IX, are instructive here and should be part of this Court's analysis, as they affect this Court's prior rulings.

DATED: July 15, 2026

ADVOCATES FOR FAITH & FREEDOM

By: /s/ Robert Tyler
Robert Tyler, Esq.
*Attorney for Plaintiffs Madison McPherson, et al*

# EXHIBIT "A"

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WEST VIRGINIA ET AL. *v*. B. P. J., BY HER NEXT FRIEND AND MOTHER, HEATHER JACKSON

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 24–43. Argued January 13, 2026—Decided June 30, 2026*

The question before the Court in these cases is whether, under Title IX and the Equal Protection Clause of the Fourteenth Amendment, schools may maintain women's and girls' sports teams for biological females, *i.e.*, may schools determine eligibility for female sports based on biological sex? In the past six years, 27 States have enacted laws that maintain female sports for biological females.

In 2021, West Virginia enacted the Save Women's Sports Act, which prohibits male students from playing on female teams. W. Va. Code Ann. §§18–2–25d(c)(2)–(3). The law specifies that sex is determined by biology. §§18–2–25d(a)(4), (b)(1). The legislature expressly found that prohibiting biological male participation in female sports is necessary to promote equal athletic opportunities for women and girls. See §§18–2–25d(a)(1), (3), (5). Respondent B. P. J., who identifies as female, is a biological male as defined by §§18–2–25d(a)(4), (b)(1). B. P. J. has sought to participate on the girls' cross-country and track-and-field teams at school. B. P. J. sued West Virginia and relevant officials for alleged violations of Title IX and the Equal Protection Clause of the Fourteenth Amendment. The U. S. District Court for the Southern District of West Virginia granted summary judgment for the State on both claims. On appeal, the Fourth Circuit reversed on the Title IX issue and remanded for further fact-finding on the Equal Protection Clause claim. 98 F. 4th 542.

---

*Together with No. 24–38, *Little, Governor of Idaho, et al.* v. *Hecox et al.*, on certiorari to the United States Court of Appeals for the Ninth Circuit.

In 2020, Idaho enacted the Fairness in Women's Sports Act, which prohibits male students from participating on female teams. Idaho Code Ann. §33–6203. The Idaho law states that sex is determined by biology. *Ibid*. And the law declares that "separate sex-specific teams furthers efforts to promote sex equality . . . by providing opportunities for female athletes." §33–6202(12). It also recognizes the physical differences between biological males and biological females. §§33–6202(1)–(5), (7), (8), (10)–(12). The law further found that the benefit "that natural testosterone provides to male athletes is not diminished through the use of puberty blockers and cross-sex hormones." §33–6202(11). Respondent Hecox, who identifies as female, is a biological male as defined by §33–6203. Hecox competed for the women's club soccer team, and tried out for the women's Division I track and cross-country teams. Shortly after Idaho enacted the Fairness in Women's Sports Act, Hecox sued Idaho and relevant officials, alleging a violation of the Equal Protection Clause. The U. S. District Court for the District of Idaho granted a preliminary injunction barring enforcement of the Fairness in Women's Sports Act, and the Ninth Circuit affirmed. 104 F. 4th 1061.

*Held*:

1. Title IX allows schools to provide separate women's and men's sports teams defined by biological sex, and West Virginia has permissibly maintained female sports for biological females consistent with Title IX. Pp. 8–14.

(a) Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U. S. C. §1681(a). Two years after Title IX became law in 1972, Congress passed the Javits Amendment, which directed the then-Department of Health, Education, and Welfare (HEW) to promptly issue "regulations implementing the provisions of" Title IX with respect to "the prohibition of sex discrimination." §844, 88 Stat. 612. The amendment further specified that the regulations "shall include with respect to" "athletic activities *reasonable provisions considering the nature of particular sports*." *Ibid*. (emphasis added). In 1975, HEW promulgated comprehensive regulations requiring that schools provide "equal athletic opportunity for members of both sexes" and authorizing "separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 CFR §§106.41(b), (c). Pp. 8–10.

(b) The term "sex" in Title IX, the Javits Amendment, and the Title IX regulations cannot plausibly be interpreted to refer to anything other than biological sex. The ordinary meaning of the term "sex" at

the time of enactment in the early 1970s was biological sex and not gender identity, particularly in the sports context. See, *e.g.*, *Frontiero* v. *Richardson*, 411 U. S. 677, 686 ("sex" is "an immutable characteristic"). In addition, the Title IX regulations allowed separate sports teams precisely because of the inherent physical differences between biological men and biological women.

While B. P. J. agrees that Title IX permits schools to maintain separate female and male teams and to prohibit *most* biological males from playing on women's and girls' teams, B. P. J. argues that schools must make an exception to that general rule for biological males who identify as female and have taken puberty blockers or hormones. But the texts of Title IX, the Javits Amendment, and the Title IX regulations do not support that argument, and do not speak to that issue in a way that could properly be interpreted to require schools to allow biological males to participate in women's and girls' sports.

B. P. J. argues that if the regulations authorize a school to limit female sports teams to biological females without exception, then the regulations are not "reasonable" as required by the Javits Amendment, §844, 88 Stat. 612. The Court concludes that separate sports teams for biological males and biological females are reasonable given the inherent physical differences between the sexes. In assessing the reasonableness of the regulations, the Court must recognize the distinctiveness of competitive sports—and the safety and competitive fairness issues that can arise when females are forced to compete against males. In recent years, 27 States and various sports-governing bodies have all drawn the same line. Pp. 10–12.

(c) The Court rejects B. P. J.'s two other Title IX-related arguments. B. P. J. contends that the school's policy violates Title IX because the policy effectively excludes B. P. J. from any competitive sports teams at the school. While it is an unhappy occasion whenever a student who wants to play school sports cannot do so, the Title IX regulations guarantee only "equal athletic opportunity."

B. P. J. relies on Title VII of the Civil Rights Act of 1964, 42 U. S. C. §2000e–2(a)(1), and *Bostock* v. *Clayton County*, 590 U. S. 644, as support for interpreting Title IX to require that schools allow biological males on female teams. Title VII and *Bostock* are not relevant in this very different statutory and factual context of sports. Pp. 13–14.

2. West Virginia and Idaho did not violate the Equal Protection Clause of the Fourteenth Amendment by maintaining female sports teams for biological females. Pp. 14–25, 27–29.

(a) The challenged West Virginia and Idaho laws make sex-based classifications in limiting female teams to biological females. Under this Court's equal protection precedents, sex-based classifications are permissible only when the classification is "substantially related" to

achieving an "important" government objective. *United States* v. *Skrmetti*, 605 U. S. 495, 510 (quotation marks omitted). The States argue—and the Court agrees—that the interests of safety and competitive fairness are important interests for purposes of equal protection analysis. And the States' sex-based classification—limiting women's and girls' sports to biological females—is substantially related to those interests. See *Ibid.* Schools may determine eligibility for women's and girls' sports based on biological sex. Pp. 14–17.

(b) Respondents acknowledge that States may exclude most biological males from women's and girls' sports, given the general physical differences between males and females. The Equal Protection Clause does not prohibit the States from applying that same principle to all biological males, including those who identify as female. States are not required to conduct an individual-by-individual comparison of the physical and athletic capabilities of all biological males in order to satisfy intermediate scrutiny. Under the intermediate scrutiny test the "validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." *Ward* v. *Rock Against Racism*, 491 U. S. 781, 801. Intermediate scrutiny permits a sex-based classification that, as here, is "not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." *Michael M.* v. *Superior Court, Sonoma Cty.*, 450 U. S. 464, 469 (plurality opinion).

The as-applied argument that the States' sex-based classification is generally permissible—but not as applied to those biological males such as B. P. J. and Hecox who identify as female and have taken puberty blockers or hormones—fails for the same reasons. Particularly in the sports context, determining the effects of the puberty blockers and hormones taken by transgender athletes—and then comparing each of those transgender athletes' abilities to those of other individual biological males and individual biological females in the relevant sport—would be an almost impossible task for a judge to perform on an equitable basis. The legislatures and the schools are better equipped—and under the Constitution, are the more appropriate entities—to assess the competing medical and scientific considerations and draw appropriate lines.

The argument that the challenged laws unconstitutionally discriminate against transgender individuals is unavailing. Under this Court's decision in *Skrmetti*, the challenged laws do not classify based on gender identity or transgender status, see 605 U. S., at 517, but instead on the basis of biological sex. The classification at issue readily satisfies rational basis review or intermediate scrutiny. Pp. 17–24.

(c) The underlying medical and scientific premise of the equal

protection challenge here is that at least some biological males who identify as female and take puberty blockers or hormones do not retain physical advantages over biological females. That premise is the subject of ongoing medical and scientific debate. Even if true, that empirical claim would not alter the equal protection conclusion set forth above. Pp. 24–26.

No. 24–43, 98 F. 4th 542, and No. 24–38, 104 F. 4th 1061, reversed and remanded.

KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, GORSUCH, and BARRETT, JJ., joined. THOMAS, J., and GORSUCH, J., filed concurring opinions. SOTOMAYOR, J., filed an opinion concurring in the judgment in part and dissenting in part, in which KAGAN and JACKSON, JJ., joined. JACKSON, J., filed an opinion concurring in the judgment in part and dissenting in part.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

Nos. 24–43 and 24–38

WEST VIRGINIA, ET AL., PETITIONERS
24–43 *v.*
B. P. J., BY HER NEXT FRIEND AND MOTHER, HEATHER JACKSON

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

BRADLEY LITTLE, GOVERNOR OF IDAHO, ET AL., PETITIONERS
24–38 *v.*
LINDSAY HECOX, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 30, 2026]

JUSTICE KAVANAUGH delivered the opinion of the Court.

Title IX transformed American sports and American life. Enacted in 1972, that landmark law promoted equal opportunity for female student-athletes and has facilitated the extraordinary growth of women's and girls' sports over the past 54 years.

To provide equal opportunity for female athletes, schools do not merely maintain, for example, one soccer team, one basketball team, one ice hockey team, and one lacrosse team that are equally open to female and male athletes. That approach would deny equal opportunity to female athletes because, as all agree, females and males have

inherent physical differences relevant to athletic performance.

Those "[p]hysical differences between men and women" are "enduring." *United States* v. *Virginia*, 518 U. S. 515, 533 (1996). The differences include, among other things, height, weight, strength, speed, endurance, and jumping ability. Therefore, in contact sports, forcing female athletes to compete against males can create significant safety risks. And in virtually all competitive sports, forcing female athletes to compete against males can undermine competitive fairness.

To ensure equal opportunity for female athletes, schools therefore typically maintain separate women's and men's sports teams. Women's teams compete against other women's teams, and men's teams compete against other men's teams. To ensure equal opportunity, Title IX's regulations also require schools to provide the women's and men's teams equivalent equipment, facilities, scheduling, and the like.

In recent years, some biological males who identify as female have sought to play on women's or girls' sports teams. That modern development has triggered national and international concerns about safety and competitive fairness for female athletes, as well as related worries about preserving equal opportunity for women and girls to play sports. For those reasons, 27 States—as well as the International Olympic Committee, the United States Olympic and Paralympic Committee, and the NCAA—have banned all biological males from competing in women's and girls' sports.

These cases concern two of those state laws, from West Virginia and Idaho. The question before the Court is: Under Title IX and the Equal Protection Clause of the Fourteenth Amendment, may schools maintain women's and girls' sports for biological females? In other words, may

schools determine eligibility for women's and girls' sports based on biological sex? The answer is yes.[1]

## I

### A

Prior to Title IX's enactment in 1972, the participation of the two sexes in American sports was badly skewed. In the 1971–1972 school year, only about 300,000 high school girls played sports. Meanwhile, about 3.6 million high school boys played sports. The situation was similarly imbalanced at the college level. See NCAA, Title IX 50th Anniversary: The State of Women in College Sports 15, 17.

The low female participation rate was the byproduct of overt sex discrimination, as well as mistaken stereotyping of American women and girls. Men and boys usually received more encouragement and more opportunities to play sports than women and girls. And male sports teams typically received more funding and resources than female teams. As of 1972, for example, women's sports reportedly accounted for only 2% of annual college athletics spending. 130 Cong. Rec. S4601 (Apr. 12, 1984) (remarks of Sen. Stevens).

In 1972, in a belated but historic response to persistent discrimination against women in educational institutions, including in athletics, Congress passed and President Nixon signed Title IX of the Education Amendments of 1972. Title IX prohibits "discrimination under any

---

[1] As the plaintiffs, the States, and the United States as *amicus curiae* all agree, these cases do not present the distinct question of whether, under Title IX and the Equal Protection Clause, schools may *allow* biological males who identify as female to participate on girls' and women's sports teams. That question is currently the subject of litigation in some lower courts. Nothing in this opinion is intended to decide that question. In addition, nothing in this opinion should be interpreted to address or limit participation by biological females on male or co-ed sports teams.

education program or activity receiving Federal financial assistance" "on the basis of sex." 20 U. S. C. §1681(a).

Few laws have been as effective and consequential in day-to-day American life as Title IX. Every day across America, gyms, fields, and other sports venues are filled with female athletes competing fiercely in youth, high school, college, and professional sports. About 3.5 million high school girls now play sports. Nat. Federation of State High School Assns., 2024–2025 High School Athletics Participation Survey, p. 57 (Aug. 22, 2025). An additional 235,000 women play competitively in college. NCAA, Title IX 50th Anniversary: The State of Women in College Sports 16–17; NCAA, Sports Sponsorship and Participation Rates Report, p. 94 (Sept. 4, 2025).

Participation in sports has enabled countless American women and girls to be on a team, to take part in the human drama of athletic competition, to overcome the agony of defeat and know the thrill of victory. And those lessons and experiences in sports have empowered millions of American women who have gone on to thrive in all aspects of American life.

B

Over the past several years, some biological males who identify as female have sought to play various women's and girls' sports. Some of them have taken, as relevant here: (i) puberty-blocking drugs that suppress the rise of puberty-inducing hormones; or (ii) cross-sex hormones and other drugs, such as those that suppress testosterone or increase estrogen, sometimes called hormone therapy. (For ease of reference, we will refer to puberty blockers and hormones.) Those biological males contend that by taking puberty blockers or hormones, they can mitigate the physical advantages inherent to their biological sex, as relevant to sports.

Intense policy and legal disputes have ensued over whether biological males should be allowed to play on women's and girls' sports teams. Many athletic organizations and States have recently acted decisively to prohibit all biological males from participating in women's sports—that is, to limit women's and girls' teams to biological females.

In 2025, the NCAA prohibited biological male students, including those who identify as female and have taken hormones, from competing on women's teams. The U. S. Olympic and Paralympic Committee followed suit, likewise prohibiting biological males from competing in women's sports. NCAA, Participation Policy for Transgender Student-Athletes (Feb. 6, 2025); USOPC, Athlete Safety Policy §3.3 (June 18, 2025).

More recently, the International Olympic Committee similarly limited Olympic participation in women's sports to biological females. The IOC did so in order to "protect fairness in such sports and events, as well as safety particularly in contact sports." The IOC found that biological males possess a "performance advantage in all sports and events that rely on strength, power, and/or endurance," including a "20+ per cent" advantage in "most throwing and jumping events," a "10-12 per cent" advantage in "most running and swimming events," and a "greater than 100 per cent" advantage in "events that involve explosive power." IOC, Policy on the Protection of the Female (Women's) Category in Olympic Sport and Guiding Considerations for International Federations and Sports Governing Bodies 2, 3 (Mar. 26, 2026).

Moreover, the IOC found that "athletes retain Male performance advantage due in part to training effects and fixed traits. There is no current evidence that testosterone suppression or gender-affirming hormone treatment eliminates this advantage." *Id.*, at 3.

Most relevant for present purposes: In the past six years, 27 States have enacted laws that maintain women's and girls' sports for biological females. These cases concern two of those state laws, from West Virginia and Idaho.

C

West Virginia has long authorized sex-separated school sports teams "where selection for such teams is based upon competitive skill." W. Va. Code Rule §127–2–3.8 (2025). In 2021, the West Virginia Legislature passed and Governor Justice signed the Save Women's Sports Act. The Save Women's Sports Act prohibits male students from playing on female teams. W. Va. Code Ann. §§18–2–25d(c)(2)–(3) (2022).

The law specifies that sex is determined by biology. §§18–2–25d(a)(4), (b)(1). The legislature expressly found that prohibiting biological male participation in female sports is necessary to promote equal athletic opportunities for women and girls. See §§18–2–25d(a)(1), (3), (5).

B. P. J. is a biological male who identifies as female. In third grade, B. P. J. socially transitioned and adopted a new name. Soon thereafter, B. P. J. took puberty blockers to prevent male puberty, and in sixth grade, B. P. J. also began to take hormones.

Shortly after passage of the West Virginia law, as B. P. J. was about to enter sixth grade, B. P. J.'s middle school principal informed B. P. J.'s mother that B. P. J. could not participate on the girls' cross-country and track-and-field teams. B. P. J. is now in high school, where the same policies apply.

B. P. J. sued West Virginia officials and agencies for alleged violations of Title IX and the Equal Protection Clause of the Fourteenth Amendment. The U. S. District Court for the Southern District of West Virginia granted summary judgment for the State on both claims. On appeal, the U. S. Court of Appeals for the Fourth Circuit

reversed on the Title IX issue and remanded for further fact-finding on the Equal Protection Clause claim. 98 F. 4th 542 (2024). This Court granted certiorari. 606 U. S. 959 (2025).

During the ongoing litigation, B. P. J. competed on the teams. Recently, B. P. J. won the West Virginia Class AAA high school state championship in girls' shot put and finished fourth in girls' discus. B. P. J. won the Region 2 championship in both events. See Supp. Letter of W. Va. in No. 24–43 (May 29, 2026).

D

In 2020, the Idaho Legislature passed and Governor Little signed the Fairness in Women's Sports Act. Like the West Virginia law, the Idaho law prohibits male students from participating on female teams. Idaho Code Ann. §33–6203.

The Idaho law states that sex is determined by biology. *Ibid.* And the law declares that "separate sex-specific teams furthers efforts to promote sex equality . . . by providing opportunities for female athletes." §33–6202(12) (2025). It also recognizes the physical differences between biological males and biological females. §§33–6202(1)–(5), (7), (8), (10)–(12).

The law further found that the benefit "that natural testosterone provides to male athletes is not diminished through the use of puberty blockers and cross-sex hormones. §33–6202(11).

Hecox is a biological male who identifies as female. Hecox underwent male puberty. In college, Hecox began to take hormones. Hecox attends Boise State University and has competed for the women's club soccer team. Hecox also has tried out for the women's Division I track and cross-country teams.

Shortly after Idaho enacted the Fairness in Women's Sports Act, Hecox sued Idaho officials and agencies,

alleging a violation of the Equal Protection Clause. The U. S. District Court for the District of Idaho granted a preliminary injunction barring enforcement of the Fairness in Women's Sports Act, and the U. S. Court of Appeals for the Ninth Circuit affirmed. 104 F. 4th 1061 (2023). This Court granted certiorari. 606 U. S. 959 (2025).

## II

We first address the Title IX issue, which is raised only by B. P. J. in the West Virginia case. B. P. J. argues that the State and school officials violated Title IX by excluding B. P. J. from the girls' cross-country and track-and-field teams. Under Title IX, according to B. P. J., schools must allow biological males who identify as female and have taken puberty blockers or hormones to compete on girls' sports teams. We respectfully disagree.

### A

Passed by Congress and signed by President Nixon in 1972, Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U. S. C. §1681(a).

As originally enacted, Title IX did not explicitly address sports. Two years after Title IX became law, Congress passed and President Ford signed what is known as the Javits Amendment. The Javits Amendment directed the then-Department of Health, Education, and Welfare (HEW) to promptly issue "regulations implementing the provisions of" Title IX with respect to "the prohibition of sex discrimination." §844, 88 Stat. 612. The amendment further specified that the regulations "shall include with respect to" "athletic activities *reasonable provisions considering the nature of particular sports*." *Ibid.* (emphasis added).

In 1975, pursuant to that statutory directive, HEW promulgated comprehensive regulations to prevent sex discrimination in school sports. 40 Fed. Reg. 24128. Most critically, the regulations required that schools provide "equal athletic opportunity for members of both sexes" and authorized "separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 CFR §§106.41(b), (c) (2025). The regulations defined contact sports as "boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact." *Ibid*.

Those regulations took effect on July 21, 1975, and they remain in place today. Because HEW's interpretation of Title IX was "issued contemporaneously with the statute" and has "remained consistent over time," it is "especially useful in determining the statute's meaning." *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369, 394 (2024).[2]

B

The question is whether Title IX permits schools to maintain women's and girls' sports for biological females. The answer is yes.

Title IX prohibits discrimination on the basis of sex. Title IX's implementing regulations expressly permit schools to maintain separate teams for "members of each sex."

---

[2] In relevant part, §106.41 of the regulations states:

"(b) *Separate teams*. Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. . . . For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

"(c) *Equal opportunity*. A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes."

Case 5:25-cv-02362-SSS-SP Document 60 Filed 07/15/26 Page 19 of 81 Page ID #:681



§106.41(b). The term "sex" in the 1972 Title IX statute, the 1974 Javits Amendment, and the 1975 Title IX regulations cannot plausibly be interpreted to refer to anything other than biological sex. The ordinary meaning of the term "sex" at the time of enactment in the early 1970s was biological sex and not gender identity, particularly in the sports context. See, *e.g.*, *Frontiero* v. *Richardson*, 411 U. S. 677, 686 (1973) (plurality opinion) ("sex" is "an immutable characteristic").

In addition, the Title IX regulations allowed separate sports teams precisely because of the biological differences between the sexes—namely, the inherent physical differences between biological women and biological men. For example, the regulations authorized separate women's and girls' teams in sports when the teams are "based upon competitive skill or the activity involved is a contact sport." §106.41(b). By referring to contact sports and competitive skill, the regulations plainly recognized the inherent physical differences between biological men and biological women—as well as the safety and competitive fairness concerns that would arise if males were allowed to compete in female sports. As Justice Stevens explained a few years afterwards: "Without a gender-based classification in competitive contact sports, there would be a substantial risk that boys would dominate the girls' programs and deny them an equal opportunity to compete in interscholastic events." *O'Connor* v. *Board of Ed. of School Dist. 23*, 449 U. S. 1301, 1307 (1980) (in chambers).

Notably, B. P. J. does not seriously contest that the term "sex" in Title IX, the Javits Amendment, and the regulations means biological sex. Moreover, B. P. J. agrees with West Virginia and the United States as *amicus curiae* that Title IX permits schools to maintain separate female and male teams and to prohibit *most* biological males from playing on women's and girls' teams. B. P. J. disagrees with West Virginia and the United States only about

whether schools must make an exception to that general rule for biological males who identify as female and have taken puberty blockers or hormones.

But the texts of Title IX, the Javits Amendment, and the Title IX regulations do not say (or even hint) that schools must allow certain biological males to participate in women's and girls' sports. Nor do the statute or regulations say that schools must make an exception for those biological males who identify as female and have taken puberty blockers or hormones. Put simply, the statute and regulations do not speak to that issue in a way that could properly be interpreted to require schools to allow biological males to participate in women's and girls' sports.

B. P. J. counters with an argument based on the 1974 Javits Amendment. B. P. J. zeroes in on the Javits Amendment's directive that HEW, in its regulations, adopt "*reasonable* provisions considering the nature of particular sports." §844, 88 Stat. 612 (emphasis added). As B. P. J. sees things, if the regulations authorize a school to limit women's and girls' sports teams to biological females, then the regulations are not "reasonable" and therefore are unlawful.

We disagree. Separate sports teams for biological males and biological females are reasonable: Given the inherent physical differences between the sexes, allowing only biological females to play on women's and girls' teams can reduce the risk of physical injury and ensure fair competition. True, some might prefer a different rule allowing biological males who identify as female to participate on women's and girls' sports teams, at least in certain circumstances. But it was surely "reasonable" for HEW in 1975 to draw a biological line—a line where biological males play only on male sports teams and only biological females play on female sports teams. Even in recent years, 27 States, the NCAA, the USOPC, and the IOC have all drawn the same line.

In assessing the reasonableness of the regulations, we also must recognize the distinctiveness of competitive sports—and the safety and competitive fairness issues that can arise when females are forced to compete against males.

With respect to safety, allowing biological males to play on women's and girls' sports teams can put women and girls at significant risk of injuries. The safety risks are particularly severe in contact sports.

And as to competitive fairness, allowing biological males to play on women's and girls' sports teams can put female athletes at a serious disadvantage. That is because sports are generally zero sum. Allowing a biological male athlete to compete on a girls' team *necessarily* displaces or disadvantages a female athlete—replacing her on the roster, knocking her out of the starting lineup, reducing her playing time, depriving her of a medal, and the like. That hard reality of sports cannot be ignored or swept under the rug. On the contrary, that reality must and does inform interpretation of the term "reasonable" in the Javits Amendment.

Whether biological males may participate on women's and girls' sports teams may be a debated *policy* question. But the *legal* question for Title IX purposes is whether West Virginia may limit women's and girls' sports teams to biological females. As a matter of text and history, West Virginia may do so.

C

B. P. J. advances two other Title IX-related arguments that warrant brief mention.

*First*, B. P. J. contends that the school's policy violates Title IX because the policy effectively excludes B. P. J. from any competitive sports teams at the school. B. P. J. has taken puberty blockers and hormones, meaning that B. P. J. apparently will no longer be strong or fast enough

to compete successfully against boys. Moreover, B. P. J. might not want to compete against boys. Either way, it is an unhappy occasion whenever a student who wants to play school sports cannot do so. We appreciate the desire of every student, including B. P. J., who wants to play school sports. And we recognize that student-athletes are understandably disappointed and upset when they do not make a team or otherwise cannot participate. But the Title IX regulations guarantee "equal athletic opportunity." The regulations cannot and do not guarantee every student a spot on a team's roster.

*Second*, B. P. J. cites Title VII of the Civil Rights Act of 1964, 42 U. S. C. §2000e–2(a)(1), and *Bostock* as support for interpreting Title IX to require that schools allow biological males on female teams. Title VII prohibits employment discrimination "because of . . . sex," and *Bostock* held that the prohibition forbids firing an employee "for being gay or transgender." *Bostock* v. *Clayton County*, 590 U. S. 644, 662 (2020). B. P. J. contends that Title IX similarly bars West Virginia's law because (as B. P. J. sees things) the law excludes B. P. J. from sports on the basis of gender identity.

We disagree. Title VII concerns employment, whereas Title IX as relevant here focuses on sports. The two factual contexts are vastly different. And the two statutes are also "vastly different." *Jackson* v. *Birmingham Bd. of Ed.*, 544 U. S. 167, 175 (2005). In the workplace, Title VII generally requires that men and women be treated without regard to their sex. In the sports context, by contrast, Title IX authorizes separate men's and women's sports teams. And because Title IX permits separate teams, the only question here is whether schools may limit women's and girls' sports to biological females—a question that was not addressed by *Bostock*, as the Court expressly noted. See 590 U. S., at 681 (we "do not purport to address bathrooms, locker rooms, or anything else of the kind"). Stated simply, Title VII and

*Bostock* are not relevant in this very different statutory and factual context.

In sum, Title IX allows schools to provide separate women's and men's sports teams defined by biological sex. Consistent with Title IX, West Virginia has permissibly maintained women's and girls' sports for biological females.

## III

We next address the constitutional challenges to the West Virginia and Idaho laws under the Equal Protection Clause of the Fourteenth Amendment. Both B. P. J. and Hecox raise an equal protection argument. They contend that the States violated the Equal Protection Clause by maintaining female sports teams for biological females. Again, we respectfully disagree.[3]

---

[3] After this Court granted review, Hecox filed a suggestion of mootness stating that Hecox will "cease playing women's sports in any context covered by" the Idaho law. App. to Suggestion of Mootness, Decl. of L. Hecox in No. 24–38, ¶6 (Sept. 1, 2025). As the party asserting mootness, Hecox bears the "formidable burden of showing that it is absolutely clear the . . . behavior could not reasonably be expected to recur." *Already, LLC* v. *Nike, Inc.,* 568 U. S. 85, 91 (2013) (quotation marks omitted).

Hecox has been a student at Boise State University since 2019 and is still enrolled there. At Boise State, Hecox has competed on the women's club soccer team and has sought to try out for the Division I women's track and cross-country teams. In 2022, Hecox stated in a declaration to the Court of Appeals: "I intend to play for the BSU's Women's Club Soccer Team this semester, next semester, and *through the remainder of my time at BSU*." Decl. of L. Hecox in No. 20–35813 etc., ¶21 (CA9, Sept. 21, 2022) (emphasis added).

Only in September 2025, after this Court granted certiorari, did Hecox articulate a different view about playing competitive sports at Boise State. But that shift may not be permanent, particularly given Hecox's prior change in position. Cf. *Erie* v. *Pap's A. M.*, 529 U. S. 277, 287–288 (2000). Moreover, post-certiorari actions that would "insulate a decision from review by this Court must be viewed with a critical eye." *Knox* v. *Service Employees*, 567 U. S. 298, 307 (2012).

Hecox remains an enrolled student at Boise State. Hecox's case is not moot.

A

Ratified in 1868, the Equal Protection Clause provides that no State shall deny "to any person within its jurisdiction the equal protection of the laws." U. S. Const., Amdt. 14. That command "must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *United States* v. *Skrmetti*, 605 U. S. 495, 509 (2025) (quotation marks omitted).

Under this Court's equal protection precedents, laws that classify by sex are subject to what is known as intermediate scrutiny: Sex-based classifications are permissible only when the classification is "substantially related" to achieving an "important" government objective. *Id.*, at 510 (quotation marks omitted); see also *United States* v. *Virginia*, 518 U. S. 515, 532–533 (1996) (Ginsburg, J., for the Court); *Mississippi Univ. for Women* v. *Hogan*, 458 U. S. 718, 724–725 (1982) (O'Connor, J., for the Court).

The West Virginia and Idaho laws authorize separate female and male sports teams. And the laws limit women's and girls' sports teams to biological females. In doing so, the laws make a sex-based classification that triggers intermediate scrutiny.

So the equal protection questions become: What are the States' interests in maintaining separate teams for males and females, and in limiting female teams to biological females? And is the States' sex-based classification—that is, the limitation of women's and girls' sports teams to biological females—substantially related to those interests?

The States start with the undisputed proposition that biological males generally possess inherent physical advantages in sports—in height, weight, strength, speed, endurance, jumping ability, and the like. See *United States* v. *Virginia*, 518 U. S., at 533 ("Physical differences between men and women . . . are enduring"). Therefore, the States say, limiting women's and girls' sports to biological females

(i) helps prevent serious physical injuries to female athletes and (ii) preserves opportunities for female athletes to fairly compete and succeed. And more broadly, the States articulate the objective of promoting "equal athletic opportunities for the female sex"—that is, to provide opportunities for biological women and girls to compete only against other biological women and girls. W. Va. Code Ann. §18–2–25d(a)(5); see also Idaho Code Ann. §33–6202(12) ("Having separate sex-specific teams furthers efforts to promote sex equality" "by providing opportunities for female athletes to demonstrate their skill, strength, and athletic abilities").

With respect to safety, the States say that allowing biological males to play on women's sports teams puts women and girls at significant risk of sometimes severe injuries. The safety risks are at their apex in contact sports, such as soccer, basketball, field hockey, lacrosse, and ice hockey, among others. (Anyone who thinks that those women's and girls' sports, and other sports like them, are not contact sports has not witnessed a game recently.) And safety concerns also exist in ostensibly non-contact sports, such as volleyball, where spiked balls can cause serious injuries, and softball, where line drives can similarly cause significant harm.

As to competitive fairness, the States contend that allowing biological males to play women's and girls' sports would put female athletes at a debilitating disadvantage. Again, sports are generally zero sum. Every biological male who makes the team takes a roster spot from a female athlete. Every biological male who earns playing time reduces the playing time of a female athlete. Every biological male who starts takes a starting position from a female athlete. Every biological male who wins a race takes the gold medal away from a female athlete. And so on. Even if only one or a few males were to play on a women's

or girls' team, that would still place specific individual female athletes at a significant competitive disadvantage.

What is more, forcing women and girls to play against biological males can deter some women and girls who would otherwise participate in sports from doing so—out of understandable concern about suffering serious injury or participating in what they view as an unfair competition. That second-order effect of allowing biological males to play women's and girls' sports cannot be papered over, so the States say.

Based on all of the above, the States argue—and we agree—that the interests in safety and competitive fairness are important for purposes of equal protection analysis. And the States' sex-based classification—limiting women's and girls' sports to biological females—is substantially related to those interests. See *Skrmetti*, 605 U. S., at 510; *Tuan Anh Nguyen* v. *INS*, 533 U. S. 53, 70 (2001); *Michael M.* v. *Superior Court, Sonoma Cty.*, 450 U. S. 464, 472–473 (1981) (plurality opinion). Therefore, schools may maintain women's and girls' sports for biological females. In other words, schools may determine eligibility for women's and girls' sports based on biological sex.

B

Once again, the plaintiffs agree with the States that, consistent with the Equal Protection Clause, the States may prohibit *most* biological males from women's and girls' teams. The plaintiffs' equal protection argument is narrower. They contend that safety and competitive fairness, while sufficient reasons to exclude most biological males, do not justify excluding a relatively small *subclass* of biological males—namely, those biological males who identify as female and have taken puberty blockers or hormones.

The plaintiffs characterize their equal protection argument in three overlapping ways—(i) as a lack of

substantial relationship between the law's biological-sex classification and the State's interests in safety and competitive fairness; (ii) as an as-applied challenge to the biological-sex classification; and (iii) as discrimination against transgender athletes. Under this Court's precedents, none of those three arguments succeeds.

*First*, the plaintiffs argue that the States have not established a substantial relationship between (i) the States' interests in safety and competitive fairness and (ii) limiting women's and girls' sports to biological females. They say that the States' interests in safety and competitive fairness do not justify excluding *all* biological males—including those who identify as female and have taken puberty blockers or hormones—from participation in women's and girls' sports.

But this Court's equal protection precedents allow general classifications like those made in the West Virginia and Idaho laws so long as there is at least a substantial relationship between the classification and the State's interests. See *United States* v. *Virginia*, 518 U. S., at 533. After all, "most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Skrmetti*, 605 U. S., at 509 (quotation marks omitted). As the Court has long recognized, "[p]erfection in making the necessary classifications is neither possible nor necessary." *Massachusetts Bd. of Retirement* v. *Murgia*, 427 U. S. 307, 314 (1976) (*per curiam*). For that reason, none of this Court's "gender-based classification equal protection cases have required that the statute under consideration must be capable of achieving its ultimate objective in every instance." *Nguyen*, 533 U. S., at 70.

Rather, under the intermediate scrutiny test that the Court applies in a variety of contexts, the "validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an

individual case." *Ward* v. *Rock Against Racism*, 491 U. S. 781, 801 (1989). So we "judge the validity of the restriction in this case by the relation it bears to the general problem . . . not by the extent to which it furthers the Government's interest in an individual case." *United States* v. *Edge Broadcasting Co.*, 509 U. S. 418, 430–431 (1993).

Here, when analyzing the relationship between the classification based on biological sex and the asserted interests, the sports context is again crucial. Sports are different from, say, a typical employment or educational opportunity where equal protection often may require that the government generally treat an individual *without regard to the individual's sex*. In the sports context, by contrast, everyone agrees that the States may maintain separate women's and men's teams—in other words, that the States may make distinctions based on sex—because of the inherent physical differences between women and men.

And importantly, everyone also agrees that States, in preserving separate sports teams for female athletes, need not account for the individual physical capabilities of (and differences among) every biological male who might want to play on a women's or girls' team. To spell that out: Not *every* biological male athlete is bigger, stronger, faster, or otherwise more athletically able than *every* biological female athlete. Some percentage of biological males who identify as *male* possess physical and athletic capabilities that fall within (or below) the range of typical female physical and athletic capabilities. But the plaintiffs acknowledge that States may still exclude those biological males from women's and girls' sports, given the *general* physical differences between males and females.[4]

[4] That concession reveals that the plaintiffs' argument is based not on physical capabilities alone but also on gender identity. Suppose, for example, that two boys want to play on a girls' team. One boy identifies as male, and the other identifies as female. And suppose that both have

And the Equal Protection Clause does not prohibit the States from applying that same principle to all biological males, including those who identify as *female*. In the distinctive sports context, in other words, the States may treat all biological males the same and treat all biological females the same, given the inherent physical differences between biological males and biological females.

In short, States are not required to conduct an individual-by-individual comparison of the physical and athletic capabilities of all biological males in order to satisfy intermediate scrutiny. Intermediate scrutiny permits a sex-based classification that, as here, is "not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." *Michael M.*, 450 U. S., at 469 (plurality opinion).

*Second*, and relatedly, the plaintiffs advance what they describe as an as-applied equal protection argument. The plaintiffs say that the States' sex-based classification is generally permissible—but not as applied to those biological males such as B. P. J. and Hecox who identify as female and have taken puberty blockers or hormones.

But that argument is basically the same as the plaintiffs' first argument about the relationship between the laws' classification and the States' interests—just with different labeling. The plaintiffs' as-applied argument posits that the States' interests must justify the laws' application to a

---

the same size, height, strength, speed, jumping ability, and the like. The plaintiffs say that schools must allow the biological male who identifies as female to play on a girls' team. But schools may exclude from the girls' team the biological male who identifies as male, even if he has the same physical capabilities. So the plaintiffs' position is based not only on physical capabilities but also in part on gender identity. In a cryptic footnote, the dissent articulates the same view as the plaintiffs on that point. *Post*, at 23, n. 9 (SOTOMAYOR, J., concurring in judgment in part and dissenting in part). But the Constitution does not require that schools determine eligibility for women's and girls' sports based on gender identity rather than biological sex.

specific subclass or individual. To be sure, the plaintiffs' as-applied nomenclature and focus on subclasses is a useful construct in equal protection cases to help analyze the relationship between a State's classification and the State's asserted interests. Specifically, if a State's interests do not apply to an especially large subclass within the class specified by the State's law, then that fact may demonstrate that the relationship between the State's classification and the State's interests is not close enough. But as long as the relationship is sufficient as a general matter, the State is not *constitutionally* required to grant individualized exemptions to specific athletes or subclasses.[5]

The plaintiffs' as-applied argument is in essence a backdoor argument for strict scrutiny, which requires a much tighter relationship between the State's classification and the State's asserted interests. But strict scrutiny does not apply to sex-based classifications, as the plaintiffs acknowledge. And strict scrutiny would be particularly out of place in this sports case, where sex-based classifications are permitted and the only question is whether the States may limit women's and girls' sports to biological females.

Especially in the sports context, moreover, an enormous practical and administrability problem would arise if courts

---

[5] For support of their as-applied argument, the plaintiffs cite *Caban* v. *Mohammed*, 441 U. S. 380 (1979), and *Lehr* v. *Robertson*, 463 U. S. 248 (1983). But *Caban* nowhere stated that a plaintiff may obtain an as-applied exception to a law's classification under intermediate scrutiny review. Rather, *Caban* looked to the facts of the case at hand to illustrate the overbroad classification. 441 U. S., at 391. And *Lehr* in turn rejected an asserted as-applied exception. 463 U. S., at 267–268. It is true that *Lehr* somewhat confusingly characterized *Caban* as accepting something akin to an as-applied argument. *Id.*, at 267. But that characterization was incorrect, in our view, and in any event, *Lehr's* holding did not turn on its characterization of *Caban*. Also, the Court's more recent decision in *Nguyen* clarified that as-applied challenges are not entertained when courts apply intermediate scrutiny or rational basis review. See *Tuan Anh Nguyen* v. *INS*, 533 U. S. 53, 70 (2001).

suddenly had to make such individualized exemptions. How would courts draw those lines? Individuals come in all shapes and sizes, with different height, weight, muscle mass, heart capacity, lung capacity, strength, speed, endurance, jumping ability, and so on. Particularly in the sports context, determining the effects of the puberty blockers and hormones taken by transgender athletes—and then comparing each of those transgender athletes' abilities to those of other individual biological males and individual biological females in the relevant sport—would be an almost impossible task for a judge to perform on an equitable basis. The legislatures and the schools are better equipped—and under the Constitution, are the more appropriate entities—to assess the competing medical and scientific considerations and draw appropriate lines. Of course, no line that the States draw will satisfy everyone. But the Judiciary is not the proper institution to make what would often be arbitrary and highly intrusive athlete-by-athlete assessments.

And if those kinds of ad hoc exemptions based on physical capacity were constitutionally required, would exemptions also be required for biological males who still identify as male but contend that they, too, are no taller, no stronger, no faster than the typical females in their chosen sport? Would those males also be entitled to play on a women's or girls' team? If not, why not?

We need not belabor the point. In the sports context, starting down the road of judicially managed individualized exemptions based on physical capabilities of individual athletes could fundamentally undermine women's and girls' sports—especially if the number of biological males who seek to play women's and girls' sports increases significantly over time. The questions would be endless (and bitter) and yield few, if any, principled answers. The Equal Protection Clause and this Court's precedents do not require such a judicial quagmire.

*Third*, the plaintiffs also argue that the States' laws unconstitutionally discriminate against transgender individuals—specifically, biological males who identify as female.

That argument, too, is unavailing. To begin, under this Court's decision in *Skrmetti*, the laws do not classify based on gender identity or transgender status. 605 U. S., at 517. The laws classify on the basis of biological sex. By contrast, if a school had a co-ed sports team but prohibited all transgender individuals from participating on the team, that would be a distinct transgender classification and, unlike today's cases, would presumably not be analyzed and justified as a classification based on biological sex.

That said, even if the laws made a transgender or gender-identity classification, this Court "has not previously held" that intermediate or other heightened scrutiny applies to a transgender or gender-identity classification. *Ibid*. Several Members of this Court, moreover, have concluded that classifications based on transgender status or gender identity should receive only deferential rational basis review and not intermediate or other heightened scrutiny. See *id*., at 550–553 (BARRETT, J., joined by THOMAS, J., concurring); *id.,* at 566 (ALITO, J., concurring in part and concurring in judgment).

In these cases, we need not definitively resolve whether rational basis review or intermediate scrutiny applies to transgender classifications. In either event, the classification here readily satisfies rational basis review or intermediate scrutiny for the reasons already explained at some length above. The States' interests in ensuring safety and competitive fairness amply justify the States in maintaining women's and girls' sports for biological females. Under the Equal Protection Clause, therefore, schools may determine eligibility for women's and girls' sports based on biological sex.

C

Finally, the underlying medical and scientific premise of the plaintiffs' entire equal protection argument is that at least some biological males who identify as female and take puberty blockers or hormones do not retain physical advantages over biological females.

Even if true, that empirical claim would not alter the equal protection conclusion set forth above. Under intermediate scrutiny, there still would be a sufficient relationship between the States' classification based on biological sex and the States' asserted interests in safety and competitive fairness.

In any event, the plaintiffs' premise is the subject of ongoing medical and scientific debate and is not settled in their direction at this time. States and leading athletic organizations disagree with the plaintiffs and have concluded that biological males still retain a physical advantage after taking puberty blockers and hormones. To take one prominent example, the IOC found that "athletes retain Male performance advantage due in part to training effects and fixed traits. There is no current evidence that testosterone suppression or gender-affirming hormone treatment eliminates this advantage." IOC, Policy on the Protection of the Female (Women's) Category in Olympic Sport and Guiding Considerations for International Federations and Sports Governing Bodies (Mar. 26, 2026).

The plaintiffs counter with arguments and studies of their own. But in assessing state and federal laws passed under circumstances of "medical and scientific uncertainty," this Court has often said that the Judiciary must be cautious about swooping in and invalidating laws. *Skrmetti*, 605 U. S., at 524 (quotation marks omitted). The legislatures, we have emphasized, maintain "wide discretion to pass legislation" in those circumstances. *Ibid.* (quotation marks omitted). For good reason. Especially on medical and scientific matters where there is serious debate

and disagreement, it can be difficult for courts to meaningfully evaluate the considered policy judgments of the lawmakers who have scrutinized the medical evidence and scientific data before them, and have made a reasoned decision. See *ibid.*; cf. *Turner Broadcasting System, Inc.* v. *FCC*, 520 U. S. 180, 195–196 (1997). When there are "open questions regarding basic factual issues before medical authorities and other regulatory bodies," there is "little basis for judicial responses in absolute terms." *Skrmetti*, 605 U. S., at 525 (quotation marks omitted). The "calculus of effects, the manner in which a particular law reverberates in a society, is a legislative and not a judicial responsibility." *Ibid.* (quotation marks omitted).

To be sure, judicial deference does not mean abdication. But the current public medical and scientific record does not definitively establish that the 27 States, the IOC, the USOPC, and the NCAA are wrong in acting on the basis that at least some biological males who have taken puberty blockers or hormones still retain physical advantages over females.

In those circumstances, to reiterate, the legislative "institution is far better equipped than the judiciary to amass and evaluate the vast amounts of data," particularly in cases involving a topic of "inherent complexity." *Turner Broadcasting*, 520 U. S., at 195–196 (quotation marks omitted). Indeed, "it is precisely where such disagreement exists that legislatures have been afforded the widest latitude in drafting such statutes." *Kansas* v. *Hendricks*, 521 U. S. 346, 360, n. 3 (1997). Stated simply, "courts should be cautious not to rewrite legislation" "in areas fraught with medical and scientific uncertainties." *Marshall* v. *United States*, 414 U. S. 417, 427 (1974). So it is here.

In closing on the equal protection issue, we repeat what the Court said in *Skrmetti*:

> "This case carries with it the weight of fierce scientific and policy debates . . . in an evolving field. The voices in these debates raise sincere concerns; the implications for all are profound. The Equal Protection Clause does not resolve these disagreements. Nor does it afford us license to decide them as we see best. Our role is not to judge the wisdom, fairness, or logic of the law before us, but only to ensure that it does not violate the equal protection guarantee of the Fourteenth Amendment. Having concluded that it does not, we leave questions regarding its policy to the people, their elected representatives, and the democratic process." 605 U. S., at 525 (quotation marks and citation omitted).

IV

Two points in response to the dissent:

First, the dissent directs various rhetoric against the Court's opinion—employing phrases such as "contorted logic" and "misguided approach" and "diminished view of equal protection" and "unencumbered by fact or law." *Post*, at 2, 23, 29 (SOTOMAYOR, J., concurring in judgment in part and dissenting in part).

With respect, that rhetoric is misdirected. The Court's holding today is straightforward. The Equal Protection Clause allows schools to maintain separate teams for female and male athletes. Schools may determine eligibility for women's and girls' teams based on biological sex. That policy is constitutionally justified by the vitally important interests in safety and competitive fairness so as to provide equal opportunities for women and girls to participate in sports. And when a sex-based classification is justified as a constitutional matter, as it is here, States need not make case-by-case exceptions—for example, schools need not make individual exceptions to allow

certain biological males to compete in women's and girls' sports.

Second, we do not accept the dissent's assumed monopoly on understanding the effects on individuals involved in disputes over transgender athletes. We are acutely aware of the difficulties sometimes faced by boys who identify as girls (and by girls who identify as boys) in middle school, high school, and beyond. And we greatly admire the desire of all students, including transgender students such as B. P. J., who want to participate in sports. But in conducting the equal protection inquiry, we must also account for the effects on girls who are forced to compete against biological males in sports.

* * *

Some might ask: What is the harm in allowing an additional athlete to compete in women's or girls' sports? That sentiment, though understandable, misunderstands the nature and reality of sports.

Sports are highly competitive and generally zero sum. At almost every turn, someone wins and someone loses. Every athlete who makes a team takes a roster spot from another athlete. Every player who earns playing time reduces the playing time of a teammate. Every player who makes the starting lineup sidelines another who remains on the bench. Every competitor who wins a race or competition deprives another athlete of that victory, or medal, or prize. Every team that wins because of an added player means that another team has lost because of that added player. Every player who makes all-conference beats out another player who does not. Every student who earns an athletic scholarship takes that opportunity away from another student. And so on.

Women and girls who play sports care deeply about all of those things. They obsess about them. They spend extraordinary time and effort to train in the heat and in the

cold, to work out early in the morning and late at night, to get a little faster, to become a little stronger, to jump a little higher, to shoot a little better, to watch a little more video, to make the lonely journey back from an ACL tear, to scrap for playing time, to start, to win the game, to win a championship, to hang a banner, to bring home a medal, to be all-tournament, all-county, all-State, or all-American. They put a championship trophy or all-league award on their bedroom shelf—and it stays there forever as a reminder of their love of the game and pride in their achievements. They learn to endure losses with grace, to lift up their teammates, and to respect opponents who have beaten them fairly and squarely. They learn to win with class—to look a defeated opponent in the eye, shake her hand, and congratulate her on her effort. Whether the star of the team or the last player on the bench, they form lifelong friendships and lifetime memories. They savor their athletic accomplishments and cherish them for years, even decades, after their playing days are over.

The two States here—along with 25 other States, the IOC, the USOPC, and the NCAA—have concluded at this time that women and girls should be allowed to compete for those life-changing opportunities on an equal playing field, without fear of physical injury from biological males or being forced to compete against biological males. Consistent with Title IX and the Equal Protection Clause, we hold that the States may maintain women's and girls' sports for biological females. They may determine eligibility for women's and girls' sports based on biological sex. The Constitution and Title IX do not require an overhaul of women's and girls' sports throughout America.

In so ruling, we emphasize one last point. Most of the biological female and transgender student-athletes who are involved in transgender sports disputes around the country are teenagers or in their early twenties. Those student-athletes want to play sports. Their desire to compete

warrants respect. No student-athlete on either side of the issue, whether a biological female or transgender, deserves to be ostracized or vilified.

In B. P. J.'s case, we reverse the judgment of the U. S. Court of Appeals for the Fourth Circuit and remand the case for further proceedings consistent with this opinion. In Hecox's case, we reverse the judgment of the U. S. Court of Appeals for the Ninth Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

Nos. 24–43 and 24–38

WEST VIRGINIA, ET AL., PETITIONERS
24–43 *v.*
B. P. J., BY HER NEXT FRIEND AND MOTHER, HEATHER JACKSON

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

BRADLEY LITTLE, GOVERNOR OF IDAHO, ET AL., PETITIONERS
24–38 *v.*
LINDSAY HECOX, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 30, 2026]

JUSTICE THOMAS, concurring.

The Court correctly holds that neither Title IX nor the Equal Protection Clause prohibits States from offering sex-separated athletics. A man does not have a legal right to compete against women just because he believes that he is a woman. I join the Court's opinion in full. I write separately to make two points.

First, transgender status is not a suspect class requiring heightened equal-protection scrutiny. *United States* v. *Skrmetti*, 605 U. S. 495, 547–557 (2025) (BARRETT, J., concurring). The class of people who claim transgender status could more accurately be described as people who are experiencing "gender dysphoria," which is not a "discrete group." *Id.*, at 550–551 (internal quotation marks omitted); see also *id.*, at 566–567 (ALITO, J., concurring and concurring in

judgment). Because "gender dysphoria" is a mutable mental state that is the object of psychiatric treatment, it does not resemble the immutable characteristics on the basis of which our precedents have applied heightened scrutiny—race, sex, or national origin. Instead, gender dysphoria resembles other characteristics on the basis of which legislatures may classify with a merely rational basis. See, *e.g.*, *Heller* v. *Doe*, 509 U. S. 312, 321 (1993) (mental illness); *Plyler* v. *Doe*, 457 U. S. 202, 220 (1982) (immigration status). Legislatures have many obvious rational bases to keep men who believe that they are women out of teams and private spaces reserved for women.

Second, as the Court recognizes, this case concerns "biological men" and "boys who identify as girls." *Ante,* at 10, 27. Men and boys with gender dysphoria are not women or girls, even if they believe that they are. Sex is an immutable "biological" characteristic, see *ante,* at 10; it is binary; and "man" and "woman," "boy" and "girl," are the terms that correspond to adults and children of each sex. See A. Byrne, Are Women Adult Human Females? 177 Philosophical Studies 3783, 3786–3787 (2020). To use language to obscure reality—to show "indifference regarding the truth"—is to lie to the public and cease to treat our fellow citizens "as equal[s]." J. Pieper, Abuse of Language—Abuse of Power 17, 21 (1992).

# SUPREME COURT OF THE UNITED STATES

Nos. 24–43 and 24–38

WEST VIRGINIA, ET AL., PETITIONERS
24–43 *v.*
B. P. J., BY HER NEXT FRIEND AND MOTHER, HEATHER JACKSON

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

BRADLEY LITTLE, GOVERNOR OF IDAHO, ET AL., PETITIONERS
24–38 *v.*
LINDSAY HECOX, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 30, 2026]

JUSTICE GORSUCH, concurring.

I join the Court's opinion and write to add two observations about Title IX.

First, "Title IX was enacted as an exercise of Congress' powers under the Spending Clause." *Jackson* v. *Birmingham Bd. of Ed.*, 544 U. S. 167, 181 (2005). That provision of the Constitution does not allow Congress to regulate conduct; instead, it only authorizes Congress to spend money. *Medina* v. *Planned Parenthood South Atlantic*, 606 U. S. 357, 370–371 (2025). Of course, Congress may seek to condition the funds it gives to others. *Id.*, at 365. But much as with any contract, a funding recipient must "'voluntarily and knowingly'" assent to those conditions for them to bear any legal force. *Id.*, at 373 (quoting *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981)). And

for a funding recipient to provide that kind of assent, Congress must "clearly and unambiguously" specify the conditions it expects the funding recipient to follow. *Medina*, 606 U. S., at 373, n. 4; see also *Pennhurst*, 451 U. S., at 17, 25.

Nothing in Title IX clearly and unambiguously alerts funding recipients that they are prohibited from restricting a school-sponsored sports team to biological women or girls. Just consider the statute's terms and the evidence before us about their original meaning. Adopted in 1972, Title IX generally prohibits discrimination "on the basis of sex." 20 U. S. C. §1681. As it is now, the term "sex" was commonly understood then to mean biological sex. See, *e.g.*, Webster's New World Dictionary 1305 (2d ed. 1972). And while Title IX generally prohibits discrimination on the basis of biological sex, Congress has taken pains to emphasize that "nothing" in its mandate "sh[ould] be construed" as forbidding separate-sex living facilities in school settings, signaling that sex separation doesn't always amount to discrimination under the statute. §1686. Shortly after the law's adoption, too, Congress directed the Department of Health, Education, and Welfare to publish implementing regulations addressing athletics. Pub. L. 93–380, §844, 88 Stat. 612 (1974). And the agency responded with regulations expressly permitting schools to "sponsor separate teams for members of each sex." 45 CFR §86.41(b) (1975), as recodified, 34 CFR §106.41(b) (2025); see also *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369, 430 (2024) (GORSUCH, J., concurring) (contemporaneously issued and longstanding regulations do not control but can supply evidence of statutory meaning). Putting all these pieces together, and consistent with the Court's conclusion today, Title IX does not clearly and unambiguously alert funding recipients that they are prohibited from sponsoring sports teams restricted to biological women or girls.

Second, *Bostock* v. *Clayton County*, 590 U. S. 644 (2020), supports, not undermines, the Court's conclusion. There,

we faced the question whether firing an employee for being homosexual or transgender amounted to "discriminat[ion] . . . because of . . . sex" in violation of Title VII. *Id.*, at 650–651, 655 (internal quotation marks omitted). In answering that question, we took two things as given. One, everyone agreed that firing an employee counts as "discrimination" in violation of Title VII if done because of sex. See *id.*, at 681. Two, we read the word "sex" in Title VII to refer to biological sex. *Id.*, at 655. Given all that, the only issue we had to resolve was whether discriminating against individuals for being homosexual or transgender qualifies as discrimination "because of" their biological sex. We held that it does. The statutory phrase "because of" does not require biological sex to be the *only* cause animating discrimination. Instead, that phrase merely requires biological sex to be *one* such cause. *Id.*, at 656–659. And, as we detailed in our opinion, discriminating against a person for being homosexual or transgender necessarily entails discriminating against that person at least in part because of his biological sex. *Id.*, at 660.*

All of that is consistent with the course the Court takes today. Title IX prohibits various types of discrimination "on the basis of sex." §1681(a). The Court understands the term "sex" in Title IX to mean biological sex, just as we understood that term in Title VII in *Bostock*. See *ante,* at 10. Likewise, the Court does not question that "on the basis of" is perhaps but a synonym for "because of" and thus does not require biological sex to be the sole cause of

---

*Contra JUSTICE JACKSON, *post*, at 3, this Court's sex-stereotyping cases proceed similarly. So, for example, when an employer fires a female employee for failing to conform to a sex stereotype, the employer does so both because of the employee's biological sex and because she is perceived to act in ways that defy some stereotype the employer holds about her biological sex. And given that the employee's biological sex constitutes one reason for her firing, the employer's conduct implicates Title VII. See *Bostock*, 590 U. S., at 659–660, 662; see also *Price Waterhouse* v. *Hopkins*, 490 U. S. 228, 250–251 (1989) (plurality opinion).

discrimination, just as we held in *Bostock*. See *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60, 75 (1992).

The difference between this case and *Bostock* is that we face here a question that wasn't present there. In *Bostock*, again, no one doubted that firing someone because of his biological sex qualified as "discrimination" under Title VII. See 590 U. S., at 681. Here, though, we face the question whether it qualifies as discrimination under Title IX for a federal funding recipient to sponsor sports teams restricted to biological women or girls alone. And for the reasons just laid out above and explored in depth by the Court, it does not. Title IX anticipates and approves single-sex living accommodations and sports teams in school settings; it does not treat them as unlawful discrimination. See *supra*, at 2; *ante,* at 8–12.

Put simply, it is a mistake to assume that, just because firing someone in part because of his biological sex amounts to unlawful discrimination in violation of Title VII, sponsoring a single-sex sports team limited to biological women or girls must also amount to unlawful discrimination in violation of Title IX. It's a point *Bostock* took care to underscore. As we put it, while "[f]iring employees because of a statutorily protected trait surely counts" as unlawful discrimination under Title VII, the question "[w]hether other policies and practices might or might not qualify as unlawful discrimination" under Title VII itself or other provisions of law cannot be simply assumed but must be assessed with reference to the policies in question and according to the relevant law's terms. 590 U. S., at 681; see also *ibid.* (stressing that policies concerning "sex-segregated bathrooms, locker rooms, and dress codes"—and, one might add, school-sponsored sports teams—were not before us).

I appreciate that questions surrounding the participation of transgender athletes in women's and girls' sports are subjects of intense debate nationwide. The questions surrounding *Bostock* were too. But as there, our charge here

is not to resolve those debates, only to apply faithfully directives found in a federal statute. And, as in *Bostock*, I believe the Court does that job today, reaching the result the law demands.

# SUPREME COURT OF THE UNITED STATES

Nos. 24–43 and 24–38

WEST VIRGINIA, ET AL., PETITIONERS
24–43 *v.*
B. P. J., BY HER NEXT FRIEND AND MOTHER, HEATHER JACKSON

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

BRADLEY LITTLE, GOVERNOR OF IDAHO, ET AL., PETITIONERS
24–38 *v.*
LINDSAY HECOX, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 30, 2026]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, concurring in the judgment in part and dissenting in part.

Respondent B. P. J. is a transgender girl who wants to live her life consistent with her gender identity. When B. P. J. was 11 years old, she sought the opportunity to do what she and so many other children love to do: play sports. In order to do so, B. P. J. needed to turn to litigation because West Virginia has banned all transgender girls from playing in girls' sports from middle school through college. According to the State, this ban serves the State's important interests in ensuring safety and preventing unfair competitive advantages in girls' sports. B. P. J., however, contends that neither of the State's asserted justifications apply to transgender girls like her, who have never

experienced an endogenous male puberty, who receive gender-affirming treatment, and who, as a result of both, B. P. J. says, lack any athletic advantage that is inherent to their sex identified at birth.

In the five years since the ban has been in place, B. P. J. is the only transgender girl publicly identified in the State who has sought to play sports with other girls. Today the Court holds that neither Title IX nor the Equal Protection Clause protects B. P. J.'s ability to do so. I agree that B. P. J.'s Title IX claim fails, although on a narrower basis than that on which the majority relies. As for B. P. J.'s equal protection claim, however, the majority, at this stage of the litigation, gets the answer wrong.

Applying a form of heightened scrutiny divorced from this Court's cases, the majority holds that transgender girls like B. P. J. who wish to play girls' sports are not protected by the Constitution, even if B. P. J. is correct that neither of the State's interests is furthered by their exclusion. Yet the Equal Protection Clause demands much more when a State deploys a sex classification to achieve legislative aims. Perhaps West Virginia could meet those demands. Perhaps not. In either event, because unresolved factual questions prevent the Court from assessing the merits of B. P. J.'s equal protection claim at this time, the Court should allow the District Court to address those factual questions in the first instance. Yet in an opinion unencumbered by fact or law, the majority today cuts off that process prematurely, deciding instead that B. P. J.'s case must end now.

This litigation implicates deeply sensitive, contentious, and evolving issues. These circumstances demand exercising judicial restraint, not rushing to answer conclusively difficult questions without sufficient evidentiary development. In opting otherwise, the majority extends great sympathy to those it favors: the young cisgender girls and women who play sports. I share that sympathy. Playing sports can lead to benefits that are immeasurable, and

many are understandably invested in ensuring that competition stays fair and safe. Because the majority, however, inflicts a hardship on those it disfavors without giving them the fair and full opportunity the Constitution requires to litigate their contentions, I respectfully dissent.

## I

Before addressing the complex legal issues that this case presents, it is important to understand its history and the people involved, both of which the majority unduly brushes over.[1]

### A

In 2021, West Virginia banned all transgender girls and women from participating in school sports designated for female students. Dubbed the "Save Women's Sports Act," W. Va. Code Ann. §18–2–25d (Lexis 2022), the law's "sole purpose," and "its sole effect," is "to prevent transgender girls from playing on girl[s'] teams." *B. P. J.* v. *West Virginia State Bd. of Ed.*, 98 F. 4th 542, 550 (CA4 2024). At the time the law was passed, as the District Court found, there was no record of any transgender person participating in school sports in the State, let alone any "'problem' with transgender students playing school sports and creating unfair competition or unsafe conditions." *B. P. J.* v. *West Virginia State Bd. of Ed.*, 649 F. Supp. 3d 220, 227 (SD W. Va. 2023). West Virginia has since relied on its interests in fair competition and safety to justify the ban.

This ban replaced a policy of case-by-case assessment that had been in place since 2016. Back then, sports were also sex-separated, as they had been for decades, but transgender students could participate on teams matching their gender identity if their schools "determined that 'fair competition' would not be impacted by the student[s']

[1] Because respondent Lindsay Hecox's case is moot, see, n. 13, *infra*, this dissent focuses on B. P. J.'s case.

participation." 98 F. 4th, at 551. An opposing school could contest a student's participation by appealing the determination to the West Virginia Secondary Schools Athletic Commission's board of directors. The board would then assess whether allowing the student to play "'would adversely affect competitive equity or [the] safety of teammates or opposing players,'" considering the student's "'age,'" "'athletic experience,'" "'strength, size, and speed,'" as well as "'the nature of the sport'" and "'the degree to which fair competition among high school teams would be impacted.'" *Ibid.* (some alterations omitted).

The ban eliminated this individualized approach in favor of categorical exclusion. Now, every competitive, intramural, and club sport offered at the middle-school through college level must be "expressly designated as" either male, female, or coed, as determined by "biological sex." §18–2–25d(c)(1); see also §18–2–25d(b)(1) (defining "'biological sex'" as an "individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth"). Teams "designated" for "females" "shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." §18–2–25d(c)(2). Teams "designated" for "males" do not have the same restriction.

B

B. P. J. is a teenager who lives in West Virginia. Her mother describes her as "a bright and kind child who cares deeply about her family and friends and excels in school." 10 App. 4406. B. P. J. is like many other teenagers: She is "very passionate about math and science"; her favorite videogames include Minecraft and Overwatch; and she enjoys jumping on the trampoline, running, playing with her dogs, and seeing her friends. 2 *id.*, at 579.

B. P. J. is also transgender. Her sex was identified as male at birth, but she has known from the time that she

was "very little" that she is a girl. *Ibid*. B. P. J. found support in her family after expressing how she felt and eventually began going by a different name and living consistently with her female identity at home. A little while later, she carried those changes over to all aspects of her life, including school, and school administrators and teachers worked with B. P. J. and her family to aid her social transition.

Then, when B. P. J. was around nine years old, she was diagnosed with gender dysphoria. This clinical diagnosis means that B. P. J. experiences significant and consistent distress from the fact that her sex identified at birth does not match her gender identity. Brief for American Psychological Association et al. as *Amici Curiae* 8–9 (APA Brief). If left untreated, it "can cause debilitating distress, depression, impairment of function," self-harm, and suicidality. See *id*., at 10–12; 3 App. 1249. A year after her diagnosis, B. P. J. began receiving puberty-delaying treatment to prevent the onset of an endogenous male puberty. Two years after that, she began taking a form of estrogen to facilitate a typical female hormonal puberty.

When West Virginia enacted the ban, B. P. J. was nearing the end of fifth grade and preparing to enter middle school. B. P. J. was especially looking forward to joining the girls' track team and running cross country, like many family members had before her. The middle school principal informed B. P. J.'s mother, however, that B. P. J. could not participate on either team because of the ban. This was true even though everyone who eventually tried out for the girls' cross-country team made it, 1 *id*., at 456–457; 2 *id*., at 730, meaning that there were no "cuts," and so this was not a "zero sum" situation, contra, *ante*, at 16.

A month after the ban went into effect, B. P. J. (through her mother) brought this lawsuit, arguing that the ban violates the Equal Protection Clause and Title IX. B. P. J. pursued litigation not because she could no longer "compete successfully" on male teams due to her hormonal therapy.

Cf. *ante*, at 13. She did so because it would be inconsistent with her gender identity to play sports with boys. In fact, doing the latter would be quite harmful to her: Among other things, as her mother explains, it would "further isolate, stigmatize, and erase her." 10 App. 4408; see also APA Brief 15–24 (noting the negative consequences that can follow).

The District Court granted a preliminary injunction barring the State from enforcing the ban against B. P. J., concluding that B. P. J. had shown that the ban was likely "unconstitutional as it applie[d] to her and that it violate[d] Title IX." 1 App. 439. The State did not appeal. B. P. J. thus began participating on her school's girls' track and cross-country teams.

B. P. J.'s mother reports that B. P. J. "has had the time of her life participating on these teams." 10 *id*., at 4406. She has watched B. P. J. make close friends and gain a sense of belonging. Her mother recalls taking B. P. J. to practice after hours and on weekends, and often witnessing B. P. J. practicing her form in the backyard "by herself, for hours." *Id*., at 4407. Above all, her mother explains that B. P. J. "is the happiest I have ever seen her when she is accepted for who she is and able to participate in school sports." *Id*., at 4408. In B. P. J.'s words, "[s]ports are an important part of [her] experience at school," she is "so happy to . . . have the chance to participate," she has "made so many new friends," and she "just want[s] to have the opportunity to [play] school sports like any other girl." 2 *id*., at 581.

Meanwhile, B. P. J.'s case proceeded to discovery. Because of the medical treatment that B. P. J. has received, she has never experienced a traditional male puberty and so has never experienced elevated levels of circulating testosterone. B. P. J. contends that, as a result, she does not have an inherent athletic advantage due to her sex identified at birth and, accordingly, that her participation in girls' sports does not threaten competitive fairness or safety,

which are the two grounds the State has relied on to justify excluding transgender girls like B. P. J. from girls' teams. Both sides submitted expert testimony disputing this factual question.[2] After discovery closed, B. P. J. and the State each moved for summary judgment and to exclude the other side's expert.

The District Court granted the State's motion for summary judgment on B. P. J.'s equal protection and Title IX claims without resolving the factual dispute over whether B. P. J.'s participation in girls' sports would compromise the State's interests in competitive fairness or safety. See 649 F. Supp. 3d, at 231 (noting, but not resolving, this "debate"). Instead, the District Court concluded that the law satisfies heightened scrutiny because it is "substantially related" to the State's interests generally, regardless of

---

[2] B. P. J.'s expert is a Fellow of the American College of Physicians and an endocrinologist at Mount Sinai. He submitted a report explaining that, "based on current research," circulating testosterone, not "[a] person's genetic makeup and internal and external reproductive anatomy," is "the primary known biological cause of average differences in athletic performance" between cisgender men and cisgender women." 4 App. 1550. He further explained that individuals who received the kind of treatment B. P. J. has received are "somewhat similarly situated to women with XY chromosomes who have complete androgen insensitivity syndrome," *ibid.*, meaning they have "inactive testosterone receptors" and thus do not "respond to testosterone," *id.*, at 1541. "[I]t has long-been recognized," the expert continued, "that women with [that condition] have no athletic advantage." *Id.*, at 1550.

The State's expert is a Professor of Exercise Science at the University of Nebraska at Kearney and received a Ph.D. in Health and Human Performance. He submitted a report explaining that inherent "advantages" in athletic performance due to an individual's sex identified at birth have been "shown in children before puberty" and that they are "magnified during puberty . . . in large part by the higher testosterone concentrations in men, and adolescent boys, after the onset of male puberty." 6 *id.*, at 2124. He further explained that the administration of hormone therapy "after the onset of male puberty does not eliminate the performance advantage that men and adolescent boys have over women or adolescent girls." *Id.*, at 2123.

whether the State's interests are furthered with respect to B. P. J. specifically or to transgender girls situated similarly to her. *Ibid*. It then dissolved the injunction allowing B. P. J. to play sports.

B. P. J. moved in the Fourth Circuit for an injunction pending appeal, which the Circuit granted. This Court denied the State's request to vacate that order. See 598 U. S. ___ (2023). The next year, the Fourth Circuit reversed the District Court on B. P. J.'s Title IX claim and directed it to enter summary judgment in favor of B. P. J. on remand. As to B. P. J.'s equal protection claim, the Circuit concluded that the outstanding factual dispute precluded its resolution at this stage. It thus vacated the District Court's entry of summary judgment for West Virginia and remanded for further factfinding. 98 F. 4th, at 561–562.

II

West Virginia's decision to separate sports teams based on an individual's sex identified at birth is a clear sex classification subject to heightened scrutiny. West Virginia justifies the classification by citing two interests: ensuring (1) competitive athletic opportunities and (2) safety in participation for women and girls in sports. As the majority stresses and no one disputes, when it comes to sex identified at birth, males generally have an inherent athletic advantage over females in playing sports. B. P. J., however, contends that this generalization does not hold true for a discrete, easily identifiable group: transgender girls who have never experienced an endogenous male puberty, who receive gender-affirming treatment, and who are, she says, thus similarly situated to cisgender girls. For that group, she argues, neither of West Virginia's interests is furthered by excluding them from girls' and women's sports.

The Court should have affirmed the Fourth Circuit's decision to remand for further factfinding. In not taking this modest step, the majority badly errs in two ways. First, the

majority concludes that B. P. J.'s claim fails regardless of the unresolved factual dispute over whether transgender girls are similarly situated to cisgender girls for the reasons B. P. J. gives. That is wrong. As the Court's precedents recognize, factual disputes like this one relate to the fit of the classification and whether it survives heightened scrutiny. Second, the majority suggests that, even if relevant, the factual dispute implicates scientific uncertainty and that West Virginia's decision is thus entitled to conclusive deference. Here, too, the majority missteps, invoking cases applying rational-basis review, citing extra-record evidence, and ignoring critical context merely because it is inconvenient.

None of this is to suggest what the eventual outcome of this litigation would have been, or even should have been, had the majority allowed the courts below to make the missing factual determinations and had those courts correctly applied heightened scrutiny with the benefit of those facts. West Virginia may well have satisfied its burden and seen its ban upheld. The point, rather, is that this Court's equal protection precedents require a very different approach to B. P. J.'s claim than the one the majority follows today.

A

1

The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." Sitting "'[a]t the heart of'" this "'guarantee of equal protection'" is a "'simple command'": "'[T]he Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class.'" *Miller* v. *Johnson*, 515 U. S. 900, 911 (1995) (some internal quotation marks omitted). The Clause thus bars state action that denies individuals "full citizenship stature," or "equal opportunity to aspire, achieve, participate in and contribute to society based on their individual

talents and capacities," because of a class to which they happen to belong. *United States* v. *Virginia*, 518 U. S. 515, 532 (1996).

As all agree, the ban at issue classifies based on sex. West Virginia seeks to separate sports teams based solely on an individual's sex identified at birth. As a result, cisgender girls, whose sex identified at birth is female, can play on girls' teams whereas transgender girls, whose sex identified at birth is male, cannot. The difference, undoubtedly, is sex.[3]

The key question here is whether that sex separation is constitutionally justified. Sex classifications like this one cannot be deployed unless they survive "heightened scrutiny." *J. E. B.* v. *Alabama ex rel. T. B.*, 511 U. S. 127, 136 (1994) (explaining that this level of scrutiny is "warrant[ed]" due to "'our [Nation's] long and unfortunate history of sex discrimination'"). To survive this inquiry, the State must provide an "'exceedingly persuasive justification'" for letting the sex classification stand. *Virginia*, 518 U. S., at 546. This means that the State must show "'at

[3] The ban may also be subject to heightened scrutiny under *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256 (1979). To start, transgender status, as I argued in *United States* v. *Skrmetti*, 605 U. S. 495 (2025), is a quasi-suspect classification. *Id.*, at 600–603 (dissenting opinion). "Transgender people have long been subject to discrimination in healthcare, employment, and housing, and to rampant harassment and physical violence." *Id.*, at 601; see also *id.*, at 601–602 (collecting examples). They also "have a defining characteristic (incongruence between sex and gender identity) that plainly 'bears no relation to [the individual's] ability to perform or contribute to society.'" *Id.*, at 602. This quasi-suspect class is no less a "'discrete subgroup'" than others this Court has recognized. Contra, *ante*, at 1 (THOMAS, J., concurring); see *Skrmetti*, 605 U. S., at 602 (dissenting opinion). From here, the ban may have been enacted "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon" transgender girls and women. *Feeney*, 442 U. S., at 279. Because B. P. J.'s equal protection claim survives summary judgment based on the sex classification alone, however, there is no need to reach these issues.

least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Id.*, at 535 (alteration in original; some internal quotation marks omitted). At its core, this inquiry works to distinguish laws based on "overbroad generalizations about the different talents, capacities, or preferences of males and females" from laws based on legitimate state interests, which reflect genuine, "'inherent differences'" between "men and women" that make them differently situated. *Ibid.*

2

Before this Court, West Virginia argues that its sex classification substantially furthers its important interests in ensuring competitive fairness and safety in girls' and women's sports. As the State conceded below, however, it has no interest "in protecting one girl's ranking in any competition or 'in ensuring that cisgender girls do not lose ever to transgender girls.'" 98 F. 4th, at 560. Rather, the focus is on when the participation of transgender girls is actually unfair or unsafe for others. *Ibid.* Understood in that way, B. P. J. does not dispute the importance of either interest here.[4]

---

[4] The majority, for its part, adds a third interest: "provid[ing] opportunities for biological women and girls to compete only against other biological women and girls." *Ante*, at 16. That misrepresents West Virginia's stated legislative interest. Its law seeks "to promote equal athletic opportunities for the female sex," defined as "biological females." W. Va. Code Ann. §§18–2–25d(a)(5), (b)(2). Promoting such equal opportunity certainly encompasses ensuring competitive fairness and safety, as West Virginia has argued throughout this litigation. See Brief for Petitioners in No. 24–43, pp. 17, 39, 44; Reply Brief for Petitioners in No. 24–43, pp. 13, 22; see also 98 F. 4th, at 559 (noting that, in the Fourth Circuit, the State had "disclaim[ed] reliance on any other potential interests" besides "participant safety and competitive fairness"). Whether competition "only against other biological women and girls," *ante*, at 16,

As the majority further identifies, no one disputes that sorting based on sex identified at birth, as a means to achieve West Virginia's asserted interests, will further those interests in most situations. See *ante*, at 17. That is because, as the majority explains and B. P. J. does not contest, there are inherent physical differences between males and females, as defined by sex identified at birth, making them differently situated generally when it comes to many sports. *Ibid.*; see *Virginia*, 518 U. S., at 533.

Even so, B. P. J. contends that the means deployed by West Virginia here, a total ban on participation, lack the right fit. She argues that the chosen classification bars a discrete subclass from participating in girls' and women's sports even though the State's interests will not be furthered by their exclusion. According to B. P. J., transgender girls and women who both receive gender-affirming treatment and have never experienced endogenous male puberty neither possess any inherent athletic advantage nor pose any safety risks because of their sex identified at birth. As B. P. J. tells it, this distinct subclass is thus similarly situated to cisgender girls and women and yet is still being excluded. It is this overbreadth, she argues, that leads to the equal protection violation.

Under this Court's precedents, this asserted factual difference, which has not been conclusively litigated below, matters to the equal protection analysis.

a

This Court has held that a sex classification violates equal protection when there is an incongruity between the

---

is substantially related to promoting equal opportunity, however, is the very question posed by this case, not a separate legislative interest West Virginia has sought to pursue. In applying heightened scrutiny, moreover, it is a reviewing Court's duty to "determine whether the [State's] proffered justification" behind a sex classification "is 'exceedingly persuasive,'" *United States* v. *Virginia*, 518 U. S. 515, 533 (1996), not to drum up circular justifications on the State's behalf.

sex classification in general and its application to a discrete subclass. For instance, in *Caban* v. *Mohammed*, 441 U. S. 380 (1979), this Court reviewed a New York law that gave an unwed mother, but not an unwed father, complete veto authority over the adoption of her child by requiring her consent. *Id.*, at 385–387. The State justified that different treatment by invoking the notion that "'a natural mother, absent special circumstances, bears a closer relationship with her child . . . than a father does.'" *Id.*, at 388. The State also said that it was easier to locate unwed mothers than unwed fathers, as the former were "more likely to remain with their children." *Id.*, at 392.

The plaintiff Caban, though, did not fit the justification underlying the State's classification: He was an unwed father who had "a relationship with his children fully comparable to that of the mother," so the application of the classification to him did not further the State's interests. *Id.*, at 389. Confronted with this difference, the Court held that "[i]n those cases where the father never has come forward to participate in the rearing of his child, nothing in the Equal Protection Clause preclude[d] the State from withholding from him the privilege of vetoing the adoption of that child." *Id.*, at 392. When, however, "the father has established a substantial relationship" with the child, the State had failed to show that the use of sex bore "a substantial relationship to" the State's justifications. *Id.*, at 393. As a result, the Court held, the law as applied to fathers like Caban was the kind of "'overbroad generalizatio[n]' in gender-based classifications" that the Equal Protection Clause forbids. *Id.*, at 394.

A few years later, the Court addressed an equal protection challenge against the same New York law, this time by Lehr, an unwed father who had "never established any custodial, personal, or financial relationship" with his daughter. *Lehr* v. *Robertson*, 463 U. S. 248, 267 (1983). This time the claim failed: Because Lehr was "not like the [father]

involved in *Caban*," the Court said, "the Equal Protection Clause d[id] not prevent a State" from treating Lehr's "class" of unwed fathers differently. *Id.*, at 267–268.

Taken together, the Court in *Caban* and *Lehr* dealt with the sex classification's overbreadth by allowing the State to use the classification when doing so actually furthered its interests (*Lehr*), but not when it did not (*Caban*). Similarly here, B. P. J. contends that even if the use of the sex classification substantially furthers the State's interests when it prevents cisgender boys from playing on girls' teams, it does not substantially further the State's interests when it prevents transgender girls who have never experienced an endogenous puberty and who receive gender-affirming treatment from doing the same. As in *Caban* and *Lehr*, it matters if she is right.

The Court has closely scrutinized differences like this in others cases too. In *United States* v. *Virginia*, 518 U. S. 515, for example, the Court addressed the lawfulness of the Virginia Military Institute's (VMI's) male-only admissions policy. The Court held that Virginia could not "constitutionally deny to women who have the will and capacit[y] the . . . opportunities that VMI uniquely affords," even if "most women" did not have that "will and capacity." *Id.*, at 542.

Virginia had justified the exclusion of all women by citing its "goal of producing citizen-soldiers" and its "implementing methodology" (a harsh and rigorous "'adversative method'" of instruction). *Id.*, at 520. Prohibiting women from the school on these bases, however, rested on a "[g]eneralizatio[n] about 'the way women are'" and was at best an "estimat[e] of what is appropriate for *most women*." *Id.*, at 550. Under this Court's cases, the Court held, such classifications could "no longer justify denying opportunity to women whose talent and capacity place them outside the average description." *Ibid.* That was because neither of the Commonwealth's interests were "'inherently unsuitable to women,'" and at least a subclass of women could "'do well

under [the] adversative model,'" "'would want to attend [VMI] if they had the opportunity,'" were "'capable of all of the individual activities required by VMI cadets,'" and could "'meet the physical standards" VMI "impose[d] on men.'" *Ibid*. In other words, even though the sex classification at issue did further Virginia's interest in general and in most cases, it did not further those interests at all for a subclass of women. It was "on behalf of th[ose] women," even if they were a small minority of all women, for which the Court held that a "remedy must be crafted." *Ibid.*

Here again, B. P. J. is making a similar claim. Even though, she says, West Virginia's classification may substantially further the State's interests in most applications, as was the case for most of the women who did not want to and could not attend VMI, the State's interests are not substantially furthered as applied to her subclass, as was the case for "some women" who did want to and could attend VMI. The Court's holding in *Virginia* thus shows that unresolved factual differences matter, even if the classes of people to whom they might be relevant are themselves small.

b

Whether the fit between the means and the State's interest is "'exceedingly persuasive,'" *id*., at 533, also depends on the nature of the burdens imposed. The Court's decision in *Tuan Anh Nguyen* v. *INS*, 533 U. S. 53 (2001), provides a helpful illustration. That case concerned a statute that classified based on sex: It allowed citizen mothers, but not citizen fathers, married to noncitizens to transmit U. S. citizenship at birth to their children born abroad. *Id*., at 56–57. This Court upheld the differential treatment, concluding that it furthered the interest of ensuring a substantial "parent-child relationship" with a U. S. citizen before bestowing citizenship, given that mothers, by virtue of giving birth, had the potential for such a relationship and indeed

likely had one. *Id.*, at 68–69. For citizen fathers, by contrast, the knowledge of parenthood was not guaranteed "at the moment of birth." *Id.*, at 68.

Some citizen fathers, of course, had knowledge of parenthood from the moment of their child's birth. In this way, the classification did not fit them. Congress had accounted for those situations, however, by allowing fathers to take one of three "simple" procedural steps to secure citizenship for their children. *Id.*, at 71; see *id.*, at 63 (listing those steps as "legitimation, paternity oath, and court order of paternity"). As the Court explained, it was "mindful" of "the obligation" that the classification "impose[d]" on "a citizen father," but it recognized that the burden was "minimal" and that "Congress ha[d] not erected inordinate and unnecessary hurdles" for a father to gain the same benefit for his children as a mother to whom he was similarly situated. *Id.*, at 70–71. It was in that context that the Court upheld the sex classification, even though Congress's "ultimate objective" was not achieved in every application of it. *Id.*, at 70.

In stark contrast, *Caban*, *Virginia*, and other cases like them show that classifications can violate the Equal Protection Clause if they take the "extrem[e]" approach "of complete exclusion" even if allowing exceptions for "significant categories" (*i.e.*, subclasses) within a given classification would not "jeopardiz[e]" the State's interests. Cf. *Trimble* v. *Gordon*, 430 U. S. 762, 771 (1977). In *Nguyen*, the law allowed for such exceptions and so passed muster. In *Trimble*, to the contrary, the Court found an equal protection violation as to a law restricting inheritances by "illegitimate children" from their fathers' estates because the State "unnecessarily" refused to grant exceptions for "categories" of such children as to whom "inheritance rights" could be recognized without undermining the State's interests. 430

U. S., at 771.[5] What is more, in *Sessions* v. *Morales-Santana*, 582 U. S. 47 (2017), the Court distinguished *Nguyen*, at least in part, when the burden imposed by the process for seeking an exception "cannot fairly be described as 'minimal.'" 582 U. S., at 66, see also *id.*, at 62–72 (holding unconstitutional requirements that unwed citizen fathers be physically present in the United States for up to 10 years before they could bestow citizenship to their children born abroad while imposing only a 1-year requirement on unwed citizen mothers).

All these cases help explain what it means for the "fit between the means and the important end [to be] 'exceedingly persuasive,'" *Nguyen*, 533 U. S., at 70, and they demonstrate that the existence of readily identifiable, discrete subclasses that do not fit a classification's generalization can factor into that analysis. If a State includes a discrete subclass in an overbroad classification when exempting them would not unnecessarily jeopardize the government interest the State wishes to further, that can show that the State's choice to use the classification is not actually in service of those interests, but rests on discriminatory generalizations instead.[6]

---

[5] *Trimble* concerned a classification based on "illegitimacy," which this Court has since clarified is also subject to heightened scrutiny. See *Clark* v. *Jeter*, 486 U. S. 456, 461 (1988).

[6] To be clear, this analysis has never been about whether an interest is furthered as to an individual person based on their unique personal circumstances. Rather, it has always focused on readily identifiable, discrete subclasses. West Virginia warns that such a theory of equal protection would lead to litigants defining classifications smaller and smaller to the point that the State will be left granting exception after exception in search of a perfect fit. Brief for Petitioners in No. 24–43, at 43–44. Not so. States can justify schemes that lack exceptions for some or all by demonstrating that they did not deny those exceptions "unnecessarily." *E.g.*, *Trimble*, 430 U. S., at 771. That could be so when, as explained, an exception would "jeopardiz[e]" a State's interest, *ibid.*, or when "more accurate and impartial lines [cannot] be drawn," *Morales-*

Here, B. P. J. argues that the State's sex classification fails heightened scrutiny not only because it does not fit her subclass, but also because it operates as a categorical exclusion, much like the classifications in *Caban*, *Virginia,* and *Trimble*. Here, unlike in *Nguyen*, there are no procedures for her to follow to prove that she is similarly situated to cisgender girls and thus able to participate on the girls' team. Because this Court's equal protection analysis of sex classifications has generally considered whether the classification fits discrete subclasses and the extent to which subclasses are burdened, it matters if B. P. J. is right about the purported problems she identifies. At this stage, the Court therefore needs additional facts to assess whether B. P. J. is in fact correct, and whether, as a result, the State has "unnecessarily" refused her an exception.[7]

---

*Santana*, 582 U. S., at 63, n. 13. In addition, while a State generally cannot rely on "mere" "administrative convenience" to justify the use of a sex classification, *Wengler* v. *Druggists Mut. Ins. Co.*, 446 U. S. 142, 152 (1980), the Court has recognized that "[i]t may be that there are levels of administrative [in]convenience," *ibid.*, that could perhaps support a showing that the State has not denied an exception "unnecessarily and overbroadly," *Morales-Santana*, 582 U. S., at 63, n. 13. Whether any of these justifications hold true here depends on factual findings that have not been made and, because of the Court's decision today, never will be.

[7] In contesting whether these facts matter in the equal protection analysis, the parties at points discuss whether a challenge like B. P. J.'s should be characterized as "'as applied'" or "'facial.'" As B. P. J. argues, in most cases, such as here, this debate is largely one of "semantics." Brief for Respondent in No. 24–43, p. 46. It is true that some equal protection challenges, if successful, may mean that a given classification is impermissible in all applications and therefore resemble what this Court has called a "facial" challenge. That may be so, for instance, when the legislature has not identified an important or legitimate governmental interest. See, *e.g.*, *Romer* v. *Evans*, 517 U. S. 620 (1996). In other challenges, though, the equal protection problem is not with the classification as such, but rather with its overbreadth or the way the classification's lines have been drawn. As a result, the classification may constitutionally be applied to some individuals, see, *e.g.*, *Lehr* v. *Robertson*, 463 U. S.

3

The majority offers several reasons for concluding that the alleged inaccuracy that B. P. J. identifies does not matter at all and that further factual development is therefore unnecessary. To the majority, the fit here is simply good enough. In so concluding, the Court elevates the reasoning of earlier dissents and lowers the State's burden for justifying the use of sex classifications in potentially all cases. Cf. *Cisco Systems, Inc.* v. *Doe*, 609 U. S. ___, ___ (2026) (SOTOMAYOR, J., dissenting) (slip op., at 23) ("'When proponents of [previously rejected] arguments, greater now in number on the Court, return to fight old battles anew, it betrays an unrestrained disregard for precedent'").

a

The majority's analysis starts, and largely ends, with a single premise. As the majority tells it, because the important governmental interests behind laws subject to heightened scrutiny need to be furthered only in most (and not all) applications of a given classification, the fact that B. P. J. has identified some applications in which the State's interests may not be furthered does not and cannot give rise to an equal protection violation. See *ante*, at 18–22.[8] The majority acts as if the Court is having this debate

---

248, 267 (1983), but not others, see, *e.g.*, *Caban* v. *Mohammed*, 441 U. S 380, 393 (1979). In those circumstances, where narrowing the classification itself could arguably remedy the equal protection problem, the challenge looks more "as applied." However labeled, the purpose and effect of all such challenges is to identify overbroad generalizations and to eliminate them to the extent of the constitutional violation. That is all B. P. J. seeks to do here.

[8] For support, the majority relies on *Massachusetts Bd. of Retirement* v. *Murgia*, 427 U. S. 307 (1976) (*per curiam*), which it quotes for the idea that "'[p]erfection in making the necessary classifications is neither possible nor necessary.'" *Ante*, at 18. This quote comes from *Murgia*'s application of the "relatively relaxed" "rational-basis standard." 427 U. S.,

for the first time or that B. P. J. is asking for something new here. It is not, and she is not.

To begin, the Court in neither *Caban* nor *Virginia* imposed this limitation. In fact, similar arguments were raised by the dissents in each.

Today, for example, the majority states that a plaintiff must identify "an especially large subclass" in which the State's asserted interest is not furthered before a court can find a classification's fit lacking or grant relief of any kind. *Ante*, at 21. You would not know it from reading the majority's opinion, but Justice Stevens made the same argument dissenting in *Caban*. He observed that the Court had wrongly found an equal protection violation because the State's "justification [was] not as strong for some indeterminately small part of the disadvantaged class as it [was] for the class as a whole" and so was invalid "as it applie[d] to that subclass." 441 U. S., at 409. That was wrong, Justice Stevens said, because Caban had not "demonstrate[d] that its unjust applications are sufficiently numerous and serious to render it invalid." *Id.*, at 410. To Justice Stevens, given that Caban had shown that the classification's unfairness "extend[ed] only to himself and by implication to [an] unknown number of fathers just like him," Caban had not

---

at 314. The majority also invokes *Skrmetti*, 605 U. S. 495, for a similar purpose, but that case also applied rational-basis review. *Id.*, at 522. From here, the majority abandons the Court's equal protection precedents entirely, instead citing First Amendment cases applying distinct forms of intermediate scrutiny to regulations of commercial speech and time, place, and manner speech restrictions. See *United States* v. *Edge Broadcasting Co.*, 509 U. S. 418, 429–430 (1993) (requiring only a "reasonable" fit); see also *Ward* v. *Rock Against Racism*, 491 U. S. 781, 801 (1989). In any event, even under these more relaxed standards, a speech restriction cannot "burden substantially more speech than necessary to further the government's" interests. *Edge*, 509 U. S., at 430. As analogized to this context, the State seemingly would fail that standard if it unnecessarily declines an exception for a readily identifiable subclass, when doing so does nothing to further its interests.

provided "sufficient reason" for "invalidating the entire rule" or for "concluding that the application of a valid rule" violated "equal protection principles." *Id.*, at 410–412. The Court rejected this argument then. Today, the majority reprises it without even providing attribution to Justice Stevens (or anyone at all). See *ante*, at 19–22.

The solo dissent in *Virginia* raised similar objections to the Court's application of heightened scrutiny. In Justice Scalia's view, the majority in *Virginia* necessarily concluded that "VMI's single-sex composition [was] unconstitutional because there exist[ed] several women (or, one would have to conclude under the Court's reasoning, a single woman) willing and able to undertake VMI's program." 518 U. S., at 573. The dissent added, as the majority repeats here, that "[t]here is simply no support in our cases for the notion that a sex-based classification is invalid unless it relates to characteristics that hold true in every instance." *Id.*, at 574; see *ante*, at 18–19 (pressing this exact argument). Once again, where these arguments failed before, today they succeed.

Nor is the majority's analysis today persuasive on its own terms. Although it is true that sex classifications can be upheld even when they are not accurate in all applications, as was the case in *Nguyen*, that bare statement does not speak of what to do when confronted with differences within a class of people who are subject to a sex-based classification. Contra, *ante*, at 21, n. 5. It does not answer whether the State has "unnecessarily" denied exceptions for readily identifiable "categories" in which the classification did not fit. *Trimble*, 430 U. S., at 771. It does not answer whether any exceptions exist and if so, what the burdens associated with them are like. All told, it is inconsistent with intermediate scrutiny to dismiss out of hand the existence of classification errors that may show the State has in fact rested on exactly the kind of overbroad generalizations based on sex the Equal Protection Clause is supposed to root out.

The majority wrongly dismisses the alleged overbreadth in this case because, in its view, the subclass at issue is not large enough to matter. "[T]he avoidance of gratuitous sex-based distinctions," however, "is the hallmark of equal protection." *Nguyen*, 533 U. S., at 82 (O'Connor, J., dissenting). Unjustified sex-based discrimination inflicts "injury . . . to personal dignity" regardless of the number of individuals affected. *J. E. B.*, 511 U. S., at 153 (Kennedy, J., concurring in judgment). Allowing the State to classify groups of people based on a protected characteristic even though its interests are not substantially furthered by doing so is plainly inconsistent with the constitutional "'command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class.'" *Miller*, 515 U. S., at 911 (some internal quotation marks omitted). This Court has thus never required a plaintiff to demonstrate that a subclass is of some significant size before holding that the use of a sex classification violates principles of equal protection. Contra, *ante*, at 20–21. Indeed, "virtually every" sex classification that this Court struck down in the last quarter of the 20th century was "overwhelmingly, though not perfectly, accurate." M. Case, "The Very Stereotype the Law Condemns": Constitutional Sex Discrimination Law as a Quest for Perfect Proxies, 85 Cornell L. Rev. 1447, 1450 (2000).

It is especially problematic to change course here. Recall that for nearly five years before the State enacted this ban, it had allowed transgender girls to participate in girls' sports in certain circumstances. See *supra*, at 3–4. Before that, sex-separated sports teams had existed for decades. The ban's entire purpose, and its entire effect, therefore was to eliminate the possibility of allowing any exception based on the legislature's fears, thus far not conclusively litigated, that transgender student-athletes categorically posed dangers to competitive fairness and safety in all girls' and women's sports. To the legislature, this move was

necessary, as the Act's title suggests, to "Save Women's Sports." 98 F. 4th, at 550; see also Brief for Petitioners in No. 24–23, pp. 2–3 (expressing a similar sentiment). B. P. J. sued, contending that the State's decision, which will use her sex identified at birth to deny her an opportunity, was based on a faulty premise and that transgender girls who have never experienced an endogenous male puberty and who receive gender-affirming treatment do not pose any threat to competitive fairness or safety. Yet the majority says that even if B. P. J. could prove West Virginia wrong, the Equal Protection Clause would have nothing to say about it.

The majority's position is thus fundamentally inconsistent. It credits the West Virginia Legislature's concern that a class consisting of transgender girls like B. P. J. is large enough to pose an existential threat to girls' sports, but at the same time holds that this class is too small to be protected by the Equal Protection Clause. In other words, this potentially overbroad generalization is both necessary to furthering substantially the State's interests in girls' sports and effectively irrelevant to assessing the classification's lawfulness. The Court's equal protection precedents neither require nor support this contorted logic.[9]

---

[9] The majority asks whether exemptions would be required for cisgender men who, because of their physical characteristics, do not pose either safety concerns or threaten competitive fairness in girls' and women's sports. See *ante*, at 22. The Equal Protection Clause does not require such exemptions, at least on the State's two stated interests here. That is because the State's interest in "fairness" is geared toward eliminating the athletic advantage inherent to sex identified at birth, not toward eliminating all athletic advantages in general. A cisgender boy's equal protection claim thus would fail because even if he is, for example, shorter than the average girl, he still possesses the same athletic advantage that is inherent to his sex identified at birth as any other cisgender boy. The majority misunderstands this distinction by confusing general "physical capabilities," like size and strength, with biological, athletic advantages that stem from sex identified at birth. *Ante*, at 19–20, n. 4.

b

Next, the majority contends that B. P. J.'s claim collapses intermediate scrutiny and strict scrutiny. *Ante*, at 21. It does not.

First, and most obviously, strict scrutiny calls for a "'compelling government interes[t],'" *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. 181, 207 (2023), not an "'important'" one, *Virginia*, 518 U. S., at 533. Many laws subject to strict scrutiny fail on this ground alone. See, *e.g.*, *Louisiana* v. *Callais*, 608 U. S. ___, ___ (2026) (slip op., at 35); *Loving* v. *Virginia*, 388 U. S. 1, 11 (1967); *Vitolo* v. *Guzman*, 999 F. 3d 353, 360 (CA6 2021); *Rothe Development Corp.* v. *Department of Defense*, 545 F. 3d 1023, 1049 (CA Fed. 2008); see also *Students for Fair Admissions*, 600 U. S., at 207 (recounting the short list of interests that have satisfied this showing).

Second, under strict scrutiny, States can use a classification such as race only if it proves that the "use of race is 'narrowly tailored'—meaning 'necessary'—to achieving that interest." *Id.*, at 207. The Court has interpreted that mandate to mean that if a State can achieve the same interest through other means, even if using race would allow it to achieve that interest in some (or even most) circumstances more effectively or with less expense, the State still cannot use race at all. See, *e.g.*, *Fisher* v. *University of Tex. at Austin*, 570 U. S. 297, 312 (2013).

Intermediate scrutiny, by contrast, allows States to use a classification when it furthers its interests in most applications, even if not all applications. The State can then put the onus on the individual to come forward, as B. P. J. must here, and prove that she does not fit the generalization behind the classification and is in fact similarly situated to the class of people she is being treated differently from, so long as the burdens are not themselves too demanding, see *Morales-Santana*, 582 U. S., at 66. The State, moreover, can also prove that it did not deny a given exception

"unnecessarily" because allowing an exception would jeopardize the very interests the State is attempting to further or come at too high of an administrative cost. See n. 6, *supra*. These are attributes of intermediate scrutiny alone.

B

Stepping back from contending that the factual dispute does not matter at all, the majority suggests that even if it were relevant, B. P. J. could not prevail. That is because, the majority says, there is an ongoing scientific debate over whether transgender girls who have not experienced an endogenous male puberty and who receive gender-affirming treatment possess an athletic advantage inherent to cisgender men. In the majority's view, the Court should be "cautious about swooping in and invalidating laws" that implicate such uncertainty and should instead defer to the legislature's "considered policy judgments." *Ante*, at 24–25. Of course, even when applying heightened scrutiny, courts should give deference to what legislatures and experts have to say when dealing with scientific issues. Even so, the deference afforded is not conclusive. Nor does the mere existence of scientific debate end the matter.

In proceeding differently, the majority again cites the wrong standard, primarily relying on cases that applied rational-basis review, not heightened scrutiny. See, *e.g.*, *ante*, at 24–26 (quoting *United States* v. *Skrmetti*, 605 U. S. 495, 525 (2025); *Marshall* v. *United States*, 414 U. S. 417, 427 (1974)). Indeed, the majority recites arguments on this score that are identical to the ones it embraced in *Skrmetti*, when it applied rational-basis review to uphold the law at issue there. Compare *ante*, at 24–26, with 605 U. S., at 524 (outlining the level of caution and deference courts must

exercise when wading into areas of "'medical and scientific'" uncertainty in that context).[10]

The two tests are not the same. Courts will uphold legislation subject to rational-basis review so long as there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC* v. *Beach Communications, Inc.*, 508 U. S. 307, 313 (1993). Heightened scrutiny, by contrast, requires courts to "closely scrutinize legislative choices" to ensure that the use of the classification satisfies the required means-ends fit. *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 441 (1985); see also *Skrmetti*, 605 U. S., at 552–553 (BARRETT, J., concurring) (drawing this distinction); *id.*, at 528–529 (THOMAS, J., concurring) (same). In *Virginia*, for instance, the Commonwealth had cited a "substantial body of contemporary scholarship and research," 518 U. S., at 576 (Scalia, J., dissenting), to support its assertions that it need not allow women to attend because women thrive in a "'cooperative atmosphere,'" and not in the "atmosphere of adversativeness" that men "'tend to need,'" *id.*, at 541 (majority opinion). The Court did not thoughtlessly defer to Virginia's judgments about that research. Rather, it held that when presented with "generalizations or 'tendencies' of the kind pressed by Virginia," "reviewing courts" must "take a 'hard look'" to ensure that they do not perpetuate "overbroad 'generalizations'" and "'fixed notions concerning the roles and abilities of males and females.'" *Id.*, at 541–546.

---

[10] The majority here also invokes *Turner Broadcasting System, Inc.* v. *FCC*, 520 U. S. 180 (1997). See *ante*, at 25. In *Turner*, the Court, in applying a distinct form of intermediate scrutiny in the First Amendment context, described how to assess the constitutionality of laws that involved legislative "predictive judgments." 520 U. S., at 195–196. Even assuming that standard is relevant in this context, courts would still need to evaluate whether the legislature has "'drawn reasonable inferences based on substantial evidence.'" *Id.*, at 195. This is an analysis the District Court should have conducted for all the reasons explained in the text.

The majority's analysis looks nothing like the judicial check necessary under heightened scrutiny. For example, the majority says that the science "is not settled in [B. P. J.'s] direction at this time." *Ante*, at 24. For support, it cites a study published after oral argument in this case. *Ibid*. It should go without saying that that study is not in the record before the Court.[11] From here, the majority points to how various athletic organizations, like the National Collegiate Athletic Association and the United States Olympic & Paralympic Committee, have adopted policies consistent with West Virginia's ban. *Ante*, at 25. Yet the majority ignores that those two organizations did so after the President issued Executive Order No. 14201, which threatened to take away federal funding from any educational program that allowed transgender girls and women to participate on girls' and women's sports teams, as

[11] Earlier in its opinion, the majority recounts a legislative finding for Idaho's ban, which, it says, "found" that "the benefit 'that natural testosterone provides'" remains after transgender girls take "'puberty blockers and cross-sex hormones.'" See *ante*, at 7 (citing Idaho Code Ann. §33–6202(11) (2025)). That legislative finding cited a study "in support of this proposition" that "was later altered after peer review, and the conclusions the legislature [had] relied upon were removed." 479 F. Supp. 3d 930, 981, and n. 37 (Idaho 2020) (case below). Indeed, that study "did not involve transgender athletes at all." *Id.*, at 981. The majority also recounts other Idaho legislative findings, see *ante*, at 7, some of which cited conclusions from a different study to support the idea that transgender girls retain an advantage over cisgender girls, see §§33–6202(5), (10). That study's author later asked the Governor of Idaho to veto the law, explaining that the legislative findings had misrepresented her work. See 479 F. Supp. 3d, at 981. These are exactly the kinds of record-intensive issues that trial courts can and should consider in the first instance when applying heightened scrutiny; they also illustrate the risks posed by giving a legislature what is effectively conclusive deference when evaluating constitutional claims against the backdrop of scientific uncertainty.

defined by sex identified at birth. 90 Fed. Reg. 9279 (2025).[12] Whether these changes to their prior policies were driven by politics, science, or both is not something that the Court can resolve in the current posture of this case.

To be clear, B. P. J. ultimately may not be able to show that the science is sufficiently on her side; this dissent takes no position one way or another on B. P. J.'s odds of success. In other words, West Virginia might be right that transgender girls retain some inherent athletic advantage over cisgender girls due to their sex identified at birth even after receiving the hormonal therapy B. P. J. identifies. All agree, moreover, that States do have some room to legislate around issues when there exists significant, and genuine, scientific debate. At this point, however, neither the District Court nor the Fourth Circuit has passed upon any of the available evidence or made the necessary factual findings about the state of the scientific debate. Given the lack of factual development, it is the majority that should heed its own word and be "cautious about swooping in," *ante*, at 24, rather than resolving this kind of factual dispute in the first instance and in this slapdash manner. A restrained approach, based on all relevant facts, is particularly necessary when the Court is faced with a consequential decision of constitutional dimension.

---

[12] See NCAA Announces Transgender Student-Athlete Participation Change (Feb. 6, 2025), https://www.ncaa.org/news/2025/2/6/media-center-ncaa-announces-transgender-student-athlete-participation-policy-change.aspx (archived at https://perma.cc/G9BF-HQ4R?type=image) (explaining that the Board of Governors voted to change its policy "following the Trump administration's executive order"); S. Starcevic, Politico, U. S. Olympic Committee Bans Transgender Athletes After Trump Order (July 22, 2025), https://www.politico.com/news/2025/07/22/u-s-olympic-committee-transgender-00468845 (archived at https://perma.cc/QP2V-R9A7) (similar).

* * *

In sum, an outstanding factual dispute should have prevented the Court's resolution of B. P. J.'s claim. Far from being wholly irrelevant, that factual dispute is potentially outcome determinative. In concluding otherwise, the majority adopts the position that the Equal Protection Clause allows state actors to deploy sex classifications that impose significant burdens on subclasses within them, even when the State's interests are not furthered by their inclusion and even when those interests would not be jeopardized by exempting them. Attempting to minimize this outcome, as well as the sharp break between the Court's opinion today and its prior cases, the majority ends by contending that its "holding" is "straightforward." *Ante*, at 26. Its holding may be straightforward, but that is not the point. The problem is how the majority gets there: by moving the goalposts set by precedent and by resolving this important, divisive issue without knowing all the facts even though the validity of the means-ends fit depends on them.

The majority applies its diminished view of equal protection to the sports context today, relying on the parties' concessions that the State's asserted interests will be furthered in most applications, given the particularly close relationship between sex, sports, and those interests. One can only hope that the same misguided approach does not and will not extend to other contexts tomorrow, when any of these considerations are missing.[13]

---

[13] As the majority recognizes, respondent Lindsay Hecox also asserted an equal protection challenge, hers against a like ban enacted by Idaho. It errs by resolving rather than dismissing her case as moot. Hecox is a transgender college student nearing graduation. See Tr. of Oral Arg. in No. 24–38, pp. 118–119. The majority decides her equal protection challenge even though Hecox has sworn that she has stopped playing, and will never again play, any sport covered by the ban; even though Hecox agrees that the decision below in her favor should be vacated under

III

In addition to contending that the State's ban violates the Equal Protection Clause, B. P. J. argues that it also violates Title IX. I agree with the majority that it does not.

To start, as the majority observes, see *ante*, at 10, B. P. J. does not dispute that, for the purposes of this case, "sex" in Title IX means "biological sex," or sex identified at birth. See 20 U. S. C. §1681. Nor does she dispute that "sex" is used in the same way in the 1974 Javits Amendment, §844, 88 Stat. 612, and its accompanying regulations, which expressly authorize, but do not require, sex-separated sports

---

*United States* v. *Munsingwear, Inc.*, 340 U. S. 36, 39–40 (1950); even though Hecox could not change her mind, switch positions, and challenge the ban in the future, Brief for Respondent in 24–38, p. 17; and even though the same issues that are presented in her case are presented in B. P. J.'s case, which means the Court can decide them fully without her redundant participation. These circumstances make her case unlike *Erie* v. *Pap's A. M.*, 529 U. S. 277, 287–289 (2000) (case not moot when, despite ceasing operations, the respondent made no representations about its future intentions and "could again decide to operate" a similar business), and more like cases this Court has dismissed as moot, see *Deakins* v. *Monaghan*, 484 U. S. 193, 199–201 (1988) (relying on respondents' "state[ment] that they no longer seek [the relevant] relief in federal court" in concluding that "there no longer is a live controversy" as to that relief); see also, *e.g.*, *Acheson Hotels, LLC* v. *Laufer*, 601 U. S. 1, 5 (2023) (dismissing as moot based in part on respondent's dismissal of her suit and representation "that she w[ould] not file any others").

The majority nonetheless worries that dismissing *Hecox* as moot could risk "'insulat[ing] a decision from review'" and rewarding "post-certiorari" gamesmanship. *Ante*, at 14, n. 3. Yet no evasion of review was ever possible here because identical issues are pending before (and have now been resolved by) the Court. Indeed, despite reaching out to resolve both cases on the merits, see *ante*, at 14, n. 3, 29, nothing in the majority's analysis appears to depend on anything specific to Idaho's law or the record in *Hecox*. The majority thus accomplishes nothing by stretching the bounds of Article III to decide this moot case, other than needlessly and gratuitously prolonging the ordeal of "harassment" and "negative public scrutiny" that Hecox experienced litigating this case and has sought to escape by dropping it. App. to Suggestion of Mootness in No. 24–38, p. 2a.

teams, 34 CFR §106.41(b) (2025). Finally, she does not seriously dispute that those regulations are lawful. It follows from all this that, even though West Virginia's policy of separating sports teams by sex identified at birth draws a sex distinction, it is one that Title IX allows.[14]

In support of her claim, B. P. J. invokes this Court's decision in *Bostock* v. *Clayton County*, 590 U. S. 644 (2020). See *ante*, at 13. In *Bostock*, the Court construed Title VII and reached the simple but consequential conclusion that when a person's transgender status is a but-for cause of an employment decision, sex ineluctably is also a but-for cause of that decision. 590 U. S., at 662. It is "impossible," the Court explained, to draw a transgender-based distinction without also drawing a sex-based distinction. *Id*., at 660. Further, because Title VII prohibits sex-based discrimination in the workplace, *Bostock* held, it also prohibits transgender discrimination in that context. *Ibid.*

The majority is correct that *Bostock* does not require finding a Title IX violation in this specific context. See *ante*, at 13–14 (limiting discussion of this issue to "the sports context" and holding that *Bostock* is "not relevant" to that specific "statutory and factual context"). That is because drawing this distinction based on sex, in the form of creating sex-separated sports teams, is not unlawful under Title IX through the Javits Amendment and its accompanying regulations, given B. P. J.'s concessions. That does not mean, though, that *Bostock* has nothing to say about Title IX more broadly, nor do I understand the majority to say otherwise.

[14] The majority reaches this conclusion not by assuming that "sex" means "biological sex," or sex identified at birth, in Title IX, the Javits Amendment, and its accompanying regulations, but by saying that it does, at least in the sports context. *Ante*, at 10. There was no reason to go that far, however, given that B. P. J. loses on her concessions alone. The majority could, and should, have instead done what the Court did in *Bostock* v. *Clayton County*, 590 U. S. 644 (2020): "proceed on the assumption" that "'sex'" in Title IX "refer[s] only to biological distinctions between male and female." *Id*., at 655.

*Bostock*, again, rested on two separate inquiries: first, whether sex was a but-for cause of the challenged action; and second, whether the challenged action constitutes unlawful discrimination. *Bostock* answers only the first question. It does not answer the second. Merely because a sex distinction may be permissible does not mean that such a distinction is no longer based on sex.

The facts here illustrate the difference. B. P. J. was told that she cannot play on girls' teams because she was identified as male at birth. If her sex identified at birth had been female, however, B. P. J. would have been allowed to play on girls' teams. *Bostock* thus teaches that sex is a but-for cause of her exclusion. See 590 U. S., at 659–660 (concluding that a choice was made "because of sex" when "changing the employee's sex would have yielded a different choice by the employer"). From here, though, *Bostock* has nothing to say about whether this discrimination based on sex is unlawful. See *ante*, at 4 (GORSUCH, J., concurring) (articulating the same). On this point, B. P. J.'s claim fails because Title IX allows this sex distinction for the reasons explained.

Yet there are plenty of contexts outside of athletics in which Title IX applies and does not allow sex distinctions like this one to be drawn. Title IX does not allow schools, for example, to institute mandatory sex-segregated classes or extracurricular activities like chess club, theater, and student government. 34 CFR §106.34(b)(iii). Title IX also prohibits on-campus harassment, discrimination in admission and expulsion, and much, much more. See, *e.g.*, §§106.8, 106.21, 106.44, 106.45. I do not understand the majority to suggest, for instance, that schools could expressly bar transgender students from participating in certain classes or extracurricular activities entirely, or on the more extreme end, that schools could expel transgender students because they are transgender, and that those actions would not violate Title IX. Such actions would qualify

as sex discrimination under *Bostock*, and in those contexts, just like in the employment context for the purposes of Title VII, treating people differently because of their sex would be unlawful under Title IX.

IV

The majority's opinion ends by reciting the many wonderful ways in which playing sports can be valuable to young people. It can help build resilience, tenacity, leadership, and discipline. It can lead to life-long friendships, community, and a sense of belonging. It can bring joy and the thrill of victory, along with all the lessons one learns from experiencing defeat. The benefits are immense.

Because of the Court's decision today, West Virginia, and any other state actor, can deny B. P. J. and others like her these experiences simply because it thinks they have an inherent athletic advantage, even if the facts show that they do not. In the end, to the Court, the facts do not matter, even though the consequences are serious. The ban is absolute, so B. P. J. cannot practice on girls' teams, even if she would not take anyone's spot in an eventual competition, even if everyone who tries out for the team makes it, and even if having the chance to participate could aid immensely in treating B. P. J.'s gender dysphoria. Sports, of course, are often zero sum, but the law need not and should not be. Because the Court today errs by reducing the burden, at least in the sports context, that the Constitution places on state actors when classifying based on sex, I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

Nos. 24–43 and 24–38

WEST VIRGINIA, ET AL., PETITIONERS
24–43 *v.*
B. P. J., BY HER NEXT FRIEND AND MOTHER, HEATHER JACKSON

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

BRADLEY LITTLE, GOVERNOR OF IDAHO, ET AL., PETITIONERS
24–38 *v.*
LINDSAY HECOX, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 30, 2026]

JUSTICE JACKSON, concurring in the judgment in part and dissenting in part.

I join JUSTICE SOTOMAYOR's opinion in full. I write briefly to address B. P. J.'s Title IX claim. As JUSTICE SOTOMAYOR explains, the Court did not need to hold that Title IX protects against discrimination solely on the basis of "biological sex," even if only "in the sports context." See *ante*, at 10 (majority opinion); *ante*, at 31, n. 14 (SOTOMAYOR, J., concurring in judgment in part and dissenting in part). And it should not have. Instead, the Court should have assumed as much while leaving open the possibility that Title IX's definition of "sex" is more capacious.

As the majority notes, B. P. J. does not argue that "sex" in Title IX means anything but "biological sex," that is, sex assigned at birth. *Ante*, at 10. Accepting the concession for

purposes of this case, I agree with my colleagues that her Title IX claim fails. When B. P. J. is sorted onto a team by sex assigned at birth, she doubtless suffers discrimination on the basis of her sex assigned at birth. The same is true, however, of any other athlete sorted in the same manner, regardless of their gender identity. In the context of athletics, the Javits Amendment and resulting regulations instruct that this brand of sex discrimination is permissible: The sexes may generally be separated.

All this is true even though the holding of *Bostock* v. *Clayton County*, 590 U. S. 644 (2020), plainly applies to Title IX. Accord, *ante*, at 2–4 (GORSUCH, J., concurring); *ante*, at 31–33 (opinion of SOTOMAYOR, J.). Under *Bostock*'s reasoning, B. P. J. suffers discrimination on the basis of sex—yes, sex assigned at birth—when she is excluded from the girls' team because she was assigned male at birth (change her sex assigned at birth to female and her ability to play girls' sports changes too). But the same is true of a boy who was assigned male at birth. He too is excluded from the girls' team because he was assigned male at birth. All agree that the Javits Amendment and resulting regulations permit this type of (biological) sex discrimination.

But there is reason to doubt the soundness of the concession that Title IX's reference to "sex" means *only* sex assigned at birth. We have "constru[ed] 'discrimination' under Title IX broadly," *Jackson* v. *Birmingham Bd. of Ed.*, 544 U. S. 167, 174 (2005), to ensure that the statute protects against denial of "opportunities on the basis of gender," *Davis* v. *Monroe County Bd. of Ed.*, 526 U. S. 629, 650 (1999). Thus we have recognized that Congress's antidiscrimination statutes "intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." *Los Angeles Dept. of Water and Power* v. *Manhart*, 435 U. S. 702, 707, n. 13 (1978) (internal quotation marks omitted) (discussing Title VII). That is why, in the analogous Title VII context, "an employer who

acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender" and has therefore violated the statute. *Price Waterhouse* v. *Hopkins*, 490 U. S. 228, 250 (1989) (plurality opinion).

The prohibition against stereotyping is difficult to explain fully by reference to sex assigned at birth. A sex stereotype often will but need not have anything to do with an individual's sex assigned at birth. A transgender woman penalized for being perceived as aggressive has experienced discrimination "on the basis of sex" just as much as a cisgender woman has, no matter that the transgender woman's behavior matches expectations of her sex assigned at birth. Either way, the institution has imposed its gender-based expectations upon her. And either way, the institution may have violated Title IX.

In short, the majority is wrong to suggest that the term "sex" in Title IX "cannot plausibly be interpreted to refer to anything other than biological sex." *Ante*, at 10. Title IX makes room for individuals to live in the gender they choose; it cares not just about sex assigned at birth but also about individuals' ability to match (or not) their gender presentation to their gender identity. Because West Virginia's law forces B. P. J. to live—in this case, to play—as a boy though she is a girl, it might well run afoul of Title IX properly construed.